SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
    Randolph P. Sinnott, #107301
    rsinnott@spccław.com
550 S. Hope St., Suite 2350
Los Angeles, California 90071-2618
Tel.: (213) 996-4200; Fax: (213) 892-8322

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
    Stephen R. Wong, #186187
    swong@spccław.com
Two Embarcadero Center, Suite 1410
San Francisco, California 94111
Tel.: (415) 352-6200; Fax: (415) 352-6224

Attorneys for Defendants Aspen Specialty Insurance Company
and Aspen Specialty Insurance Solutions, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| AMERICRAFT CONSTRUCTORS, INC., dba AMERICAN CRAFTSMAN RESTORATION, a California corporation; and MICHAEL J. COSLEY, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>ASPEN SPECIALTY INSURANCE COMPANY, a business entity of unknown origin; ASPEN SPECIALTY INSURANCE MANAGEMENT CO., a business entity of unknown nature; ASPEN SPECIALTY INSURANCE SOLUTIONS LLC, a California Limited Liability Company; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 2:15-cv-01914<br><br>**ASPEN SPECIALTY INSURANCE COMPANY AND ASPEN SPECIALTY INSURANCE SOLUTIONS, LLC'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441 (DIVERSITY)** |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE THAT defendants Aspen Specialty Insurance Company ("ASIC") and Aspen Specialty Insurance Solutions, LLC ("ASIS") hereby remove to this Court the state court action described below.

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL. (213) 996-4200 • FAX (213) 892-8322

**NOTICE OF REMOVAL**

1.     On February 3, 2015, an action was commenced in the Superior Court of the State of California, in and for the County of Los Angeles, entitled *Americraft Constructors, Inc., et al. v. Aspen Specialty Insurance Company, et al.,* as Case No. BC571410.

2.     Plaintiffs Americraft Constructors, Inc. ("ACR") and Michael J. Cosley served the Summons and Complaint on ASIC and ASIS on February 13, 2015.  True and correct copies of the Complaint, Summons and all other attachments, pleadings and orders served on ASIC and ASIS are attached hereto as Exhibit A.

**JURISDICTION**

3.     This Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed by this Court pursuant to the provisions of 28 U.S.C. § 1441.

**BASIS OF DIVERSITY JURISDICTION**

4.     This is a civil action between residents of the State of California and a North Dakota corporation, wherein the matter in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.  Although the amount in controversy is not specifically alleged, ASIC is informed and believes that the matter in controversy exceeds the sum of $75,000 exclusive of interest and costs.  Plaintiff ACR seeks to recover defense and indemnity costs it incurred in the underlying claim.  (Ex. A, Complaint, ¶ 34.)  ACR alleges that ASIC's declination of coverage for the underlying claim forced it to retain its own counsel for its defense in the underlying claim, "which was litigated over several years wherein numerous court appearances were required, a day-long mediation . . . occurred, and numerous ancillary proceedings were held."  (Ex. A, Complaint, ¶ 19.)  The underlying claim concluded with an arbitration proceeding in which "seventeen parties were subpoenaed to testify and produce documents at arbitration resulting in thousands of pages of produced documents."  (Ex. A, Complaint, ¶ 20.)  The arbitration was conducted from December 16 - 20, 2013, and included expert witness testimony and "over 100 pages of arbitration briefs and point briefs."  (Ex. A, Complaint, ¶

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL. (213) 996-4200 • FAX (213) 892-8322

ASPEN SPECIALTY INS. CO. & ASPEN SPECIALTY INS. SOLUTION'S NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1441 (DIVERSITY)

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL. (213) 996-4200 • FAX (213) 892-8322

21.)  The arbitration resulted in an award of $8,583 in favor of the underlying claimant. (Ex. A, Complaint, ¶ 22.)   In addition to defense and indemnity costs incurred in the underlying claim, ACR seeks an award of punitive damages and attorneys' fees based on its ASIC's alleged bad faith in declining coverage for the underlying claim.  (Ex. A, Complaint, ¶ 29 & p. 18 (requesting attorneys' fees pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813).)[1]   The amount in controversy requirement for diversity jurisdiction is therefore satisfied.  *Engle v. Liberty Mut. Fire Ins. Co.*, 402 F. Supp. 2d 1157, 1160 (D. HI 2005) ("Although the Complaint did not state a specific damage amount, [removal was proper because] it clearly prayed for compensatory and punitive or treble damages, as well as attorney's fees."); *Cain v. Hartford Life & Acc. Ins. Co.*, 890 F. Supp. 2d 1246, 1250 (C.D. Cal. 2012) (insurance bad faith claim met jurisdictional minimum for diversity where plaintiff sought unspecified attorneys' fees for prosecution of action); *Campbell v. Hartford Life Ins. Co.*, 824 F. Supp. 2d 1005, 1008-09 (E.D. Cal. 2011) (insurance bad faith claim met jurisdictional minimum for diversity where plaintiff sought compensatory and punitive damages and attorneys' fees).

5.     Complete diversity of citizenship exists between the plaintiffs and defendants ASIC and Aspen Specialty Insurance Management Company ("ASIM"). Plaintiffs are both California residents.  (Ex. A, Complaint, ¶ 1.)  ASIC is a North Dakota corporation, with its principal place of business in New York, New York.  (Declaration of Sean Upton, ¶ 3.)   ASIM is a Massachusetts corporation with its principal place of business in New York, New York.  (Declaration of Sean Upton, ¶ 4.)

6.     In an apparent effort to defeat diversity jurisdiction, plaintiffs have fraudulently joined defendant Aspen Specialty Insurance Solutions LLC ("ASIS"), a California Limited Liability Company, on the purported grounds that ASIS is a fictitious business name for both ASIC and ASIM.  (Ex. A, Complaint, ¶ 2 ("both ASPEN

---

[1] Plaintiff Michael J. Cosley seeks to recover both compensatory and punitive damages for alleged emotional distress allegedly caused by ASIC's declination of a defense in the underlying claim.  (Ex. A, Complaint, ¶¶ 44-50.)

ASPEN SPECIALTY INS. CO. & ASPEN SPECIALTY INS. SOLUTION'S NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1441 (DIVERSITY)

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL (213) 996-4200 • FAX (213) 892-8322

SPECIALTY INSURANCE COMPANY and ASPEN SPECIALTY INSURANCE MANAGEMENT CO. are doing business in the State of California as ASPEN SPECIALTY INSURANCE SOLUTIONS LLC").)[2]  If, as plaintiffs allege, ASIS is a fictitious business name for ASIC and ASIM, ASIS would not be a California resident since both ASIC and ASIM are corporations incorporated outside of California and principally based outside of California.  *Providence Washington Ins. Co. v. Valley Forge Ins. Co.*, 42 Cal. App. 4th 1194, 1200  (1996) ("'Doing business under another name does not create an entity distinct from the person operating the business.' [Citation.]  The business name is a fiction, and so too is any implication that the business is a legal entity separate from its owner.").  Thus, assuming plaintiffs' allegations are true, ASIS is not a California resident for purposes of determining diversity.  Further, the insurance policy upon which plaintiffs' claims are based was issued by ASIC, not by ASIS.  (Ex. A, Complaint, Ex. A.)  Similarly, the denials of coverage which give rise to this claim were made by ASIC only.  (Ex. A, Complaint, Exs. E, G & I (declinations made by ASIC's coverage counsel).)  ASIS has had no involvement in either the issuance of the insurance policy or the handling of any claims made under this policy (including the claim at issue), and plaintiffs make no allegations in the Complaint specifically against ASIS. (Declaration of Sean Upton,  ¶ 5; Ex. A, Complaint, ¶¶ 1-50.)  Accordingly, ASIS should not be considered for purposes of determining diversity.  *United Computer Sys., Inc. v. AT&T Corp.*, 298 F.3d 756, 761-62 (9th Cir. 2002) (defendant who was not a party to the contract giving rise to plaintiff's claims was fraudulently joined, and her citizenship was not relevant for purposes of determining diversity).

7.     ASIM has not been served with the Summons and Complaint, and ASIM therefore has not joined this notice of removal.

8.     Removal to the Central District Court, Western Division is proper because

---

[2] "The designation of 'DBA' or 'doing business as' simply indicates [that a company] operates under a fictitious business name." *Pinkerton's, Inc. v. Superior Court*, 49 Cal. App. 4th 1342, 1348  (1996).

ASPEN SPECIALTY INS. CO. & ASPEN SPECIALTY INS. SOLUTION'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441 (DIVERSITY)

1   the state court action was filed in Los Angeles County, which is within the Central District,

2   Western Division.  Notice of this removal was filed contemporaneously in the Los Angeles

3   County Superior Court to which this matter was assigned.  A copy (without exhibit) of said

4   Notice of Removal sent to the Clerk of the Los Angeles County Superior Court and proof

5   of service on plaintiffs' counsel of record is attached hereto as Exhibit B.

6

7   DATED:  March 16, 2015              SINNOTT, PUEBLA,
                                        CAMPAGNE & CURET, APLC
8

9

10                                     By:  _____/s/ Stephen R. Wong_____
                                            STEPHEN R. WONG
11                                          Attorneys for Aspen Specialty Insurance
                                            Company and Aspen Specialty Insurance
12                                          Solutions, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ASPEN SPECIALTY INS. CO. & ASPEN SPECIALTY INS. SOLUTION'S NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1441 (DIVERSITY)

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL. (213) 996-4200 • FAX (213) 892-8322

# Exhibit A



1  SHAPERO, SHAPERO & HURST
   A Partnership of Professional Corporations
2  E. RICH HURST - Bar No. 176614
   STEVEN J. SHAPERO - Bar No. 90282
3  5950 Canoga Ave., Suite 404
   Woodland Hills, California 91367-5060
4  Telephone: (818) 710-1200
   Facsimile: (818) 710-1447
5
   Attorneys for Plaintiff,
6  Americraft Constructors, Inc.,
   dba American Craftsman Restoration
7

**FILED**
Superior Court Of California
County Of Los Angeles

FEB 03 2015

Sherri R. _____ Executive Officer/Clerk

By _____, Deputy
Judi Lara

A6015
91358

DEPT. 55

MALCOLM
MACKEY

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      FOR THE COUNTY OF LOS ANGELES

10

11  AMERICRAFT CONSTRUCTORS, INC.,          Case No.: **BC 571410**
    dba AMERICAN CRAFTSMAN
12                                          COMPLAINT AND DEMAND FOR JURY
13  RESTORATION, a California corporation;  TRIAL
    MICHAEL J. COSLEY, an individual,
14                                          1.  Tortious Breach of Duty of Good
                                                Faith and Fair Dealing;
15                                          2.  Breach of Contract for Insurance;
              Plaintiffs,                   3.  Unfair Business Practices [Business
16       vs.                                    and Professions Code section 17200];
17                                          4.  Negligent Infliction of Emotional
    ASPEN SPECIALTY INSURANCE                   Distress;
18  COMPANY, a business entity of unknown   5.  Intentional Infliction of Emotional
    origin; ASPEN SPECIALTY INSURANCE           Distress
19  MANAGEMENT CO., a business entity of
    unknown nature; ASPEN SPECIALTY
20  INSURANCE SOLUTIONS LLC, a
    California Limited Liability Company; and
21  DOES 1 through 100, inclusive,
22
23
24            Defendants.
25
26  Plaintiff, AMERICRAFT CONSTRUCTORS, INC. dba AMERICAN CRAFTSMAN
27  RESTORATION, alleges as follows:
28

                                    -1-
                                 Complaint

THE PARTIES

1.     Plaintiff, AMERICRAFT CONSTRUCTORS, INC. dba AMERICAN CRAFTSMAN RESTORATION ("ACR") is a corporation duly organized and existing under the laws of the State of California, with its principal place of business in the City of Santa Clarita, County of Los Angeles, State of California.  Plaintiff, Michael J. Cosley ("Cosley"), is a principal and officer of ACR and a resident of the City of Santa Clarita, County of Los Angeles.

2.     Defendant, ASPEN SPECIALTY INSURANCE COMPANY, is a business entity whose nature is presently unknown to Plaintiff.  Plaintiff is informed and believes, and based thereon alleges, that, at all times relevant herein, Defendant Aspen's principal place of business was at 14500 North Northsight Blvd., Suite 208, Scottsdale, AZ 85260. Plaintiff is informed and believes, and based thereon alleges, that, at all times relevant hereto, Defendant Aspen Specialty Insurance Company did business under the name ASPEN SPECIALTY INSURANCE MANAGEMENT CO., a business entity of unknown nature.  Plaintiff is further informed and believes, and based thereon alleges, that both ASPEN SPECIALTY INSURANCE COMPANY and ASPEN SPECIALTY INSURANCE MANAGEMENT CO. are doing business in the State of California as ASPEN SPECIALTY INSURANCE SOLUTIONS LLC, a California Limited Liability Company. (Defendants, ASPEN SPECIALTY INSURANCE COMPANY, ASPEN SPECIALTY INSURANCE MANAGEMENT CO. and ASPEN SPECIALTY INSURANCE SOLUTIONS LLC are collectively referred to herein as "Aspen.")

3.     The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 100, inclusive, are unknown to Plaintiff, who therefore sues those Defendants by such fictitious names.  Plaintiff is informed and believes and on such information and belief alleges that each of the Defendants sued herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and Plaintiff will ask leave of this Court to amend this complaint to insert their true names and capacities in place and instead of fictitious names when the same become known to Plaintiff.

-2-

Complaint

1    4.    At all relevant times, Defendants, and each of them, were the agents and

2  employees of each of the remaining Defendants, and were at all times acting within the purpose

3  and scope of said agency and employment, and each Defendant has ratified and approved the

4  acts of its agents.

5

6                              THE ASPEN INSURANCE POLICY

7

8    5.    Aspen issued its Commercial General Liability Policy, Policy No. ERA5KCM10,

9  to ACR which was effective during the policy period from June 7, 2010 to June 7, 2011. The

10  policy included the following classifications:  Environmental Restoration Contractor,

11  Contractors Pollution Liability and Environmental Impairment Pollution Legal Liability.  ACR

12  paid all premiums required to keep the policy in full force and effect.  A true and correct copy of

13  the Policy is attached hereto, marked Exhibit "A", and incorporated herein by this reference as if

14  set forth in full.  The policy provided, *inter alia:*

15      " 1.  Insuring Agreement

16          a.  Insuring Agreement – Contractors Pollution Legal Liability (Occurrence

17              Coverage)

18              We will pay those sums that you become legally obligated to pay as <u>Loss</u> as a

19              result of <u>Claims Arising from Pollution Conditions</u> caused by <u>Contracting</u>

20              <u>Activities</u> during the <u>Policy Period.</u>

21

22  Claim is defined, at page 9, paragraph 3, as follows:

23          "<u>Claim</u> or <u>Claims</u> means any written or oral demand, notice, request for indemnity

24          or other legal or equitable proceedings asserted against the <u>Insured</u>, or the filing of

25          any suit or arbitration demand, by a person, entity, or asserted class for <u>Loss</u>,

26          including the service of suit or institution of arbitration or mediation proceedings,

27          arising out of <u>Pollution Conditions</u> or <u>Mold</u> from <u>Contracting Activities</u> to which

28          this insurance applies.  Any <u>Loss</u> should be deemed to occur at the time the

-3-
Complaint

1  damage first started to occur relating to the insured's <u>Contracting Activities</u>, even

2  if such damage continues or progresses."

3

4  Contracting Activities is defined, at page 9, paragraph 7, as follows:

5      "<u>Contracting Activities</u> means those activities or operations conducted by you or

6      on your behalf, or as otherwise disclosed to us as of the Inception of this Policy.

7      <u>Contracting Activities</u> include <u>Completed Operations</u>."

8

9  Loss is defined, at page 9, paragraph 11, as follows:

10     "<u>Loss</u> means <u>Bodily Injury</u>, <u>Property Damage</u>, <u>Clean-up Cost</u>, <u>Mold Clean-up</u>

11     <u>Cost</u> and <u>Claims Expenses</u>."

12

13              FACTUAL BACKGROUND OF THE *OVERHOLT* ACTION

14

15     6.     The *Overholt* Action involved an emergency dry-out performed on August 12-14,

16  2008, by ACR at the home of William Overholt, located at 16619 Calle Haleigh, Pacific

17  Palisades, CA  90272 (the "Property").  ACR was called to perform dry-out services at

18  Overholt's property after Overholt discovered a leak in connection with a heating and air

19  conditioning unit ("HVAC") located in the ground level closet at the Property.  At the time ACR

20  performed its work, the air conditioning unit had been removed and Mr. Overholt represented

21  the leak had been repaired. Mr. Overholt also represented the leak had occurred within (72)

22  hours of ACR's appearance on the scene, which meant that significant mold growth was not a

23  concern, since it takes mold 72 hours to grow after exposed to a water source.

24

25     7.  Overholt signed ACR's standard Emergency Work Authorization ("EWA") form

26  which defined the scope of the work performed by ACR to be limited to dry-out of the leak

27  caused by the defective air conditioning unit.  The EWA specifically disclaimed any work for

28  mold remediation, as follows:

-4-

Complaint

"PRE-EXISTING MICROBIAL CONTAMINATION: Owner/Agent acknowledges and agrees that ACR will not be held liable nor will owner seek to hold ACR liable for visible and/or unseen mold that may exist at the premises. Owner/Agent acknowledges that ACR is not retained to perform mold remediation or investigation. Owner/Agent acknowledges that any mold issues must be addressed directly with the insurance company or a certified environmental testing company."

8.  ACR performed the work called for in the EWA for a sum less than $3,000.  At the conclusion of ACR's services, on August 14, 2008, ACR's technician found the moisture level in the areas surrounding the HVAC closet to be within acceptable standards and Claimant signed a certificate of satisfaction stating that Claimant was satisfied with the dry-out services performed by ACR.

9.  Cosley and his partner, Tom Geoffroy, were called out to the Property on November 4, 2008, to perform an inspection after Overholt contacted ACR to advise that mold had been detected at the Property.   When they arrived, Cosley was shown what appeared to be a small amount of mold on a tack strip and on the outside of the air conditioning platform.  No other areas of visible mold were demonstrated to ACR. Cosley did note the presence of an air intake vent in the ceiling of the upstairs hallway adjacent to the area of visible water damage that was not part of ACR's work in August, 2008.  This is significant as the air intake vent could have acted as a distribution system for mold spores emanating from the area of leaks in the attic. After the inspection, as a customer service accommodation, and to avoid a dispute, ACR offered to perform cleaning at the Overholt property at no charge.  However, Overholt never gave ACR an opportunity to perform any cleaning.  No further contact was made until ACR received a lawsuit from Overholt almost three years later, in May of 2011.

10. On May 5, 2011, ACR received a letter from Overholt's counsel, advising it, <u>for the first time</u>, that Overholt was making a claim for damages arising out of the work performed by ACR at the Overholt residence in October, 2008. A true and correct copy of this correspondence is attached hereto, marked Exhibit "B," and incorporated herein by this reference. In the May 5th letter, Overholt contended that he had a telephone conversation, in October, 2008, wherein Thomas Geoffroy, co-owner of ACR, purportedly admitted that ACR's work had been performed improperly and not to ACR's standards, that its technician was not competent to perform the work and that Overholt would be financially compensated. ACR has denied that any such statements were made. The letter concludes with the statement: "<u>At this time</u> we request that American Craftsman make good on its promise to provide compensation to Mr. Overholt to cover his financial losses due to the negligently performed restoration and mold prevention/remediation work." Again, after learning that mold was discovered at the Property in October, 2008, ACR offered to perform cleaning as a customer service accommodation only. Overholt never requested that ACR perform any cleaning and never, prior to May 5, 2011, made any demands for compensation. ACR never offered to pay Overholt compensation for any purported loss.

11. On May 9, 2011, Overholt filed a lawsuit, styled *William Overholt v. Americraft Constructors, Inc. d/b/a American Craftsman, a California corporation, and DOES 1 to 10 inclusive*, Los Angeles Superior Court, case number SC112542 (the "*Overholt* Action"), alleging that he lost a sale of the property in October 2008 due to the discovery of mold in air samples taken at two locations at the property, as described in a mold report obtained by the buyers. However, the buyers' mold report described at least two other sources of water intrusion, a skylight and a leaking kitchen sink, which could have been the source of the mold. ACR was never hired to investigate or repair these other leaks. Further, there was no indication that those additional sources were ever investigated as possible sources of mold contamination at the Property. A true and correct copy of the complaint is attached hereto, marked Exhibit "C," and incorporated herein by this reference.

-6-

Complaint

12. In the complaint, Overholt repeatedly asserted that buyers cancelled their purchase of the property due to a finding of mold. However, the cancellation of escrow provided by the buyers did not mention anything having to do with mold at the property but simply referred to the broad inspection contingency found at paragraph 14 of the purchase contract. The inspection contingency allows the Buyer a "free out" of the escrow without having to specify a reason. This could have been for any of a number of reasons, the finding of mold, the concealment of mold by Overholt or the collapse of the economy in the Fall of 2008.

13. Overholt sought damages in the *Overholt* Action for the purported lost sale of his residence which occurred in November, 2008. However, the damages Overholt sought were not realized by him until March of 2009, at the earliest, when Overholt sold the property for less than the purchase price of the first transaction. In other words, by Overholt's version of the facts, which ACR disputed, he did not realize any damages until March of 2009, at the earliest. However, again, Overholt did not advise ACR of said damages, or make any claim against ACR, until May 5, 2011 (See Exhibit "B," May 5, 2011 letter to ACR).

ASPEN'S FAILURE TO INVESTIGATE THE *OVERHOLT* ACTION

14. Shortly after receiving the complaint in the *Overholt* Action, ACR promptly tendered the complaint to Aspen to provide a defense. Aspen acknowledged receipt of the complaint on May 27, 2011, noting the date of the claim was May 26, 2011. A true and correct copy of Aspen's letter is attached hereto, marked Exhibit "D," and incorporated herein by this reference.

15. On June 16, 2011, Aspen, by and through its coverage counsel, Clausen Miller, by Kathleen Bailey, transmitted correspondence to ACR, consisting of nineteen pages, wherein it advised ACR that "there is no potential for coverage for the claims asserted in the subject action under the subject policies, and therefore, Aspen has no duty to defend or indemnify American Craftsman." A true and correct copy of the correspondence is attached hereto, marked Exhibit "E," and incorporated herein by this reference. In her letter, Ms. Bailey concludes, *inter alia*,

-7-

that "Plaintiff's 'claim' against American Craftsman was first made on or about November 4-5, 2008, when Mr. Overholt advised you that his house had failed a mold inspection due to American Craftsman's failure to remove the pedestal underneath the air conditioner and sought financial compensation from American Craftsman for all financial damages caused thereby." Ms. Bailey purportedly relied on Exhibit "B," (the May 5, 2011, letter from Overholt's counsel to ACR) as the source of her "fact" that Overholt had demanded compensation from ACR in November, 2008. However, nowhere in Exhibit "B" does Overholt claim he sought compensation from ACR in November, 2008. He did not seek compensation until May 5, 2011.

16. On July 1, 2011, ACR, through its counsel, responded to Aspen's June 16th denial. ACR advised Aspen that it had failed to conduct any investigation of the facts but instead simply accepted the contentions made in Exhibit "B" (the May 5, 2011, letter from Overholt's counsel). In addition, ACR advised Aspen as follows with respect to Aspen's reliance on the policy definition of "claim," as described in paragraph 5 herein:

"Your "analysis" with respect to Coverage D – Pollution Legal Liability is misguided. Although you set forth the policy definition of "claim" as "any written or oral demand, notice, request for indemnity or other legal or equitable proceedings" nowhere do you cite to any "facts" that support your contention that such a claim was "first made on or about November 4-5, 2008, when Mr. Overholt advised you that his house had failed a mold inspection due to American Craftsman's failure to remove the pedestal underneath the air conditioner and sought financial compensation from American Craftsman for all financial damages caused thereby." You acknowledge in your "Statement of Facts" that you rely entirely on only two sources for the "facts" which you contend support the denial of a defense: the May 5, 2011 letter from Daniel Berberich, counsel for the Plaintiff, and the complaint filed by Mr. Overholt. However, nowhere in the letter or the complaint does it state that "Mr. Overholt sought financial compensation" during the November 2008 timeframe. You apparently simply made that up. The closest the letter or complaint comes to such a conclusion is the unsubstantiated statement (unverified by you) by Mr. Berberich at the end of page one of his letter that "At the end of the discussion [Mr. Geoffroy] promised Mr. Overholt that he would be financially compensated for this unfortunate situation." Even if this statement were true, it would not constitute a "written or oral demand, notice, request for indemnity or other legal or equitable proceedings" arising to a "claim."
Moreover, I would direct you to Mr. Berberich's letter at page two where he states: "At this time we request that American Craftsman make good on its

promise to provide compensation to Mr. Overholt to cover his financial losses due to the negligently performed restoration and mold prevention/remediation work." This request confirms that a claim had not been made during the November 2008 timeframe, as you contend."

ACR requested that Aspen reconsider its denial of a defense in the Overholt matter. A true and correct copy of the correspondence is attached hereto, marked Exhibit "F," and incorporated herein by this reference.

17.   Instead of investigating the points raised in Exhibit "F," and reconsidering its denial, Aspen sent further correspondence, dated July 27, 2011, this time authored by Alec Barinholtz of Clausen Miller.  After referencing the definition of "claim" set forth in the policy (see paragraph 5, above), Barinholtz ignored said definition, and ignored the "facts" upon which Aspen was basing its denial, consisting entirely of the complaint and the May 5, 2011, letter from Overholt's counsel (Exhibit "B") stating:  "(I)n November 2008, American Craftsman was placed on notice that toxic mold was emanating from the pedestal underneath an air conditioning unit that American Craftsman cleaned, but did not remove.  At that time, American Craftsman allegedly acknowledged the inadequacy of its work, and offered to financially compensate Mr. Overholt.  The foregoing fits comfortably within the subject policies' definition of 'Claim.'"  A true and correct copy of the correspondence is attached hereto, marked Exhibit "G," and incorporated herein by this reference.  Thus, Aspen, in addition to relying on disputed facts which it had taken no steps to investigate, ignored that fact that Overholt, prior to May 5, 2011, had not made any demand for compensation.

18.  On December 1, 2011, Overholt's counsel, Daniel Berberich of Kaye Rose & Partners, transmitted correspondence to ACR's counsel wherein, *inter alia*, Overholt demanded the sum of $189,000 to settle the *Overholt* Action.  This letter was transmitted to Barinholtz by ACR's counsel, Steven Murray, by letter dated December 2, 2011.  True and correct copies of both letters are attached hereto, collectively marked Exhibit "H," and incorporated herein by this reference.  Barinholtz responded, on December 14, 2011, and refused, on behalf of Aspen, to

-9-

Complaint

1  take any action to defend or protect ACR. A true and correct copy of the correspondence is

2  attached hereto, marked Exhibit "I," and incorporated herein by this reference.

4  THE LITIGATION AND ARBITRATION OF THE *OVERHOLT* ACTION

6  19.  As a result of Aspen's wrongful denial of a defense in the *Overholt* action, ACR was

7  forced to retain counsel in an effort to protect itself. The *Overholt* Action was litigated over

8  several years wherein numerous court appearances were required, a day-long mediation with

9  Hon. Patricia L. Collins, a retired Judge of the Los Angeles Superior Court, occurred, and

10  numerous ancillary proceedings were held.  Throughout the litigation of the *Overholt* Action,

11  Overholt continued to demand hundreds of thousands of dollars from ACR.  On the other hand,

12  ACR maintained it had done nothing wrong.

14  20.  Prior to arbitration, seventeen parties were subpoenaed to testify and produce

15  documents at arbitration resulting in thousands of pages of produced documents.  Among the

16  documents produced were documents confirming that another party, Palisades Heating & Air

17  Conditioning, had performed repairs to the pedestal underneath the air conditioner, not ACR as

18  Aspen had contended in support of its denial of a defense in the *Overholt* Action.

20  21. The *Overholt* Action proceeded to Arbitration on December 16 – 20, 2013, pursuant

21  to a contractual agreement to arbitrate contained in the EWA, before Paul D. Loreto of the

22  Business Consumer Alliance ("BCA"), the successor to the Better Business Bureau Arbitration

23  Division in Southern California.  The arbitration entailed, in addition to testimony of live

24  witnesses, including expert witnesses, the introduction of approximately 70 exhibits, and over

25  100 pages of arbitration briefs and point briefs. Overholt sought the sum of $220,000 in

26  damages (reduced to approximately $200,000 at arbitration).

22. The BCA, by Mr. Loreto, the Arbitrator, rendered its twelve page decision on

February 12, 2014, awarding Overholt the sum of $8,583.00.  A true and correct copy of the

1  Arbitrator's decision is attached hereto, marked Exhibit "J," and incorporated herein by this

2  reference.

3

4  <div align="center">**FIRST CAUSE OF ACTION**</div>

5  <div align="center">**(Tortious Breach of the Duty of Good Faith and Fair Dealing, Against All Defendants and DOES 1 through 50)**</div>

6

7      23.    Plaintiffs refer to each and every one of the above paragraphs, and incorporates

8  those paragraphs as through set forth in full in this cause of action.

9

10      24.    Defendant Aspen issued the Policy to ACR.  The Policy was entered into by ACR

11  and required the provision of a defense and indemnification for the allegations made in the

12  *Overholt* Action.

13

14      25.    Defendants, and each of them, have breached their duty of good faith and fair

15  dealing owed to the Plaintiffs under the Policy, by the following:

16

17          (a)    Unreasonably delaying benefits under the Policy to ACR in bad faith, at a

18                  time when Defendants knew that the Plaintiff was entitled to such benefits

19                  under the terms of the Policy;

20          (b)    Unreasonably denying ACR's tender of a defense in the *Overholt* Action

21                  knowing that ACR's tender of a defense under the Policy to be valid;

22          (c)    Failing to effectuate, in good faith, a prompt, fair, and equitable settlement

23                  of the claims asserted in the *Overholt* Action;

24          (d)    Unreasonably and in bad faith implementing a defective coverage review

25                  process, including the failure to investigate the claims made in the *Overholt*

26                  Action;

27          (e)    Unreasonably and in bad faith delaying to ACR the benefits it was

28                  promised under the Policy;

(f)    Unreasonably and in bad faith failing to promptly provide a reasonable and consistent explanation of the basis relied upon the Policy, in relation to the applicable facts, for failing to accept ACR's tender of a defense;

(g)    Giving bad and inaccurate advice and information, thereby exposing ACR to unnecessary risks and issues; and

(h)    Failing and refusing to give at least as much consideration to ACR's welfare in the investigation of its requests as it gave to its own interests.

26.    Plaintiffs are informed and believe and thereon allege that Defendants have breached their duty of good faith and fair dealing owed to Plaintiffs by other acts or omissions of which Plaintiffs are presently unaware and which will be shown according to proof at the time of trial.

27.    As a proximate result of the aforementioned unreasonable and bad faith conduct of Defendants, and each of them, Plaintiffs have suffered, and will continue to suffer in the future, economic and other consequential damages, including emotional distress and health damages, for a total amount to be shown at the time of trial.

28.    As a further proximate result of the unreasonable and bad faith conduct of Defendants, and each of them, Plaintiffs were compelled to retain legal counsel to obtain the benefits due under the Policy.   Therefore, Defendants, and each of them, are liable to the Plaintiffs for those attorneys' fees, witness fees and costs of litigation reasonably necessary and incurred by Plaintiffs in order to obtain the benefits under the Policy, in a sum to be determined at the time of trial.

29.    Defendants' conduct described herein was intended by the Defendants to cause injury to the Plaintiff or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of the Plaintiffs or subjected the Plaintiffs to cruel and unjust hardship in conscious disregard of the Plaintiffs' rights, or was an intentional misrepresentation,

1  deceit or concealment of a material fact known to the Defendants with the intention to deprive

2  the Plaintiffs of the Property, legal rights or to otherwise cause injury, such as to constitute

3  malice, oppression or fraud under California Civil Code § 3294, thereby entitling Plaintiffs to

4  punitive and exemplary damages in an amount appropriate to punish or set an example of

5  Defendants.

6

7      30.   Defendants' conduct described herein was undertaken by the corporate

8  Defendants' officers or managing agents, identified herein as DOES 1 through 50, who were

9  responsible for claims supervision and operations, underwriting, communications and/or

10 decisions.  The aforementioned conduct of said managing agents and individuals was therefore

11 undertaken on behalf of the corporate Defendant.  Said corporate Defendant further had advance

12 knowledge of the actions and conduct of said individuals whose actions and conduct were

13 ratified, authorized and approved by managing agents whose precise identities are unknown to

14 Plaintiff at this time and are therefore identified and designated herein as DOES 1 through 50,

15 inclusive.

16

17                    **SECOND CAUSE OF ACTION**
18      **(Breach of Written Contract, Against All Defendants, and DOES 1 through 50)**

19     31.   Plaintiffs refer to each and every one of the above paragraphs, and incorporates

20 those paragraphs as though set forth in full in this cause of action.

21

22     32.   Defendant Aspen issued the Policy to ACR. The Policy was entered into by ACR

23 and required the payments of benefits within the jurisdiction of the above-entitled court for a

24 total amount to be shown at the time of trial.

25

26     33.   Defendants contracted, in writing, with ACR and agreed to provide services,

27 including benefits determinations, directly to persons and entities insured by them, which

28 services were the obligation of Defendants under the Policy.

34.     Defendants, and each of them, breached the terms and provisions of this contract to provide coverage for defense and indemnification in the *Overholt* Action, by unreasonably delaying and failing to provide benefits to which the Plaintiffs were entitled under the Policy.

35.     As a direct and proximate result of Defendants' conduct and breach of their contractual obligations, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be determined according to proof at the time of trial, plus interest and other foreseeable and incidental damages according to proof, and in amount to be determined at time of trial.

<div align="center">

**THIRD CAUSE OF ACTION**
**(Injunctive and Restitutionary Relief Under California Business**
**and Professions Code Sections 17200, et seq., Against All Defendants,**
**and DOES 1 through 50)**

</div>

36.     Plaintiffs refer to each and every one of the above paragraphs, and incorporates those paragraphs as though set forth in full in this action.

37.     California Business and Professions Code § 17200 et seq. precludes a person or entity from engaging in unfair competition, defined as business practices which are unlawful, unfair or fraudulent.  Section 17203 permits the court in an action based on allegations of unfair competition to issue injunctive, restitutionary or other equitable relief.

38.     California Business and Professions Code § 17204 permits individuals, such as the Plaintiffs, to institute an action on behalf of the general public to obtain injunctive and/or restitutive relief against persons and entities which engage in unfair business practices and/or unfair competition.

<div align="center">

-14-
Complaint

</div>

39.    Defendants, and each of them, have committed acts of unfair competition as defined by California Business and Professions Code § 17200 et seq. by engaging in the following acts:

(a)    Unreasonably delaying benefits under the Policy to ACR in bad faith, at a time when Defendants knew that the Plaintiff was entitled to such benefits under the terms of the Policy;

(b)    Unreasonably denying ACR's tender of a defense in the Overholt Action knowing that ACR's tender of a defense under the Policy to be valid;

(c)    Failing to effectuate, in good faith, a prompt, fair, and equitable settlement of the claims asserted in the Overholt Action;

(d)    Unreasonably and in bad faith implementing a defective coverage review process, including the failure to investigate the claims made in the *Overholt* Action;

(e)    Unreasonably and in bad faith delaying to ACR the benefits it was promised under the Policy;

(f)    Unreasonably and in bad faith failing to promptly provide a reasonable and consistent explanation of the basis relied upon in the Policy, in relation to the applicable facts, for failing to accept ACR's tender of a defense;

(g)    Giving bad and inaccurate advice and information, thereby exposing ACR to unnecessary risks and issues; and

(h)    Failing and refusing to give at least as much consideration to the ACR's welfare in the investigation of its requests as it gave to its own interests.

40.    Plaintiffs are informed and believe and on that basis allege that the unlawful practices alleged above are continuing in nature and are widespread practices engaged in by Defendants, and each of them.

-15-

Complaint

41.     On behalf of the general public, the Plaintiffs request that an injunction against Defendants, and each of them, issue to enjoin them from continuing to engage in the unlawful conduct alleged herein.

42.     On behalf of the general public, the Plaintiffs request that the court order any other and further equitable relief deemed necessary by the court including without limitation, an order or judgment restoring to every person in interest money or the Property which may have been acquired by Defendants by means of such unfair competition and/or an order for restitutionary relief requiring Defendants, and each of them, to disgorge the profits illegally made by them as a result of such unfair competition.

43.     Plaintiffs request an award of attorneys' fees upon prevailing in the request for injunctive, equitable and/or restitutionary relief pursuant to Code of Civil Procedure § 1021.5 and Business and Professions Code § 17203.

## FOURTH CAUSE OF ACTION
### (For Negligent Infliction of Emotional Distress By Cosley Against All Defendants)

44.     Plaintiffs refer to each and every one of the above paragraphs, and incorporate those paragraphs as though set forth in full in this cause of action.

45.     Defendants knew, or should have known, that their conduct as set forth hereinabove would cause Plaintiff Cosley to incur severe emotional distress.

46.     As a direct and proximate result of the acts or failures to act on the part of Defendants, and each of them, Plaintiff Cosley sustained severe emotional distress and mental suffering, all to his damage in a sum according to proof.

## FIFTH CAUSE OF ACTION
### (For Intentional Infliction of Emotional Distress
### By Cosley Against All Defendants)

47.     Plaintiffs refer to each and every one of the above paragraphs, and incorporate those paragraphs as though set forth in full in this cause of action.

48.     Defendants, and each of them, intentionally misrepresented or intentionally failed to disclose and suppressed from Plaintiffs the above-referred to facts and circumstances concerning the defense of the *Overholt* Action and Defendants' true intentions with respect to the *Overholt* Action.

49.     Upon Plaintiff Cosley's learning that Defendants were wrongfully refusing to provide a defense of the *Overholt* Action, and continuing up through trial therein, and thereafter, Plaintiff sustained severe emotional distress and mental suffering all to his damage in a sum according to proof.

50.     The aforementioned acts of Defendants, and each of them, were willful, malicious and oppressive entitling Plaintiffs to exemplary or punitive damages according to proof.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.     Damages for failure to provide coverage under the Policy, plus interest at the maximum legal rate, including pre-judgment interest, and other economic and consequential damages, in an amount to be determined at the time of trial;

2.     General and compensatory damages including damages for mental and emotional distress for Plaintiff in a sum to be determined at time of trial;

-17-

Complaint

3.      General damages for personal injury for Plaintiff in a sum to be determined at the time of trial;

4.      For attorneys' fees, witness fees and costs of litigation incurred by Plaintiff to obtain coverage under the Policy in an amount to be determined at the time of trial and/or for attorneys' fees pursuant to Code of Civil Procedure § 1021.5 and Business and Professions Code § 172303;

5.      For interest provided by law;

6.      Punitive and exemplary damages in an amount appropriate to punish or set an example of Defendants, and each of them;

7.      For an injunction against Defendants, and each of them, to enjoin them from continuing to engage in the unfair business practices alleged herein;

8.      For an order requiring Defendants, and each of them, to disgorge the profits they have wrongfully obtained through the use of these practices;

9.      For attorney's fees pursuant to the California Supreme Court authority of *Brandt v. Superior Court (Standard Ins. Co.)* (1985) 37 Cal.3d 813;

10.     For costs of suit incurred herein; and

11.     For such other and further relief as the court deems just and proper.

SHAPERO, SHAPERO & HURST

By: _____
Steven J. Shapero
Attorneys for Plaintiffs

-18-
Complaint

**EXHIBIT A**

ASPEN SPECIALTY INSURANCE COMPANY
POLICY NUMBER:ERA5KCM10
RENEWAL OF: ERA5KCM09



A S P E N

ASPEN SPECIALTY

## COMMON POLICY DECLARATIONS

| ASPEN SPECIALTY INSURANCE COMPANY<br>c/o ASPEN SPECIALTY INSURANCE MANAGEMENT CO.<br>14500 NORTH NORTHSIGHT BLVD. SUITE 208<br>SCOTTSDALE, AZ 85260 | NATIONAL E & S INSURANCE BROKERS<br>41235 11TH STREET WEST<br>SUITE A<br>PALMDALE, CA 93551 |
|---|---|

NAMED INSURED: AMERICRAFT CONSTRUCTORS, INC.
DBA: AMERICAN CRAFTSMAN RESTORATION
MAILING ADDRESS: 28430 WITHERSPOON PKWY
VALENCIA, CA 91355
POLICY PERIOD: FROM 06/07/2010 TO 06/07/2011 AT 12:01 A.M. STANDARD
TIME AT YOUR MAILING ADDRESS SHOWN ABOVE.

| BUSINESS DESCRIPTION | ENVIRONMENTAL RESTORATION CONTRACTOR |
|---|---|

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | PREMIUM |
|---|---|
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $32,001 |
| COMMERCIAL PROPERTY COVERAGE PART | $N/A |
| LIQUOR LIABILITY COVERAGE PART | $N/A |
| TERRORISM PREMIUM | $N/A |
| TOTAL ADVANCE PREMIUM DUE AND PAYABLE AT INCEPTION | $32,001 |

Minimum retained audit prem: $N/A          Minimum retained premium: $8,000

FORMS APPLICABLE TO ALL COVERAGE PARTS:
AS PER SCHEDULE OF APPLICABLE FORMS

_3_ % STATE TAX _963.03_
_0.25_% STAMPING FEE _80.25_
TOTAL _1,043.28_

Surplus Lines Broker Name: ENVIRONMENTAL INSURANCE AGENCY
Surplus Lines Broker Address: PO BOX 23605
PORTLAND, OR 97281
Surplus Lines Broker License No.: 0D25391

| Countersigned: | By: |  |
|---|---|---|
| (Date) |  | (Authorized Representative) |

ASPGL074 DEC 0909          Includes copyrighted material of ISO, Inc., with its permission.          Page 1 of 1



ASPEN SPECIALTY INSURANCE COMPANY
POLICY NUMBER: ERA5KCM10
RENEWAL OF:    ERA5KCM09



ASPEN
ASPEN SPECIALTY

## COMMERCIAL GENERAL LIABILITY DECLARATIONS

| ASPEN SPECIALTY INSURANCE COMPANY<br>c/o ASPEN SPECIALTY INSURANCE MANAGEMENT CO.<br>14500 NORTH NORTHSIGHT BLVD. SUITE 208<br>SCOTTSDALE, AZ 85260 | NATIONAL E & S INSURANCE BROKERS<br>41235 11TH STREET WEST<br>SUITE A<br>PALMDALE, CA 93551 |
|---|---|

NAMED INSURED:    AMERICRAFT CONSTRUCTORS, INC.
                 DBA: AMERICAN CRAFTSMAN RESTORATION
MAILING ADDRESS: 28430 WITHERSPOON PKWY
                 VALENCIA, CA 91355
POLICY PERIOD: FROM  06/07/2010   TO   06/07/2011   AT 12:01 A.M. TIME AT
YOUR MAILING ADDRESS SHOWN ABOVE.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ 1,000,000 | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ 50,000 | Any one premises |
| MEDICAL EXPENSE LIMIT | $ 5,000 | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | Any one person or organization |
| CONTRACTORS POLLUTION LEGAL LIABILITY | $ 1,000,000 | Each occurrence / claim |
| | $ 2,000,000 | Endorsement aggregate |
| PROFESSIONAL LIABILITY ENDORSEMENT | $ N/A | Each claim |
| | $ N/A | Endorsement aggregate |
| ENVIRONMENTAL IMPAIRMENT POLLUTION LEGAL LIAB | $ 1,000,000 | Each claim |
| | $ 1,000,000 | Endorsement aggregate |
| OPTION NOT APPLICABLE TO THIS POLICY | $ N/A | Each claim |
| | $ N/A | Endorsement aggregate |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ 2,000,000 | |
| GENERAL AGGREGATE LIMIT | $ 2,000,000 | |


**POLICY NUMBER:** ERA5KCM10
**RENEWAL OF:**   ERA5KCM09



A S P E N

ASPEN SPECIALTY

# ENVIRONMENTAL IMPAIRMENT POLLUTION LEGAL LIABILITY DECLARATIONS

VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. PORTIONS OF THIS POLICY ARE ON A CLAIMS MADE AND REPORTED BASIS. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE YOUR RIGHTS, DUTIES, AND WHAT IS AND IS NOT COVERED. THE CLAIMS MADE AND REPORTED COVERAGE PARTS, APPLIES ONLY TO ANY CLAIM FIRST MADE DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF ANY, AND REPORTED TO THE COMPANY BEFORE THE END OF THE POLICY PERIOD OR WITHIN THE EXTENDED REPORTING PERIOD, IF ANY.

1. **COMPANY:**

   ASPEN SPECIALTY INSURANCE COMPANY
   c/o Aspen Specialty Insurance Management Co.
   14500 NORTH NORTHSIGHT BLVD. SUITE 208
   SCOTTSDALE, AZ 85260

2. **NAMED INSURED:**

   AMERICRAFT CONSTRUCTORS, INC.
   DBA: AMERICAN CRAFTSMAN RESTORATION

3. **NAMED INSURED MAILING ADDRESS:**

   28430 WITHERSPOON PKWY
   VALENCIA, CA 91355

4. **BROKER NAME:**

   NATIONAL E & S INSURANCE BROKERS

5. **BROKER MAILING ADDRESS:**

   41235 11TH STREET WEST
   SUITE A
   PALMDALE, CA 93551

6. **POLICY PERIOD:**

   a. **Inception Date:**   06/07/2010
   b. **Expiration Date:**   06/07/2011
   12:01 A.M. Standard Time at the address of the Named Insured as stated above.

7. **SECTION I POLLUTION LEGAL LIABILITY COVERAGE(S) NEW POLLUTION CONDITIONS:**

   | | |
   |---|---|
   | $N/A | Each Claim |
   | $N/A | In the Aggregate |
   | $N/A | Deductible |
   | N/A | Retroactive Date |

8. **PRE-EXISTING POLLUTION CONDITIONS:**

   | | |
   |---|---|
   | $N/A | Each Claim |
   | $N/A | In the Aggregate |
   | $N/A | Deductible |
   | N/A | Retroactive Date |

| | | |
|---|---|---|
| 9. SUDDEN AND ACCIDENTAL POLLUTION CONDITIONS: | $1,000,000<br>$1,000,000<br>$10,000<br>06/07/2010 | Each Claim<br>In the Aggregate<br>Deductible<br>Retroactive Date |
| 10. PRODUCTS POLLUTION: | $N/A<br>$N/A<br>$N/A<br>N/A | Each Claim<br>In the Aggregate<br>Deductible<br>Retroactive Date |
| 11. N/A: | $N/A<br>$N/A<br>$N/A<br>N/A | Each Claim<br>In the Aggregate<br>Deductible<br>Retroactive Date |
| 12. N/A: | $N/A<br>$N/A<br>$N/A<br>N/A | Each Claim<br>In the Aggregate<br>Deductible<br>Retroactive Date |
| 13. PREMIUM: | $INCLUDED | |
| 14. TERRORISM PREMIUM: | $N/A | |
| 15. TOTAL PREMIUM: | $INCLUDED | |
| 16. MINIMUM EARNED PREMIUM: | $INCLUDED | |
| 17. FORMS & ENDORSEMENTS ATTACHED AT INCEPTION: | SEE SCHEDULE OF APPLICABLE FORMS | |

Surplus Lines Broker Name:   ENVIRONMENTAL INSURANCE AGENCY
Surplus Lines Broker Address: PO BOX 23605
                              PORTLAND, OR 97281

Surplus Lines Broker License No.: 0D25391

Issued on:   08/24/2010          By  _____
                                        Authorized Representative

**ASPER061 DEC 0310**                                        Page 2 of 2

14500 North Northsight Blvd. | Suite 208 | Scottsdale | Arizona | 85260 | Phone 480-612-8800 | Fax 480-612-8810

## CALIFORNIA NOTICE

1. The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "Surplus Line" insurers.

2. The insurer is not subject to the financial solvency regulation and enforcement which applies to California licensed insurers.

3. The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.

4. California maintains a list of eligible surplus line insurers approved by the Insurance Commissioner. Ask your agent or broker if the insurer is on that list, or view that list at the website of the California Department of Insurance: www.insurance.ca.gov.

5. For additional information about the insurer you should ask questions of your insurance agent, broker, or "Surplus Line" broker or contact the California Department of Insurance, at the following toll-free number: 1-800-927-4357

6. If you, as the applicant, required that the insurance policy you have purchased be bound immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker fee charged for this insurance will be returned to you.

SCHEDULE OF APPLICABLE FORMS



A S P E N

ASPEN SPECIALTY

**CONTRACTORS POLLUTION LEGAL LIABILITY**

**NAMED INSURED:** AMERICRAFT CONSTRUCTORS, INC.

DBA: AMERICAN CRAFTSMAN RESTORATION

**POLICY NUMBER:** ERA5KCM10

**FORMS AND ENDORSEMENTS MADE PART OF THIS POLICY AT TIME OF ISSUE:**

**FORM NUMBER AND TITLE:**

| Form Number | Title |
|---|---|
| ASPGL074 DEC 0909 | Common Policy Declarations |
| ASPER060 DEC 0210 | Commercial General Liability Declarations |
| ASPER061 DEC 0310 | Environmental Impairment Pollution Legal Liability Declarations |
| ASPSL004 0109 | California Notice |
| ASPER027 0409 | Schedule of Applicable Forms |
| ASPER003 0210 | Contractors Pollution Legal Liability Endorsement - Integrated |
| ASPER009 0310 | Professional Liability - ASPER003 |
| ASPER032 0409 | Interim Premium Audit Condition |
| ASPER042 1109 | Construction Defect Exclusion: New Residential Construction |
| ASPER051 0809 | Additional Named Insured Endorsement |
| ASPER055 1209 | Nanotubes And Nanotechnology Exclusion |
| ASPER058 0110 | Asbestos Exclusion Endorsement |
| ASPER059 0110 | Fungi Or Bacteria Exclusion |
| ASPER062 0710 | Environmental Impairment Pollution Legal Liability Policy |
| ASPER064 0310 | Schedule of Covered Locations Endorsement |
| ASPER074 0510 | Retained Limit Endorsement |
| ASPCO002 0110 | General Service of Suit Endorsement |
| ASPGL003 0104 | Total Lead Exclusion |
| ASPGL007 0104 | Silica Exclusion Endorsement |
| ASPGL032 0504 | Exterior Insulation and Finish System Exclusion |
| ASPGL044 0504 | Amendment - Common Policy Conditions |
| ASPGL061 1104 | Primary and Non-Contributing Insurance (Third-Party) |
| ASPGL071 0305 | Bodily Injury-Property Damage Personal and Advertising Injury Liability Deductible Per Occurrence |
| ASPGL114 1206 | Non-Duplication of Limits of Insurance Endorsement |
| ASPGL164 0110 | Continuous or Progressive Injury or Damage Exclusion |
| CG 00 62 12 02 | War Liability Exclusion |
| CG 20 10 10 01 | Additional Insured - Owners Lessees Or Contractors - Scheduled Person Or Organization |
| CG 20 37 10 01 | Additional Insured - Owners, Lesses or Contractors - Completed Operations |
| CG 21 16 07 98 | Exclusion - Designated Professional Services |
| CG 21 47 07 98 | Employment - Related Practices Exclusion |
| CG 21 49 09 99 | Total Pollution Exclusion Endorsement |
| CG 21 75 12 02 | Exclusion Of Certified Acts Of Terrorism And Other Acts Of Terrorism |
| CG 24 04 10 93 | Waiver Of Transfer Of Rights Of Recovery Against Others To Us |
| IL 00 21 07 02 | Nuclear Energy Liability Exclusion Endorsement |
| IL 00 17 11 98 | Common Policy Conditions |
| ASPER031 0710 | Policyholder's Guide to reporting an Environmental or Professional Liability Claim |

ASPER027 0409          Includes copyrighted material of ISO, Inc., with its permission.



**ASPEN**

ASPEN SPECIALTY

### THIS ENDORSEMENT PROVIDES COVERAGE ON BOTH A CLAIMS-MADE AND OCCURRENCE BASIS, AS APPLICABLE. PLEASE READ IT CAREFULLY.

## CONTRACTORS POLLUTION LEGAL LIABILITY ENDORSEMENT - INTEGRATED

In consideration of payment of the additional premium by you, and in reliance upon the Application, submitted materials and statements provided you, we agree with you, subject to all the terms, exclusions and conditions of the Policy and this Endorsement, that this Endorsement modifies insurance provided under the following Coverage Part:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM -** <u>CG 00 01 10 01</u>

### SCHEDULE OF INSURANCE FOR THIS POLLUTION LEGAL LIABILITY ENDORSEMENT

| Coverage | Limit Of Insurance | | Deductible | | Premium |
|---|---|---|---|---|---|
| Contractors Pollution Legal Liability Endorsement | $SEE ASPER060 | each loss | $10,000 | each loss | $INCLUDED |
| | $SEE ASPER060 | aggregate | | | |
| Non-Owned Disposal Site Retroactive Date: | | 06/07/2009 | | | |
| Mold Retroactive Date: | | 06/07/2005 | | | |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations of the Policy.

**SECTION I - COVERAGES**
The following is added to **SECTION I COVERAGES** as additional Coverage Part D:

**COVERAGE D – POLLUTION LEGAL LIABILITY**

1. **Insuring Agreement**

   a. **Insuring Agreement - Contractors Pollution Legal Liability (Occurrence Coverage)**

   We will pay those sums that you become legally obligated to pay as <u>Loss</u> as a result of <u>Claims Arising from</u> <u>Pollution Conditions</u> caused by <u>Contracting Activities</u> during the <u>Policy Period.</u>

   b. **Insuring Agreement - Crisis Management Expense (Occurrence Coverage)**

   We will pay <u>Crisis Management Expense Arising from</u> <u>Pollution Conditions</u> caused by <u>Contracting Activities</u> which occur during the <u>Policy Period.</u> This coverage is subject to a $250,000 sub-limit.

   c. **Insuring Agreement - Non-Owned Disposal Site (Claims-MadeCoverage)**

   We will pay on your behalf all sums the insured shall become legally obligated to pay as <u>Loss</u> as a result of <u>Claims</u> first made and reported during the <u>Policy Period</u> resulting from <u>Pollution Conditions Arising from Contracting Activities</u>, subsequent to the retroactive date on, at, under or migrating from a <u>Non-Owned Disposal Site</u>. This coverage applies only if the <u>Loss Arises From Contracting Activities.</u>

   d. **Insuring Agreement - Mold (Claims-Made Coverage)**

   We will pay on your behalf all sums an insured shall become legally obligated to pay for <u>Bodily Injury</u>, <u>Property Damage</u>, <u>Claim Expenses</u>, or <u>Mold Clean-up Cost</u> as a result of <u>Claims</u> first made and reported against you during the policy period <u>Arising from Mold</u> caused by <u>Contracting Activities</u>, subsequent to the retroactive date.

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

This coverage applies only if the **Bodily Injury, Property Damage, Claim Expenses,** or **Mold Clean-up Cost arises from Contracting Activities.**

e. No other obligation or liability to pay sums or to perform acts or services is covered unless explicitly provided for under Supplementary Payments for this Coverage Part **D.**

## 2. Exclusions

This insurance does not apply to:

a. **Affiliates: Arising from** errors, acts or omissions claimed against, any of the following entities:

   1) Any related business enterprise which is operated, managed or owned, in whole or in part, by an insured; or

   2) Your parent company; or

   3) Any other affiliated or subsidiary companies;

   unless the entity is named as an insured or as an additional insured in this Policy, or in an endorsement attached to this Policy. In no event shall this policy cover suits by one insured or additional insured under this policy against another insured or additional insured under this policy.

b. **Bankruptcy: Arising from** any insolvency or Bankruptcy of any insured.

c. **Contractual Liability: Arising from** the liability of others assumed by the insured under any contract or agreement. This exclusion does not apply to liability for **Loss:**

   1) That you would have in the absence of the contract or agreement; or

   2) Assumed in a contract or agreement that is a "covered contract" provided the loss occurs subsequent to the execution of the contract or agreement. "Covered contract" as used in this exception to the exclusion means:

      i. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality; or

      ii. That part of any other contract or agreement pertaining to your business

under which you assume the tort liability of another party to pay for **Loss** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

d. **Discrimination: Arising from** any actual or alleged discrimination, humiliation, harassment, or misconduct because of race, creed, color, age, gender, sex, sexual preference or orientation, national origin, religion, disability, handicap, or marital status.

e. **Employment Related Practices: Arising from** any refusal to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, wrongful infliction of emotional distress or other employment related torts, wrongful deprivation of a career opportunity, breach of any oral, written or implied employment contract or quasi-employment contract, violation of any federal, state, or local statute, regulation, ordinance, common law or public policy concerning employment or discrimination in employment.

f. **Expected or Intended Loss: Arising From Loss** expected or intended from the standpoint of the insured.

g. **Fines, Penalties and Multiple Damages:** Any fines or penalties or awards for multiple damages assessed against an insured relating to **Claims** or **Loss** covered by this policy.

h. **Insurance, Suretyship and Bonds: Arising from** the advising, requiring, obtaining or maintaining of any form of insurance, suretyship or bond, or the failure to do so.

i. **Intentional Actions: Arising from** any insured's intentional disregard of, or deliberate, willful or dishonest non-compliance with, any statute, regulation, ordinance, administrative complaint, notice letter, order, settlement agreement, or instruction by or on behalf of any governmental agency or representative.

j. **Known Conditions: Arising From** any **Known Condition.**

k. **Mold:** This Policy does not provide coverage for, and will not apply to **Loss** or **Claims Arising from Mold,** except as otherwise expressly provided by **Section I – Pollution Legal Liability, Insuring Agreement part (D), Mold (Claims-Made Coverage).**

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

l. **Owned Property:** <u>Arising From</u> of or relating to <u>Property Damage</u>, including the loss of use and any resulting diminution in value of or cost of remediating environmental contamination to, the insured's own property or property over which the insured is now or has ever exercised physical possession or control. For purposes of this exclusion, the insured's own property shall include sub-surface water.

m. **Product Liability:** <u>Arising from</u> the sale, handling, supply, distribution, design or manufacture of a product by you or by others trading under your name or under license, unless installed by you or on your behalf as part of <u>Contracting Activities</u>.

n. **Professional Liability:** <u>Arising from</u> professional services rendered or failed to be rendered by you or others for whom you are legally liable, including but not limited to: recommendations, opinions or strategies rendered for environmental or site consulting, design or engineering work, such as drawings, designs, maps, reports, surveys, change orders, plan specifications, assessment work, remedy selections, site maintenance, equipment selection, or related construction management, supervisory, inspection or engineering service. This Exclusion does not apply to any <u>Claim</u> alleging liability against you on the basis of improper supervision or lack of supervision of any sub-contractors performing <u>Contracting Activities</u> on your behalf.

o. **Property Damage:** <u>Arising from</u>

1) <u>Property Damage</u> to the insured's products; or

2) <u>Property Damage</u> to that particular part of real property on which the insured, or any persons or entities acting on the insured's behalf, are performing <u>Contracting Activities</u>, including any <u>Property Damage</u> caused by materials, parts or equipment furnished in connection with such <u>Contracting Activities</u>. However, this Exclusion does not apply to <u>Completed Operations</u>

p. **Radioactive Material:** <u>Arising from</u> the hazardous properties of Radioactive Material. For purposes of this exclusion, Radioactive Material means any substance or material, whether liquid, solid or gas, which is, or may be, radioactive, or has been exposed to radiation, including but not limited to Source Material, Special Nuclear Material and Byproduct material as defined in the Atomic Energy Act of 1954 and any amendments thereto.

q. **Transportation:** <u>Arising from</u> the use, maintenance or operation, of an automobile, aircraft, watercraft, or other conveyance. This exclusion does not apply to <u>Loss</u> or <u>Claims</u> from the use of vehicles directly related to the <u>Contracting Activities</u> by or on behalf of the <u>Insured</u>, beyond the boundaries of a job site, by a Motor Vehicle or watercraft while in due course of transit from the time of movement from its point of origin until its delivery to its final destination, including loading or unloading onto or from the Motor Vehicle or watercraft. Transportation does not include cargo off-loaded from the Motor Vehicle or watercraft, or cargo in or on a Motor Vehicle or watercraft at rest for a period longer than seventy-two (72) hours prior to reaching its final destination.

r. **War:** <u>Arising from</u> war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion, riot, civil commotion or revolution.

s. **Warranty or Guarantee:** <u>Arising from</u>, any kind of express warranty or guarantee given on or behalf of the insured.

t. **Workers Compensation and Employers Liability:** <u>Arising from</u> any obligation for which you or any other party may be held liable under any unemployment laws, Workers' Compensation acts, disability benefits schemes, the Jones Act, or similar laws, including claims:

1) Of any employee, contract employee, or leased personnel retained by you if such injury occurs during and in the course of employment;

2) Involving injury to a spouse, child, parent, sibling or other relation of any employee, contract employee, or leased personnel occurring as a consequence of the employment; or

3) Relating to any obligation of any Insured for indemnity or contribution to third parties due to the employment of any employee, contract employee, or leased personnel.

4) This exclusion does not apply to liability assumed by the insured under a written contract that was signed by the insured and the insured's client prior to the date the <u>Pollution Condition</u> or <u>Mold</u> first commenced, provided the <u>Loss Arises From</u> a <u>Pollution Condition</u> or <u>Mold Arising from Contracting Activities</u> and does not <u>Arise from</u> the sole negligence of the client.

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission

## SUPPLEMENTARY PAYMENTS – COVERAGE D ONLY

We will pay the following, with respect to Coverage D – Pollution Legal Liability only:

### 1. Settlements & Defense Expense

When a **Claim** is made against you for which this Coverage D – Pollution Legal Liability applies, we shall have the right and duty to defend any **Claim**, even if any of the allegations of the **Claim** are groundless, false or fraudulent. We shall investigate the **Claim** and, with your written consent, settle or compromise any **Claim** as it deems appropriate. If you refuse to consent to any settlement or compromise recommended by us and acceptable to the claimant, then our liability for the **Claim** shall not exceed the amount which we would have paid for **Loss** and **Claim Expenses** at the time the **Claim** could have been settled or compromised.

Upon your satisfaction of any applicable deductible amounts, **Claim Expenses** shall be paid by us and such payments shall be included as **Loss** and reduce the available applicable Limit of Liability as shown in the Declarations. We shall not be obligated to defend or continue to defend any **Claim** after the applicable Limit of Liability has been exhausted by payment of **Loss**.

### 2. Deposition and Other Hearing Expense

We will compensate you for actual loss of earnings, and reasonable personal and travel expenses up to $500 per day, incurred by you when you, or an employee on your behalf, attends a hearing, deposition or trial (other than a disciplinary proceeding above) at the written request of us in the course of defending **Claims** within Coverage D – Pollution Legal Liability.

The maximum payment made by us pursuant to this Supplemental Payment for loss of earnings and expense under this sub-part shall be **$10,000** for each **Claim** regardless of the number of depositions, hearings or trials relating to such **Claim**. This limit shall be in addition to the stated Limit of Liability for **Loss** under the Policy.

### 3. Subpoena and Records Expense

We will compensate you for actual loss of earnings, and reasonable personal and travel expense when you, or an employee on your behalf, is required to produce documents or respond to a subpoena for records in the course of defending **Claims** within Coverage D - Pollution Legal Liability.

We shall, at your request, retain counsel and pay such counsel's reasonable and necessary fees and costs to advise you regarding the production of documents and/or represent you during the preparation and giving of testimony, in response to a subpoena for records, served on you.

This coverage is available provided such expense is not otherwise recoverable as **Claim Expense** in conjunction with a **Claim** or **Loss**. Note that the actual cost of copying and reviewing such records in the defense of a **Claim** by us will be considered **Claim Expense**. The most we will pay for loss of earnings and expenses in relation to subpoenas or record requests for any one **Claim** is **$10,000**.

### 4. Disciplinary Proceeding Expense

We will compensate you for actual loss of earnings, and reasonable personal and travel expense up to $500 per day, incurred by you when you, or an employee on your behalf, is required to attend or participate in any disciplinary hearings in the course of defending coverage within Coverage D - Pollution Legal Liability. The most we will pay for actual loss of earnings and expense for all insureds in any one disciplinary proceeding is **$10,000**. This limit shall be in addition to the stated Limit of Liability for **Loss** under the Policy.

### 5. Supplementary Payments Sub-Limit

The most we will pay for actual loss of earnings and reasonable expenses, fees and costs under each individual **Supplementary Payment 2, 3 and 4** above, in any one **Claim** is **$10,000**. Such Supplementary Payments are made in addition to the Per Loss Limit of Liability set forth in the Schedule above or the Policy Declarations, but are subject to the Policy Aggregate Limit of Liability.

## SECTION II – WHO IS AN INSURED

The following is added to **SECTION II – WHO IS AN INSURED** of the Policy.

4. For purposes of Coverage D – Pollution Legal Liability only, the word "You" or "Insured" as used herein means:

    1. You;

    2. Any present director, officer, partner, member, employee, leased or temporary worker of yours, while acting within the scope or his or her duties as such;

    3. Any other person or organization in which you did or currently have a 50% or more ownership

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

interest which is listed in the Declarations as an Insured or Additional Insured;

4. Any joint venture in which you are a member, but solely with regard to an insured's liability arising out of **Contracting Activities** provided under such joint venture and scheduled to this policy by endorsement;

5. Solely with respect to coverage for **Coverage D – Contractors Pollution Legal Liability, Crisis Management Expense**, and **Mold**, the client for whom an insured performs **Contracting Activities**. This applies only:

   a. When required by a written contract signed by the insured and the client prior to the date the **Pollution Condition** or **Mold** commenced; and

   b. If the client is found liable based on the **Contracting Activities** negligently performed by an insured other than the client.

Coverage D - Pollution Legal Liability provided under this Item 5. for the client shall not exceed the lesser of the following:

   a. The Limit of Liability required by the written contract; or

   b. The applicable Limit of Liability of this insurance for Coverage D, **Contractors Pollution Legal Liability, Crisis Management Expense**, and **Mold** coverage.

6. Any other person or organization which you acquire during the Policy Period. Coverage will be provided only for 90 days from the legal acquisition date unless (a) coverage is requested during that 90 day period and we agree to provide coverage, (b) you agree to pay any additional premium required. and (c) we add the person or organization to the Declarations as an Insured or Additional Insured.

## SECTION III – LIMITS OF INSURANCE

**SECTION III – LIMITS OF INSURANCE** shall be modified as follows for amounts payable under Coverage D – Pollution Legal Liability only:

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought;

   c. Persons or organizations making claims or bringing "suits"; or

   d. Governmental actions or demands taken with respect to **Clean-up Costs** or **Mold Clean-up Costs**.

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard";

   c. Damages under Coverage B; and

   d. Loss under Coverage D.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, in Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **2.** above, Coverage D is subject to the following additional conditions:

   a. We will pay all Loss resulting from each **Claim** in excess of the Deductible stated in the Schedule above or in the Policy Declarations as subject to this endorsement, subject to the applicable Limits of Liability stated in the Schedule above or in this endorsement, subject to this endorsement.

   b. **Claim Expenses** shall be part of and not in addition to the Limit of Liability and payments of **Claim Expenses** and **Loss** shall reduce the Per

Loss Limit of Liability.

c. Payments under **SUPPLEMENTARY PAY-MENTS - COVERAGE D** are in addition to the applicable Per Loss Limit of Liability stated in the Schedule above or in the Policy Declarations as subject to this endorsement and shall not reduce such Limit of Liability, but are subject to the Policy Aggregate Limit of Liability shown in the Declarations.

d. Our maximum aggregate limit of liability for all **Loss** payable under Coverage D shall be the Aggregate Limit of Liability stated in the Schedule above or in the Policy Declarations as subject to this endorsement.

e. Any "Per Loss" deductible stated in the Schedule above or in the Policy Declarations as subject to this endorsement applies to all **Loss** arising out of any one **Pollution Condition** or **Mold** incident or out of the same, related or continuous **Pollution Condition** or **Mold** incident. The deductible shall be paid by the insured "Per Loss" and shall remain uninsured. The Limits of Liability for this coverage shall apply in excess of the deductible.

We may advance payment of part or all of the deductible amount and, upon notification of such payment made, the insured shall promptly reimburse us for the deductible amounts advanced by us.

We shall at all times be entitled to offset unpaid deductible amounts due from the insured against **Claims** payments due to, or to be paid on behalf of, the insured.

f. If the applicable Per Loss Limit of Liability stated in the Schedule above or in the Policy Declarations as subject to this endorsement is exhausted by:

(1) Payment of **Loss**; or

(2) Payment of **Claims Expenses**, **Clean-up Costs** or **Mold Clean-up Costs**; or

(3) Tender of the policy limits for Coverage D is made to the insured, or a claimant, or to a court having jurisdiction over the **Claim** or any combination of the foregoing,

all of our obligations under the Policy with respect to any **Claim**, including the duty to defend, shall terminate immediately.

7. Subject to Paragraph 5, above, the Damage To Premises Rented To You Limit is the most we will

pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

8. Subject to Paragraph 5, above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

**SECTION IV- COMMERCIAL GENERAL LIABILITY CONDITIONS** of the Policy   is modified by this Endorsement *WITH RESPECT ONLY TO* Coverage D – Pollution Legal Liability, as follows. All other Conditions of the Policy, including any General Conditions Endorsements, apply.

Section (2) **Duties in The Event of Occurrence, Offense, Claim or Suit** shall be replaced in its entirety by the following

2. **Insured's Duties in the Event of a Loss, Claim, Suit, or Mold Incident, including Crisis Management Expense**

a. In the event of **Loss**, **Mold** or **Crisis Management Expense**, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances of the alleged **Loss**, **Mold** or **Crisis Management Expense** or, the date and manner in which any insured first learned of the **Loss**, **Mold** or **Crisis Management Expense** and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to us as soon as practicable. Notice to your or our agent, broker, or producer is not notice to us as required by (c) below until actually received by us.

b. If a **Claim** for **Loss**, **Mold** or **Crisis Management Expense** is made or suit is brought against any insured, the insured shall immediately forward to  us every demand, notice, summons or other process received, and

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

notify us in writing of the date any insured first received such **Claim** for **Loss**, **Mold** or **Crisis Management Expense** or suit.

c. All Notices of incidents, and **Claims** for **Loss, Mold** or **Crisis Management Expense** must be immediately sent to Aspen Specialty Insurance Management, Inc. as follows;

**By Mail:** Claims Department
Aspen Specialty Insurance Company
c/o Aspen Specialty Insurance Management Co.
600 Atlantic Avenue 21st Floor
Boston, MA 02210
Main Tel. No.: 617-532-7300

**By FAX:** 617-532-7342
**By Dedicated Email:**
environmental.claims@aspenspecialty.com

d. The insured shall cooperate with us and, upon our request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of injury or damage with respect to which insurance is afforded under this Policy;

e. The insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. Upon written request of the Company, the insured shall submit to an examination under oath by our representative; and

f. No insured shall, except at his, her, or its own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of an accident.

g. If a **Crisis Management Expense** is incurred, the insured shall forward to us immediately following the termination of **Pollution Conditions** associated with the **Crisis Management Expense** all information as referenced above .

h. As a condition precedent to coverage for **Loss** or **Expense Arising from** Coverage **D – Contractors Pollution Legal Liability, Non-Owned Disposal Site**, or **Mold** coverages, the insured shall provide notice to us:

1) Prior to the start of any remediation work,

2) Prior to the undertaking of any clean-up activities, or

3) For the approval of any expense relating to any of the items covered under this Policy

as Supplementary Payments.

Section (4) **Other Insurance** shall be replaced in its entirety by the following:

4. **Other Insurance**

a. **Excess Insurance**

This insurance shall apply in excess of the amount of the Deductible, the self-insured retention, and any other valid insurance available, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance specifically applies as excess insurance over the applicable Limit of Liability provided herein unless paragraph (b), Primary Insurance, below applies below.

b. **Primary Insurance**

This insurance is primary only if required of the Insured by a written contract. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in paragraph (c), Method of Sharing, below.

c. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

The following paragraphs are added to Section (6), Representations:

d. By acceptance of this Policy, you agree that the declarations, representations and warranties in the Application and in materials and statements made a part of this policy are the true and correct. Each shall be deemed material to the acceptance of the risk or the hazard assumed by us under this Policy, and this Policy is issued in reliance upon the truth and accuracy of such representations. In the event there are misrepresentations or there is a failure to state facts which materially affect either the acceptance of the risk or the hazard assumed by us under this Policy, this Policy in its entirety

shall be void and of no effect whatsoever. This Policy shall be deemed to be a single unitary contract and not a severable contract of insurance of a series of individual contracts with each Insured.

e. Notice to or knowledge possessed by any agent or other person acting on our behalf or any conduct by any such agent or other person shall not effect a waiver or a change in any part of this Policy or stop us from asserting any right under the terms of the Policy. This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our written consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this Policy.

**Section (8) Transfer of Rights of Recovery Against Others** shall be replaced in its entirety by the following:

8. **Transfer of Rights of Recovery Against Others To Us**

   In the event of any payment under this policy, then we shall be subrogated to all the insured's rights of recovery therefore against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights.

   Notwithstanding the forgoing, we hereby waive our rights of subrogation against Clients of the Named Insured(s) where required by written contract executed prior to any **Loss**.

**Section (9) When We Do Not Renew** shall be replaced in its entirety by the following :

9. **When We Do Not Renew, Cancellation**

   a. The Policy may be cancelled by the first Named Insured by mailing to us written notice requesting cancellation and stating when thereafter the cancellation shall take effect. If the Endorsement is cancelled, we shall retain the customary short rate proportion charge, that is – 10% of the premium.

   b. If this Policy is cancelled by us, the earned premium shall be computed pro rata, however, we shall be entitled to no less than the minimum earned premium stated in the Declarations page. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

c. We may cancel the Policy for any of the following reasons:

   1) Non-payment of Premium;

   2) Fraud or material misrepresentation on the part of any Insured; or

   3) Material change in the **Contracting Activities** from the description identified in the Application to this policy and its supporting materials and not disclosed in writing to us prior to **Loss** which results in a materially increased likelihood of **Claims**, **Loss**, **Pollution Conditions** or **Mold.**

d. We will mail written notice of cancellation to the first named Insured at the last known address. If cancellation is for non-payment of premium at least ten (10) days notice will be provided. If cancellation is for any other reason, at least thirty (30) days notice will be provided.

The following Section shall be added as (10) **Assignment:**

10. **Assignment**
   Assignment of interest under this policy shall not bind us without our written consent.

The following Section shall be added as (11) **Policy Territory:**

11. **Policy Territory**
   The insurance afforded by this policy applies worldwide **Arising from Contracting Activities**, provided that the **Claim** is made in, and any legal action is pursued within, the United States of America, its territories, possessions or commonwealths, or Canada, and to which U.S. law only applies.

**SECTION V – DEFINITIONS APPLICABLE TO COVERAGE D – POLLUTION LEGAL LIABILITY**

For purposes of Coverage **D – Pollution Legal Liability** only, SECTION V – DEFINITIONS is replaced in its entirety by the following. Definitions herein apply to this Endorsement and any Endorsements amending or applicable to Coverage D.

1. **Arising from**, **Arises From**, and **Arise from** means directly or indirectly caused by, resulting from, based upon, arising out of, from, in consequence of, or in any way involving or related to.

2. **Bodily Injury** means physical injury, illness, sickness or disease sustained by a person, including death resulting from any of these at any time.

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

**Bodily Injury** also means mental illness, mental anguish, or emotional distress, pain or suffering, or shock sustained by that person, whether or not resulting from physical injury, sickness, disease or death of any person.

3. **Claim** or **Claims** means any written or oral demand, notice, request for indemnity or other legal or equitable proceedings asserted against the **Insured**, or the filing of any suit or arbitration demand, by a person, entity, or asserted class for **Loss**, including the service of suit or institution of arbitration or mediation proceedings, arising out of **Pollution Conditions** or **Mold** from **Contracting Activities** to which this insurance applies. Any **Loss** should be deemed to occur at the time the damage first started to occur relating to the Insured's **Contracting Activities**, even if such damage continues or progresses.

4. **Claim Expense** or **Claims Expenses** means reasonable fees charged by any lawyer retained by us, and, if authorized by us, all other reasonable fees or costs incurred in the defense of a **Claim**, including expenses for investigation, adjustment and appeal. **Claim Expenses** shall not include any remuneration, salaries, regular or overtime wages, or benefits of any Insured that are associated with the defense and investigation of a **Claim**. Expense payments shall not be deemed **Supplementary Payments** under Coverage D to they extent they are already covered as **Claim Expense**.

5. **Clean-up Costs** means reasonable expenses incurred to investigate, quantify, monitor, abate, remove, dispose, treat, detoxify, remediate, neutralize, and/or immobilize **Pollution Conditions** which arise from the performance of **Contracting Activities** to the extent required by **Environmental Regulations and Laws**. **Clean-up Costs** shall also include:

   a. Reasonable **Claims Expense**, where such cost have been incurred; and

   b. **Restoration Costs**.

6. **Completed Operations** means work from **Contracting Activities** that has been completed, including materials, parts or equipment furnished in connection with such work or operations.

   **Contracting Activities** will be deemed completed at the earliest of the following:

   a. When all of the **Contracting Activities** or work or operations noted for in the Insured's contract has been completed;

   b. When all of the **Contracting Activities** or work

to be done at the job site has been completed if the Insured's contract calls for work at more than one job site; or

   c. When that part of the **Contracting Activities** or work done at a job site has been put to its intended use by any person or organization other than another contractor or sub-contractor working on the same project.

   **Contracting Activities** or work that may need service, maintenance, correction, repair or replacement, but which is otherwise completed, will be treated as completed.

7. **Contracting Activities** means those activities or operations conducted by you or on your behalf, or as otherwise disclosed to us as of the inception of this Policy. **Contracting Activities** include **Completed Operations**.

8. **Crisis Management Expense** means necessary expenses, **Clean-up Cost**, including **Claim Expense** incurred by the **Insured** and subsequently approved by us in the remediation of soil, surface water, groundwater or other contamination; in response to **Pollution Conditions** that necessitate immediate action; and within seventy-two (72) hours of the commencement of such **Pollution Conditions**; or as approved by us in writing.

9. **Environmental Regulations and Laws** means any federal, state, provincial or local laws that are applicable to **Pollution Conditions** or **Mold**. **Environmental Regulations and Laws** shall include, but not limited to, statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives.

10. **Known Condition** means **Loss** arising out of **Pollution Conditions** or **Mold** that existed prior to the **Policy Period** or were known by an insured prior to the **Policy Period**, and any subsequent continuation or resumption of or changes in such **Pollution Conditions** or **Mold**.

11. **Loss** means **Bodily Injury**, **Property Damage**, **Clean-up Cost**, **Mold Clean-up Cost** and **Claims Expenses**.

12. **Mold** means the presence, discharge, dispersal, release, escape, migration, or seepage of any fungi, mold or mildew, bacteria, viruses or spores whether or not such **Mold** is living in or within any **structure**, provided such conditions are not naturally occurring in the environment in amounts and concentrations discovered. **Structure** as used in this definition means a roofed and walled building built for permanent use. **Mold** must be unexpected and

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission

unintended from the standpoint of the insured.

13. **Mold Clean-up Cost** means reasonable expenses incurred to investigate, quantify, monitor, abate, remove, dispose, treat, detoxify, neutralize, and/or immobilize **Mold** which arise from the performance of **Contracting Activities** to the extent required by **Environmental Regulations and Laws** or as recommended by a mutually agreed upon review by a Certified Industrial Hygienist (CIH). **Mold Clean-up Costs** shall also include: 1. reasonable **Claims Expense**, where such cost have been incurred; and 2. **Restoration Costs**.

14. **Natural Resources** means fish, wildlife, biota, land, air, water, groundwater, drinking water supplies, and other similar resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the US, and state or local government, any foreign government, or any Indian tribe, including the reasonable cost of assessing such injury, destruction or loss resulting therefrom.

15. **Natural Resource Damage** means damages for, injury to, destruction of, or loss of, **Natural Resources**.

16. **Non-Owned Disposal Site** means a site the insured uses or arranges for use for treatment, storage, or disposal of an insured's waste material, but only if the waste material is generated by the insured:

   a. As part of its responsibility in a written contract with its client for **Contracting Activities; or**

   b. From a site owned, leased or managed by the insured where **Contracting Activities** do not occur; and

   c. The **Non-Owned Disposal Site** is not managed, operated, owned or leased by the insured or any subsidiary or affiliate of the insured; and

   d. The **Non-Owned Disposal Site** is permitted and or licensed by the Federal, State, Local or Provincial authorities to accept waste materials generated by the insured as of the date of treatment, storage or disposal; and

   The **Non-Owned Disposal Site** is not listed on a proposed or final Federal National Priorities List ("NPL") and any State, or Provincial equivalent NPL, Superfund or hazardous waste site list prior to the treatment, storage or disposal of the waste materials.

17. **Policy Period** means the period of time as shown in the Declarations, or if applicable, any earlier cancellation date. The **Policy Period** does not include the Automatic Extended Reporting Period.

18. **Pollution Condition(s)** means the discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, bacteria, hazardous substances, hazardous materials, or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water or groundwater.

This applies provided such conditions are not naturally occurring in the environment in amounts and concentrations discovered. **Pollution Condition(s)** must be unexpected and unintended from the standpoint of the insured.

For the purpose of this definition, waste materials includes, but is not limited to, low level radioactive waste and mixed waste. Low level radioactive waste is as defined in 10 CFR 62.2 by the United States Nuclear Regulatory Commission.

19. **Property Damage** means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **Pollution Condition** or **Mold** that caused it.

   c. **Natural Resources Damage**

   **Property Damage** does not include **Clean-up Cost**, **Mold Clean-up Cost** or physical injury to or the loss of use of the insured's own property or property over which the insured is now or has ever exercised physical possession or control.

20. **Restoration Costs** means reasonable and necessary costs incurred by the insured with our written consent, which consent shall not be unreasonably withheld or delayed, to repair, replace or restore real or personal property to substantially the same condition it was in prior to being damaged during work performed in the course of incurring **Clean-Up Costs** or **Mold Clean-up Cost** Arising from **Pollution Conditions** or **Mold**. **Restoration Costs** do not include costs associated with improvements or betterments.

## SECTION VI – EXTENDED REPORTING PERIOD

SECTION VI – EXTENDED REPORTING PERIOD is added and applies to Coverage **D** – Pollution Legal Liability only, as follows:

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

1. **Automatic Extended Reporting Period**

   a. An Automatic Extended Reporting Period of 60 days is provided if this policy is cancelled or not renewed by us, or if it is renewed with an advanced Retroactive Date, unless:

      1) We cancel the Policy or this Endorsement for non-payment of premium; or

      2) Any insured fails to repay any deductible amount we have paid.

   b. The Extended Reporting Period applies only to those coverages provided on a claims-made basis: **Mold** and **Non-Owned Disposal Site**.

   c. The Extended Reporting Period does not extend the **Policy Period** or change the scope of coverage provided. It applies only to **Claims** to which the following applies;

      1) The **Claim** is first made and reported to us before the end of the Extended Reporting Period; and

      2) The **Claim Arises From** covered **Contracting Activities** or **Completed Operations** that commence on or after the Retroactive Date, if any, shown in the Schedule above or the Declarations and before the end of the **Policy Period.**

   d. There is no separate or additional Limit of Liability for the Extended Reporting Period. The Limit of Liability available during the Extended Reporting Period shall be the remaining amount, if any, of the Aggregate Limit of Liability available. at the time that this policy was cancelled, non-renewed, or renewed with an advanced Retroactive Date.

2. **Optional Extended Reporting Period**

   a. An Optional Extended Reporting Period may be available if this Policy is cancelled or not renewed by us, or if it is renewed with an advanced Retroactive Date, unless:

      1. We cancel the Policy for non-payment of premium;

      2. Any insured fails to repay any deductible amount we have paid;

      3. Any insured has purchased any other insurance to replace the insurance provided under this Policy; or

      4. We cancel this insurance because of fraud

or material misrepresentation by an insured.

   b. The Optional Extended Reporting Period applies only to those coverages provided on a claims-made basis: **Mold** and **Non-Owned Disposal Site**.

   The Optional Extended Reporting Period is available only if a written request of the first Named Insured is mailed to us, by Certified U.S. Mail, during the 60 days of the Automatic Extended Reporting Period.

   c. The Optional Extended Reporting Period will not provide a separate or additional Limit of Liability for the Optional Extended Reporting. Period. The Limit of Liability available during the Optional Extended Reporting Period shall be the remaining amount, if any, of the aggregate Limit of Liability available at the time that this Policy was cancelled, non-renewed, or renewed with an advanced Retroactive Date.

   d. The Optional Extended Reporting Period will not extend the **Policy Period** or change the scope of coverage provided. It applies only to **Claims** to which the following applies;

      1) The **Claim** is first made and reported to us before the end of the Extended Reporting Period; and

      2) The **Claim Arises from Ccontracting Activities** that commence on or after the Retroactive Date, if any, shown in the Declarations and before the end of the **Policy Period.**

   e. The length and cost of any Optional Extended Reporting Period offered will be determined by us after the written request of the first Named Insured has been received.

Copyright, Aspen Specialty, 2008
Includes copyrighted material of Insurance Services Office, Inc.,
with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PROFESSIONAL LIABILITY (ASPER003)

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

CONTRACTORS POLLUTION LEGAL LIABILITY COVERAGE Form Number: ASPER003

Section II – Exclusions, n. is deleted in its entirety and replaced as follows:

n.  **Professional Liability:** <u>Arising from</u> professional services rendered or failed to be rendered by you or others for whom you are legally liable, including but not limited to, recommendations, opinions or strategies rendered for environmental consulting, or other consulting, design or engineering work, such as drawings, designs, maps, reports, surveys, change orders, plan specifications, assessment work, remedy selections, site maintenance, equipment selection, or related construction management, supervisory, inspection or engineering service. However this exclusion does not apply to any <u>Claim:</u>

1.  alleging liability against you on the basis of improper supervision or lack of supervision of any sub-contractors performing <u>Contracting Activities</u> on your behalf or

2.  Alleging liability against you for those opinions and recommendations about your <u>Contracting Activities</u> that are made by you and are incidental and necessary to your <u>Contracting Activities</u> and for which no additional compensation is requested or received by you.

All other terms and conditions remain unchanged.



**ASPEN**

ASPEN SPECIALTY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### INTERIM PREMIUM AUDIT CONDITION

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE POLICY FOR ALL COVERAGE PARTS, AS FOLLOWS:

It is understood and agreed that we are pricing and issuing this Policy to you in material reliance on your representations as to the amount of sales (a) reported in prior years, and (b) estimated for the current policy year.

In addition to any other audit rights we may have under specific coverage parts or Endorsements, we reserve the right to conduct a complete audit of your records any time during the policy term to determine the adequacy of all Premium charged under this policy in light of your sales previously reported, and estimated for the Policy term. The first Named Insured must keep records of the information we need for Premium computation, and provide us access to, or send us copies of policies and related information, at such times as we may request.

In the event an audit is conducted mid-term, the actual sales shall for the period shall be compared to the total sales estimated by the insured, as pro-rated for that same period. If actual sales exceed estimated pro-rated sales by an amount of 15% or more, we shall reserve the right to amend the premium base(s) in the Declarations to reflect the data produced by the interim audit, and to revise the Premium for the Policy accordingly.

We will compute all premiums for this Coverage Part in accordance with our rules and rates. Audit premiums are due and payable within thirty (30) days of notice to the first Named Insured. This provision shall not serve to amend any Minimum Premium as shown in the Declarations or our right to conduct further audits as per any other provision of the Policy.

**ASPER032 0409**

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## CONSTRUCTION DEFECT EXCLUSION:  NEW RESIDENTIAL CONSTRUCTION

This endorsement modifies Insurance under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCT/COMPLETED OPERATIONS LIABILITY COVERAGE PART**

The following Exclusion is added to Section I – COVERAGES, COVERAGE A. – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2 – EXCLUSIONS and SECTION I – COVERAGES, COVERAGE B.– PERSONAL AND ADVERTISING INJURY LIABILITY, 2. – EXCLUSIONS:

In consideration of the premium charged, it is agreed that this insurance does not apply to "bodily injury," "property damage," "personal and advertising injury" or any other coverage provided by endorsement which, in whole or in part , directly or indirectly, arises out of "new residential construction work" performed by or on behalf of an "insured," or by or on behalf of any other person or entity, on "residential property".  We have no duty to investigate, adjust or defend, or to pay any investigation, adjustment or defense costs, including attorney's fees, with respect to, a claim or "suit" seeking damages for such injury or damage.

This exclusion applies regardless of whether any such injury, damage, loss or expense arises out of "your work" or "your product" or any ongoing or completed operations

Solely For the purposes of this Endorsement, the following definitions apply:

1.  "New residential construction work" means the construction of any new residential building or structure prior to the building or structure being certified for occupancy or use, regardless of whether a work permit is required.

2.  "Residential property": means structures intended for use or used, in whole or in part, as human dwellings, including but not limited to multi-family housing, condominiums, town homes, townhouses, villas, co-operative housing, master-planned housing, tract homes, mass-produced single family homes, custom-built and single family-homes.

However, this exclusion does not apply to any such injury, damage, loss or expense arising out of "your work" or "your product" or any ongoing or completed operations from the following:

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## NANOTUBES AND NANOTECHNOLOGY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
COMMERCIAL LIABILITY UMBRELLA COVERAGE FORM

**Nanotubes and Nanotechnology**

A.  This insurance does not apply to:

1.  "Bodily injury", "property damage", or "personal and advertising injury" related to the actual, alleged, or threatened presence of or exposure to "nanotubes" or "nanotechnology" in any form, or to harmful substances emanating from "nanotubes" or "nanotechnology". This includes the use of, consumption of, ingestion of, inhalation of, absorption of, contact with, existence of, presence of, proliferation of, discharge of, dispersal of, seepage of, migration of, release of, escape of, or exposure to "nanotubes" or "nanotechnology". Such injury or exposure to "nanotubes" or "nanotechnology" also includes, but is not limited to:

a.  The existence, storage, handling or transportation of "nanotubes" or "nanotechnology";

b.  The removal, abatement or containment of "nanotubes" or "nanotechnology" from any structures, materials, goods, products, or manufacturing process;

c.  The disposal of "nanotubes" or "nanotechnology";

d.  Any structures, manufacturing processes, or products containing "nanotubes" or "nanotechnology";

e.  Any obligation to share damages with or repay someone else who must pay damages because of such injury or damage;

f.  Any product manufactured, sold, handled or distributed by or on behalf of the insured which contains "nanotubes" or "nanotechnology"; or

g.  Any supervision, instructions, recommendations, warranties (express or implied), warnings or advice given or which should have been given.

2.  Any loss, cost or expense including, but not limited to, payment for investigations or defense, fines, penalties, interest and other costs or expenses, arising out of any:

a.  Claim, "suit", demand, judgment, obligation, order, request, settlement, or statutory or regulatory requirement that any insured or any other person or entity test for, monitor, clean up, remove, contain, mitigate, treat, neutralize, remediate, or dispose of, or in any way respond to, or assess the actual or alleged effects of "nanotubes" or "nanotechnology"; or

b.  Claim "suit", demand, judgment, obligation, request, or settlement due to any actual, alleged, or threatened injury or damage from "nanotubes" or "nanotechnology" or testing for, monitoring, cleaning up, removing, containing, mitigating, treating, neutralizing, remediating, or disposing of, or in any way responding to or assessing the actual or alleged effects of, "nanotubes" or "nanotechnology" by any insured or by any other person or entity; or

This exclusion applies regardless of who produced, installed, used, owned, sold, distributed, handled, stored or controlled the "nanotubes" or "nanotechnology".

B.  The following definitions are added:

"Nanotubes" means hollow cylinders of carbon atoms or carbon fibers or any type or form of "nanotechnology" which contain remarkable strength and electrical properties used in any products, goods, or materials.

"Nanotechnology" means engineering at a molecular or atomic level.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ASBESTOS EXCLUSION ENDORSEMENT**

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

1. The following Exclusion is added to SECTION I - COVERAGES, COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. - EXCLUSIONS and SECTION I - COVERAGES, COVERAGE B. - PERSONAL AND ADVERTISING INJURY LIABILITY, 2. - EXCLUSIONS.

   1. Any liability for "bodily injury", "property damage", "personal injury", "advertising injury", occupational disease, disability, shock, mental anguish or mental injury, at any time arising out of the manufacture of, mining of, use of, sale of, installation of, distribution of, disposal of, or exposure to (including, but not limited to exposure occurring during disturbance, removal, encapsulation, or abatement activities involving) asbestos, asbestos products, asbestos containing materials, asbestos fibers or asbestos dust; or

   2. Any obligation of the "insured" to indemnify any party because of damages arising out of "bodily injury", "property damage", "personal injury", "advertising injury", occupational disease, disability, shock, mental anguish or mental injury, at any time as a result of the manufacture of, mining of, use of, sale of, installation of, distribution of, disposal of, or exposure to (including, but not limited to exposure occurring during disturbance, removal, encapsulation, or abatement activities involving) asbestos, asbestos products, asbestos containing materials, asbestos fibers or asbestos dust; or

   3. Any obligation to defend any "suit" or claim against the "insured" alleging "bodily injury", "property damage", "personal injury", "advertising injury", occupational disease, disability, shock, mental anguish or mental injury, resulting from or contributed to by, the manufacture of, mining of, use of, sale of, installation of, distribution of, disposal of, or exposure to (including, but not limited to exposure occurring during disturbance, removal, encapsulation, or abatement activities involving) asbestos, asbestos products, asbestos containing materials, asbestos fibers or asbestos dust.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## FUNGI OR BACTERIA EXCLUSION

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2.**, Exclusions of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

   **2. Exclusions**

     This insurance does not apply to:

     **Fungi or Bacteria**

     **a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

     **b.** Any financial loss, cost or expense to abate, test, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate, dispose, or otherwise respond to, or assess the effects of, "fungi" or bacteria on or within a building or structure, including its contents, incurred by any insured or by any other person or entity.

     This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**B.** The following exclusion is added to Paragraph **2.**, Exclusions of **Section I – Coverage B – Personal And Advertising Injury Liability:**

   **2. Exclusions**

     This insurance does not apply to:

     **Fungi or Bacteria**

     **a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

     **b.** Any financial loss, cost or expense to abate, test, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate, dispose, or otherwise respond to, or assess the effects of, "fungi" or bacteria on or within a building or structure, including its contents, incurred by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

   "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

Includes copyrighted material of ISO, Ins., with its permission.

# ENVIRONMENTAL IMPAIRMENT POLLUTION LEGAL LIABILITY POLICY

**Various provisions in this Policy restrict coverage. Portions of this Policy are on a claims made and reported basis. Read the entire Policy carefully to determine your rights, duties, and what is and is not covered.**

Throughout this Policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as an Insured under this Policy per **Section IV – Who Is An Insured.** The words "we," "us," and "our" refer to the Company providing this insurance, as stated in the Declarations.

Other words and phrases that appear in bold-faced and underlined type have special meaning. Refer to Section VIII – Definitions.

In consideration of payment of the premium and in reliance upon the Application, submitted materials and statements made a part hereof, we agree with you, subject to all the terms, exclusions and conditions of this Policy, as follows:

## Section I - Pollution Legal Liability Coverage(s)

The following coverages apply only if a premium and limit of liability is shown for the coverage in the Declarations of this Policy:

1. **Insuring Agreement - New Pollution Conditions (Claims-Made and Reported Coverage)**

   We will pay those sums that you become legally obligated to pay as <u>Loss</u> as a result of <u>Claims Arising from</u> <u>Pollution Conditions</u> on, at, under, or migrating from the <u>Covered Location(s)</u> provided the <u>Claim</u> is first made during the <u>Policy Period</u> or extended reporting period, if any. Coverage as identified in this paragraph only applies to <u>Pollution Conditions</u> that first commenced, in whole or part, on or after the inception of the <u>Policy Period</u> and subsequent to the retroactive date.

2. **Insuring Agreement – Pre-Existing Pollution Conditions (Claims-Made and Reported Coverage)**

   We will pay those sums that you become legally obligated to pay as <u>Loss</u> as a result of <u>Claims Arising from</u> <u>Pollution Conditions</u> on, at, under, or migrating from the <u>covered location(s)</u> provided the <u>Claim</u> is first made during the <u>Policy Period</u> or extended reporting period, if any. Coverage as identified in this paragraph only applies to <u>Pollution Conditions</u> that first commenced, in whole or part, prior to the inception of the <u>Policy Period</u>, if any, and subsequent to the retroactive date.

3. **Insuring Agreement – Sudden and Accidental Pollution Conditions (Claims-Made and Reported Coverage)**

   We will pay those sums that you become legally

obligated to pay as <u>Loss</u> as a result of <u>Claims Arising from</u> <u>Pollution Conditions</u> on or at a <u>Covered Location</u> provided:

a. The <u>Pollution Condition</u> is the result of an unforeseen, unplanned, or unexpected event or circumstance; and

b. The <u>Pollution Condition</u> is first discovered within 72 hours from when it began; and

c. A <u>Claim</u> is first made within 7 days from the day and time the <u>Pollution Condition</u> is first discovered; and

d. The <u>Claim</u> is made during the <u>Policy Period</u> or the extended reporting period, if any; and

e. The <u>Claim</u> is made subsequent to the retroactive date.

"<u>Pollution Condition</u>" or "<u>Pollution Conditions</u>" as used in this **Insuring Agreement 3**, and only in this **Insuring Agreement 3**, means, at a <u>Covered Location</u>, the sudden and abrupt discharge, release, or escape of any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, bacteria, hazardous substances, hazardous materials, EM of waste materials on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater and originated at the <u>Covered Location</u>.

4. **Insuring Agreement – Products Pollution (Claims-Made and Reported Coverage)**

   We will pay those sums that you become legally obligated to pay as <u>Loss</u> as a result of <u>Claims Arising from</u> <u>Pollution Conditions</u> caused by your

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

environmental products completed operations hazard provided the claim is first made during the policy period or extended reporting period, if any and subsequent to the retroactive date.

5. No other obligation or liability to pay sums or to perform acts or services is covered unless explicitly provided for under Supplementary Payments.

## Section II – Settlements, Defense Expense and Supplementary Payments

We will pay:

### 1. Settlements & Defense Expense

When a Claim is made for which Section I - Pollution Legal Liability Coverage applies, we shall have the right and duty to defend any Claim, even if any of the allegations of the Claim are groundless, false or fraudulent. We shall investigate the Claim and, with your written consent, settle or compromise any Claim as we deem appropriate. If you refuse to consent to any settlement or compromise recommended by us which is acceptable to the claimant, then our liability for the Claim shall not exceed the amount which we would have paid for Loss and Claim Expenses at the time the Claim could have been settled or compromised.

Upon your satisfaction of any applicable Deductible amounts as shown in the Declarations, Claim Expenses shall be paid by us and such payments shall be included as Loss and reduce the available applicable Limit of Liability as shown in the Declarations. We shall not be obligated to defend or continue to defend any Claim after the applicable Limit of Liability has been exhausted by payment of Loss or by tender of amounts into court of appropriate jurisdiction in satisfaction of any judgment or award issued against the Insured..

### 2. Deposition and Other Legal Expense Reimbursement

We will compensate you for actual loss of earnings, and reasonable personal and travel expenses up to $500 per day, incurred by you when you, or an employee on your behalf, attends a hearing, deposition or trial at the written request of us in the course of defending Coverage within Section I - Pollution Legal Liability Coverage. The most we will pay for loss of earnings and expenses for your attendance at hearings, depositions or trials for any one Claim is $10,000.

### 3. Disciplinary Proceeding Expense

We will compensate you for actual loss of earnings, and reasonable personal and travel expenses up to

$500 per day, incurred by you when you, or an employee on your behalf, is required to attend a disciplinary proceeding made against you or any third party related to coverage within Section I - Pollution Legal Liability Coverage. The most we will pay for loss of earnings and expenses for your attendance at any one disciplinary proceeding is $10,000.

### 4. Subpoena Expense Reimbursement

We will compensate you for actual loss of earnings, and reasonable personal and travel expenses up to $500 per day, incurred by you when you, or an employee on your behalf, is required to produce documents or respond to a subpoena for records in the course of defending Coverage within Section I - Pollution Legal Liability Coverage.

We shall, at your request, retain counsel and pay such counsel's reasonable and necessary fees and costs to advise you regarding the production of documents and/or represent you during the preparation and giving of testimony, in response to a subpoena for records, served on you. This coverage is available provided such expense is not otherwise recoverable as Defense Expense in conjunction with a Claim or Loss. The actual cost of copying and reviewing such records in the defense of a Claim by us will be considered Claim Expense. The most we will pay for loss of earnings and expenses in relation to subpoenas or record requests issued in any one Claim is $10,000.

### 5. Supplementary Payments Sub-Limit

Subject to the sub-limits listed for each, the payments made under Section II - Supplementary Payments Coverages 2, 3, and 4 are made in addition to the Per Loss Limit of Liability set forth in the Declarations, but are included in, and capped by, the Policy Aggregate Limit of Liability.

## Section III - Exclusions

This Policy does not provide coverage for, and will not apply to Loss, cost, expense or any other amount:

a. Affiliates: Arising from errors, acts or omissions claimed against, any of the following entities:

1. Any related business enterprise which is operated, managed or owned, in whole or in part, by an Insured; or

2. Your parent company; or

3. Any other affiliated or subsidiary companies;

unless the entity is named as an Insured or as an

Copyright, Aspen Specialty, 2008, 2010.
Includes copyrighted material of ISO, Inc. with its permission.

additional Insured in this Policy, or in an endorsement attached to this Policy. In no event shall this policy cover suits by one Insured or additional Insured under this policy against another Insured or additional Insured under this policy.

b. **Asbestos:** <u>Arising From</u> asbestos, or asbestos containing materials, on, in or applied to any building or other structure. This exclusion does not apply to asbestos, or asbestos containing materials in groundwater or soil.

c. **Bankruptcy:** <u>Arising From</u> any insolvency or bankruptcy of any Insured.

d. **Contractual Liability:** Solely as respects to Section I - Pollution Legal Liability Coverage Insuring Agreement 1, 2 and 3 <u>Arising From</u> the liability of others assumed by the Insured under any contract or agreement. This exclusion does not apply to:

   1. Liability for <u>Loss</u> that you would have in the absence of the contract; or

   2. Your obligations to indemnify, hold harmless, or defend any assumptions of liability from an <u>Environmental Contractual Indemnity Agreement</u>, with respects to <u>Pollution Conditions</u> to which this insurance applies, pursuant to a contract listed on the Schedule of the Environmental Contractual Indemnity Agreement Schedule attached to this policy.

e. **Discrimination:** <u>Arising from</u> any actual or alleged discrimination, humiliation, harassment, or misconduct because of race, creed, color, age, gender, sex, sexual preference or orientation, national origin, religion, disability, handicap or marital status.

f. **Divested Property:** <u>Arising from Pollution Conditions</u> on, at, under, or migrating from, a location, even though it may qualify as a <u>Covered Location</u> because it is shown in the Declarations or a Schedule as a <u>Covered Location</u> for this policy, if the <u>Pollution Condition</u> is first discovered after the location has been:

   1. Sold, abandoned, discharged, disposed of, or given away by you; or

   2. Condemned by any local, state, or federal government or agency.

g. **Employment Related Practices:** <u>Arising from</u> any refusal to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, wrongful infliction of emotional distress or other employment related tors, wrongful deprivation of a career opportunity, breach of an y oral, written

or implied employment contract or quasi-employment contract, violation of any federal, state or local statute, regulation, ordinance, common law or public policy concerning employment or discrimination in employment.

h. **Expected or Intended:** <u>Arising From Loss,</u> expected or intended from the standpoint of the Insured, from <u>Pollution Conditions</u>.

i. **Known Conditions:** <u>Arising From</u> any <u>Known Condition</u>.

   which are not specifically identified in the documents listed in the Schedule of the Known Conditions Endorsement attached to this policy.

j. **Exterior Insulation and Finish System (EFIS):** <u>Arising from Pollution Conditions</u> where such <u>Pollution Conditions</u> is caused by or related to the use, installation, removal of or presence of <u>Exterior Insulation and Finish System (EFIS)</u>, synthetic Stucco, or any similar product or any part thereof, including the use or application of paints, conditioners, accessories, primers, flashings, coating, caulking or sealants in connection with such product.

k. **Fines, Penalties and Multiple Damages:** Any criminal fines or penalties or awards including the defense of such proceedings or allegations for multiple damages assessed against an Insured relating to <u>Claims</u> or <u>Loss</u> covered by this Policy. Solely as respects to Section I - Pollution Legal Liability Coverage Insuring Agreements 1, 2 and 3 this exclusion shall not apply to coverage for punitive damages where such coverage is allowable by law.

l. **First-Party Property Damage:** <u>Arising from</u> damage to real or personal property owned by, leased to, loaned to, or rented by you, or otherwise in the care, custody, or control of by you. This exclusion does not apply to <u>clean-up costs</u>.

m. **Insurance, Suretyship and Bonds:** <u>Arising from</u> the advising, requiring, obtaining or maintaining of any form of insurance, suretyship or bond, or the failure to do so.

n. **Insureds' Expenses.** Expenses incurred for the use of salaried staff or any other employees of an Insured.

o. **Intentional Actions:** <u>Arising From</u> any Insured's intentional disregard of, or deliberate, willful or dishonest non-compliance with, any statute, regulation, ordinance, administrative complaint, notice letter, order, settlement agreement, or instruction by or on behalf of any governmental

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

agency or representative.

p. **Lead:** <u>Arising from</u> Lead based paint, on, in or applied to any building or structure. This exclusion does not apply to lead based paint in groundwater or soil.

q. **Material Change in Use:** <u>Arising from</u> a change in the use or operations at the <u>covered location</u> that materially increases the likelihood or severity of a <u>pollution condition</u>, <u>claim</u> or <u>loss</u> from the intended use or operations, as of the inception date of this policy and as disclosed to the company and made part of the application or submission.

r. **Mold:** Arising from <u>Mold</u> or <u>Mold Clean-up Cost</u>.

s. **Non-Owned Disposal Sites:** <u>Arising from</u> <u>pollution conditions</u> on, at, under, or migrating from a <u>Non-Owned disposal site</u>. This exclusion shall not apply to any <u>Non-Owned Disposal Site</u> listed on the Schedule of Non-Owned Disposal Sites Endorsement, if any.

t. **Product Liability:** Solely as respects to **Section I - Pollution Legal Liability Coverage Insuring Agreements 1, 2 and 3** <u>Arising from</u> the sale, handling, supply, distribution, design or manufacture of a product by you or by others trading under your name or under license.

u. **Product Recall:** <u>Arising from</u> the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of <u>your product</u>, <u>your work</u> or <u>impaired property</u> if such product, work or property is recalled or withdrawn from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition.

v. **Professional Liability:** <u>Arising from</u> professional services rendered or failed to be rendered by you or others for whom you are legally liable, including but not limited to, recommendations, opinions or strategies rendered for environmental consulting, or other consulting, design or engineering work, such as drawings, designs, maps, reports, surveys, change orders, plan specifications, assessment work, remedy selections, site maintenance, equipment selection, or related construction management, supervisory, inspection or engineering service.

w. **Property Damage:** <u>Arising from:</u>

1. <u>Property Damage</u> to the Insured's products; or

2. <u>Property Damage</u> to that particular part of real property.

x. **Radioactive Material:** <u>Arising from</u> the hazardous properties of <u>Radioactive Material</u>. For purposes of this Policy, <u>Radioactive Material</u> means any substance or material, whether liquid, solid or gas, which is, or may be, radioactive, or has been exposed to radiation, including but not limited to Source Material, Special Nuclear Material and Byproduct material as defined in the Atomic Energy Act of 1954 and any amendments thereto.

y. **Transportation:** Arising from the use, maintenance or operation, of an automobile, aircraft, watercraft, mobile equipment, or other conveyance.

z. **Underground Storage Tank(s) or System(s):** <u>Arising from</u> <u>Pollution Conditions</u> emanating from an <u>Underground Storage Tank(s) or System(s)</u> at a <u>Covered Location</u> that was known to you prior to the policy period:

1. When the existence of such <u>Underground Tank(s) or System(s)</u> was known to you prior to the policy period; and

2. Which <u>Underground Storage Tank(s) or System(s)</u> is not listed in the schedule of <u>Underground Storage Tank(s) or System(s)</u>, if applicable; or

3. If an <u>Underground Storage Tank(s) or System(s)</u> has been closed, removed or identified, and is not scheduled to the known conditions endorsement, if applicable.

aa.**War:** however caused, arising directly or indirectly, out of:

1. War, including undeclared civil war;

2. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or agents; or

3. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

bb.**Warranty or Guarantee:** Solely as respects to **Section I - Pollution Legal Liability Coverage Insuring Agreements 1, 2 and 3** <u>Arising From</u> any kind of express warranty or guarantee given on or behalf of the Insured.

cc.**Wells:** <u>Arising From Pollution Conditions</u> that result from the discharge, escape, migration, release or seepage of oil, gas, drilling fluid, or any other fluid, from any oil, gas, mineral, geothermal or

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

water well.

dd. **Workers Compensation and Employers Liability:** <u>Arising From</u> any obligation for which you or any other party may be held liable under any state or federal unemployment laws, Workers' Compensation acts, disability benefits schemes, the Jones Act, or other similar laws, including claims:

1. Of any employee, contract employee, or leased personnel retained by you if such injury occurs during and in the course of employment;

2. Involving injury to a spouse, child, parent, sibling or other relation of any employee, contract employee, or leased personnel occurring as a consequence of the employment; or

3. Relating to any obligation of any Insured for indemnity or contribution to third parties due to the employment of any employee, contract employee, or leased personnel.

**Section IV – Who Is An Insured**

The word "Insured" as used herein means:

1. You; and

2. Any present director, officer, partner, member, employee, leased or temporary worker of yours, while acting within the scope or his or her duties as such;

**Section V - Limits of Liability and Deductible**

1. The Limit of Liability for this insurance shall be shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. <u>Claims</u>;

   c. Persons or organizations making <u>Claims</u>; or

   d. Governmental actions or demands taken with respect to <u>Clean Up Costs</u> or <u>Environmental Products Completed Operations Hazard.</u>

2. For coverages for which a premium and limit of liability are shown in the Declarations of this policy or in any endorsement attached to this Policy we will pay all <u>Loss</u> resulting from each <u>Claim</u> in excess of the Deductible stated in the Declarations for that coverage. The most we will pay for <u>Loss</u> is the applicable Limits of Liability for that coverage stated in the Declarations or in any endorsement attached to this Policy.

The most we will pay for <u>Loss</u> for all coverages under this Policy shall be the Policy Aggregate Limit of Liability stated in the Declarations.

<u>Claim Expenses</u> shall be part of and not in addition to the Limit of Liability and payments of <u>Claim Expenses</u> and <u>Loss</u> shall reduce the applicable Per Loss Limit of Liability.

Any payments made under **Section II - Supplementary Payments Coverages 2, 3, and 4,** are in addition to the applicable Per Loss Limit of Liability stated in the Declarations, and shall not reduce such Limit of Liability, but are subject to the Policy Aggregate Limit of Liability.

3. If the applicable Per Loss Limit of Liability stated in the Declarations for a coverage, in any endorsement attached to this Policy, or the Policy Aggregate Limit of Liability stated in the Declarations, is exhausted by any one or more of the following:

   a. Payment of <u>Loss</u>, or

   b. Payment of <u>Claim Expenses</u> or <u>Clean-up Cost</u>, or

   c. Tender of the remaining Policy limits is made to the insured, or a claimant, or to a court having jurisdiction over the <u>Claim</u>.

all of our obligations under the Policy with respect to any <u>Claim</u> under the coverage if that coverage's Per Loss Limit of Liability is exhausted, or under the Policy if the Policy Aggregate is exhausted, including the duty to defend, shall terminate immediately.

4. Any "Per Loss" Deductible stated in the Declarations for a coverage applies to all <u>Loss</u> under that coverage arising out of any one <u>Pollution Condition</u> or <u>Environmental Products Completed Operations Hazard</u> or continuous <u>Pollution Conditions</u>. <u>Environmental Products Completed Operations Hazard</u>. The Deductible shall be paid by the Insured "Per Loss" and shall remain uninsured. The Limits of Liability for a coverage shall apply in excess of the Deductible.

We may advance payment of part or all of the Deductible amount and, upon notification of such payment made, the Insured shall promptly reimburse us for the Deductible amounts advanced by us.

We shall at all times be entitled to offset unpaid Deductible amounts due from the Insured against <u>Claims</u> payments due to, or to be paid on behalf of, the Insured.

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

## Section VI – General Conditions

**1.  Application and Representations**

In granting coverage under this Policy, we have relied on the declarations, representations and warranties in the Application and in submitted materials and statements made a part of this Policy. All such declarations, representations and warranties are the basis of coverage under this Policy and are considered as incorporated into and constituting a part of this Policy.

By acceptance of this Policy, you agree that the declarations, representations and warranties in the Application, submitted materials and statements made a part of this Policy are the true and correct. Each shall be deemed material to the acceptance of the risk or the hazard assumed by us under this Policy, and this Policy is issued in reliance upon the truth and accuracy of such representations.

This Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts with each Insured.

**2.  Insured's Duties in the Event of a Loss, Claim, Suit, or Mold Incident**

a.  In the event of a **Pollution Condition** which may result in a **Claim** or any action or proceeding to impose an obligation on an insured for **Clean Up Costs** you must give us notice as soon as practicable. The notice should include:

(1) The names and addresses of the injured and of available witnesses;

(2) How, when, and where the **Pollution Condition** took place; and

(3) The nature and location of any injury or damage arising out of the **Pollution Condition** . Notice to your or our agent, broker, or producer is not notice to us as required by c. below.

b.  In the event of discovery of a **Pollution Condition** you must make every attempt to mitigate any **Loss** and **Clean Up Cost** and to comply with any applicable **Environmental Regulations and Laws**. We have the right, but no duty, to mitigate a **Pollution Condition** if we believe you fail to take reasonable and necessary action to mitigate the **Loss** and **Clean Up Costs.** Any cost or expense we incur will be considered **Claims Expense.**

c.  If a **Claim** for **Loss** or **Environmental Products**

**Completed Operations Hazard** is made or suit is brought against any Insured, the Insured shall immediately forward to us every demand, notice, summons or other process received, and notify us in writing of the date any Insured first received such **Claim** for **Loss** or suit.

d.  All Notices of incidents, and **Claims** or suits for **Loss**, **Environmental Products Completed Operations Hazard** must be immediately sent to Aspen Specialty Insurance Management, Inc. as follows;

**By Mail: Claims Department**
Aspen Specialty Insurance Mgmt, Inc.
600 Atlantic Avenue 21st Floor
Boston, MA 02210
Main Tel. No.: 617-532-7300
**By FAX: 617-532-7342**

**By Dedicated Email:**
environmental.claims@aspenspecialty.com

e.  The Insured shall cooperate with us and, upon our request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of injury or damage with respect to which insurance is afforded under this Policy;

f.  The Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. Upon written request of the Company, the Insured shall submit to an examination under oath by our representative; and

g.  No Insured shall, except at his, her, or its own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of an accident or to mitigate a **Pollution Condition** as described in Paragraph **b.** above.

h.  As a condition precedent to any coverage provided by this Policy to apply the Insured shall provide notice to us:

(1) Prior to the start of any remediation work;

(2) Prior to the undertaking of any clean-up activities, or

(3) For the approval of any expense relating to any of the items covered under this Policy as Supplementary Payments.

**3.  Governing Law**

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

This Policy shall be interpreted in accordance with the law of the Commonwealth of Massachusetts, without regard to any conflict of law provisions thereof.

4. **Other Insurance**

a. **Excess Insurance:** This insurance shall apply in excess of the amount of the Deductible, the self-insured retention, and any other valid insurance available, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance specifically applies as excess insurance over the applicable Limit of Liability provided herein unless paragraph **b. Primary Insurance**, below, applies.

b. **Primary Insurance:** This insurance is primary only if required of the Insured by a written contract. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in paragraph **c. Method of Sharing**, below.

c. **Method of Sharing:** If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Changes**

Notice to or knowledge possessed by any agent or other person acting on our behalf or any conduct by any such agent or other person shall not effect a waiver or a change in any part of this Policy or stop us from asserting any right under the terms of the Policy. This Policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this Policy with our written consent. This Policy's terms can be amended or waived only by endorsement issued by us and made a part of this Policy.

6. **Assignment**

Assignment of interest under this Policy shall not bind us without our written consent.

7. **Cancellation**

a. This Policy may be cancelled by the first Named Insured by surrendering the Policy to us or by mailing to us written notice requesting cancellation and stating when thereafter the cancellation shall take effect. If the Policy is cancelled by the first Named Insured, we shall retain the customary short rate proportion charge, that is – 10% of the premium.

b. If the Policy is cancelled by us, the earned premium shall be computed pro rata, however, we shall be entitled to no less than the minimum earned premium stated in the Declarations page. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

c. We may cancel this Policy for any of the following reasons:

(1) Non-payment of Premium; or

(2) Fraud or material misrepresentation on the part of any Insured.

d. We will mail written notice of cancellation to the first Named Insured at the last known address. If cancellation is for non-payment of premium at least ten (10) days notice will be provided. If cancellation is for any other reason, at least thirty (30) days notice will be provided.

8. **Action Against Company**

No person or entity has a right under this Policy to join us as a party or otherwise bring us into a suit asking for damages from an Insured, or to sue us on this Policy unless all its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an Insured; but we will not be liable for damages that are not payable under the terms of this Policy or that are in excess of the applicable Limit of Liability. An agreed settlement means a settlement and release of liability signed by us, the Insured, and the claimant or the claimant's legal representative.

9. **Bankruptcy or Insolvency**

a. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve us of any of our obligations under the Policy.

b. Notwithstanding the foregoing, you agree that in any bankruptcy or similar insolvency proceeding

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

we should have full rights as a party in interest under 11 U.S.C §1109(b) of the Bankruptcy Code or similar statute including, among other things, objecting to any Plan proposed or other matters affecting, directly or indirectly, the Policy or rights created hereunder.

You further agree that it will be a material breach of this Policy for you to propose or support in a plan of reorganization, or otherwise, any provision or any claims resolution facilities that would alter, restrict, modify or affect, in any way, or rights under the Policy.

## 10. Authorization

By acceptance of this Policy, you agree that the first named Insured shall act on behalf of all Insureds with respect to the purchase and negotiation of this Policy, the giving and receiving of all notices as provided herein, the cancellation of this Policy, the payment of premiums and Deductibles, the receiving of any return premiums that may become due and the purchase of any available Optional Extended Reporting Period.

## 11. Audit

We may examine and audit your books and records at any time during the Policy period and within three (3) years after the final termination of this Policy or the Optional Extended Reporting Period, as far as they relate to this Policy.

## 12. Inspection

We shall be permitted but not obligated to inspect, sample, and monitor on a continuing basis the Insured's property or operations, at any time. Neither our right to make inspections, sample, and monitor, nor the actual undertaking thereof nor any report thereon, shall constitute an undertaking, on behalf of the Insureds or others, to determine or warrant that property or operations are safe, healthful or conform to acceptable engineering practice or are in compliance with any law, rule, or regulation.

## 13. Subrogation

In the event of any payment under this Policy, then we shall be subrogated to all the Insured's rights of recovery therefore against any person or organization. The Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after loss to prejudice our rights. Notwithstanding the forgoing, we hereby waive our rights of subrogation against Clients of the Named Insured(s) where required by written contract

executed prior to any **Loss** or **Environmental Products Completed Operations Hazard**.

## 14. Policy Territory

The insurance afforded by this Policy applies worldwide provided that the **Claim** is made in, and any legal action is pursued within, the United States of America, its territories, possessions or commonwealths, or Canada, and to which U.S. law only applies.

## Section VII – Extended Reporting Periods

1. **Automatic Extended Reporting Period**

   a. An Automatic Extended Reporting Period of 60 days is provided if this Policy is cancelled or not renewed by us, or if it is renewed with an advanced Retroactive Date, unless:

      1. We cancel the Policy for non-payment of premium; or

      2. Any Insured fails to repay any Deductible amount we have paid.

   b. The Automatic Extended Reporting Period does not extend the **Policy Period** or change the scope of coverage provided. It applies only to **Claims** to which the following applies;

      1. The **Claim** is first made and reported to us before the end of the Automatic Extended Reporting Period; and

      2. The **Claim Arises From Pollution Conditions** that commence on or after the Retroactive Date, if any, shown in the Declarations and before the end of the **Policy Period.**

   c. There is no separate or additional Limit of Liability for the Automatic Extended Reporting Period. The Limit of Liability available during the Automatic Extended Reporting Period shall be the remaining amount, if any, of the aggregate Limit of Liability available at the time that this Policy was cancelled, non-renewed, or renewed with an advanced Retroactive Date.

2. **Optional Extended Reporting Period**

   a. An Optional Extended Reporting Period may be available if this Policy is cancelled or not renewed by us, or if it is renewed with an advanced Retroactive Date, unless:

(1) We cancel the Policy for non-payment of premium;

(2) Any Insured fails to repay any Deductible amount we have paid;

(3) Any Insured has purchased any other insurance to replace the insurance provided under this Policy; or

(4) We cancel this insurance because of fraud or material misrepresent-tation by an Insured.

The Optional Extended Reporting Period is available only if a written request of the first Named Insured is mailed to us, by Certified U.S. Mail, during the 60 days of the Automatic Extended Reporting Period.

b. The Optional Extended Reporting Period will not provide a separate or additional Limit of Liability for the Optional Extended Reporting Period. The Limit of Liability available during the Optional Extended Reporting Period shall be the remaining amount, if any, of the aggregate Limit of Liability available at the time that this Policy was cancelled, non-renewed, or renewed with an advanced Retroactive Date.

c. The Optional Extended Reporting Period will not extend the **Policy Period** or change the scope of coverage provided. It applies only to **Claims** to which the following applies;

(1) The **Claim** is first made and reported to us before the end of the Optional Extended Reporting Period; and

(2) The **Claim Arises From Pollution Conditions** that commence on or after the Retroactive Date, if any, shown in the Declarations and before the end of the **Policy Period.**

d. The length and cost of any Optional Extended Reporting Period offered will be determined by us after the written request of the first Named Insured has been received.

**Section VIII - Definitions**

Definitions used in this Policy form apply to this Policy form only, and any Endorsements which rely upon such definitions or do not contain their own definitions.

1. **Arising from, Arises From,** and **Arise From** means directly or indirectly caused by, resulting from, based upon, arising out of, from, in consequence of, or in any way involving or related to.

2. **Bodily Injury** means physical injury, illness, sickness or disease sustained by a person, including death resulting from any of these at any time. **Bodily Injury** also means mental illness, mental anguish, or emotional distress, pain or suffering, or shock sustained by that person, whether or not resulting from physical injury, sickness, disease or death of any person.

3. **Claim or Claims** means any written or oral demand, notice, request for indemnity or other legal or equitable proceedings asserted against an **Insured** by a person, entity, or asserted class for **Loss**, including the service of suit or institution of arbitration or mediation proceedings, arising out of **Pollution Conditions** to which this insurance applies. Any **Loss** will be deemed to occur at the time the damage first started to occur, even if such damage continues or progresses.

4. **Claim Expense** or **Claims Expenses** means reasonable fees charged by any lawyer retained by us, and, if authorized by us, all other reasonable fees or costs incurred in the defense of a **Claim**, including expenses for investigation, adjustment and appeal. **Claim Expenses** shall not include any remuneration, salaries, regular or overtime wages, or benefits of any Insured that are associated with the defense and investigation of a **Claim**. Expense payments shall not be deemed **Supplementary Payments** to the extent they are already covered as **Claim Expense.**

5. **Clean-up Costs** means reasonable expenses incurred to investigate, quantify, monitor, abate, remove, dispose, treat, detoxify, remediate, neutralize, and/or immobilize **Pollution Conditions** which arise to the extent required by **Environmental Regulations and Laws. Clean-up Costs** shall also include reasonable **Claims Expense**, where such cost have been incurred; and **Restoration Costs.**   Clean-up Cost shall also include:

a. Reasonable **Claims Expense**, where such cost have been incurred; and

b. **Restoration Cost.**

during the course of responding to a **Pollution Condition.**

6. **Covered Location** or **Covered Locations** means any location(s) listed on the Declarations Page or any other schedule or endorsement attached to this policy as a **covered location** for which this insurance applies. Locations, not listed or attached

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

to the policy as referenced above are not **covered locations**.

7. **Environmental Contractual Indemnity Agreement** means your obligations to indemnify, hold harmless, or defend any assumptions of liability, with respects to **pollution conditions** to which this insurance applies, pursuant to a contract listed on the Schedule of Environmental Contractual Indemnity Agreement Schedule.

8. **Environmental Products Completed Operations Hazard** includes those hazards resulting in **Loss** occurring away from your premises that you own, rent or occupy, or away from premises that you sell, give away or abandon, caused by **pollution conditions arising from your product** or **your work** for which this insurance applies except:

   a. (1) **Your Product** that remains in your physical possession: or

   (2) **Your Work** that has not been completed or abandoned. However, **Your Work** will be deemed to be completed at the earliest of the following items:

   (a) When all of the work called for in your contract has been completed.

   (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

   (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   b. **Environmental Products Completed Operations Hazard** does not include **Loss arising from**:

   (1) The transportation of property, unless the injury or damage **Arises From** a condition in or on the vehicle not owned or operated by you, and that condition was created by the loading and unloading of that vehicle by any insured; or

   (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

   (3) **Your Product** or **Your Work** that are not specifically named in a schedule attached to this policy or by endorsements attached to this policy.

9. **Environmental Regulations and Laws** means any federal, state, provincial or local laws that are applicable to **Pollution Conditions**. **Environmental Regulations and Laws** shall include, but not limited to, statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives.

10. **Exterior Insulation and Finish System (EFIS)**: means synthetic stucco or any other exterior insulation and finish system used on any part of any building or structure and consisting of:

   a. A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

   b. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

   c. A reinforced base coat; and

   d. A finish coat providing surface texture and color.

11. **Impaired Property** means tangible property, other than **your product** or **your work**, that cannot be used or is less useful because:

   a. It incorporates **your product** or **your work** that is known or thought to be defective, inadequate, dangerous, deficient; or

   b. You, or someone acting on your behalf, have failed to fulfill the terms of a contract or agreement.

   **Impaired Property** does not include property that can be restored to use by:

   a. The repair, replacement, removal or adjustment of **your product** or **your work**; or

   b. Your fulfilling the terms of a contract or agreement

12. **Known Condition** means **Loss** arising out of **Pollution Conditions** that existed prior to the **Policy Period** or were known by an insured prior to the **Policy Period**, and any subsequent continuation or resumption of our changes in such **Pollution Conditions**.

13. **Loss** means **Bodily Injury**, **Property Damage**, **Clean-up Cost**, .

14. **Mold** means the presence, discharge, dispersal, release, escape, migration, or seepage of any fungi, mold or mildew, bacteria, viruses or spores whether or not such **Mold** is living in or within any structure,

provided such conditions are not naturally occurring in the environment in amounts and concentrations discovered. Structure as used in this definition means a roofed and walled building built for permanent use. **Mold** must be unexpected and unintended from the standpoint of the Insured.

15. **Mold Clean-up Cost** means reasonable expenses incurred to investigate, quantify, monitor, abate, remove, dispose, treat, detoxify, neutralize, and/or immobilize **Mold** to the extent required by **Environmental Regulations and Laws** or as recommended by a mutually agreed upon review by a Certified Industrial Hygienist (CIH). **Mold Clean-up Costs** shall also include:

    1. reasonable **Claims Expense**, where such cost have been incurred; and

    2. **Restoration Costs**.

16. **Natural Resource Damage** means damages for, injury to, destruction of, or loss of, **Natural Resources**.

17. **Natural Resources** means fish, wildlife, biota, land, air, water, groundwater, drinking water supplies, and other similar resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the US, and state or local government, any foreign government, or any Indian tribe, including the reasonable cost of assessing such injury, destruction or loss resulting therefrom.

18. **Non-Owned Disposal Site** means a site that is not operated by or owned by you or you do not maintain ownership interest or equity of, which receives or has returned your waste.

19. **Policy Period** means the period of time as shown in the Declarations, or if applicable, any earlier cancellation date. The **Policy Period** does not include the Automatic Extended Reporting Period or an Optional Extended Reporting Period.

20. **Pollution Condition** or **Pollution Conditions** means the discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, bacteria, hazardous substances, hazardous materials, EMF or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water or groundwater.

    This applies provided such conditions are not naturally occurring in the environment in amounts and concentrations discovered. Any **Pollution Condition(s)** must be unexpected and unintended from the standpoint of the Insured. For the purpose

of this definition, waste materials includes, but is not limited to, low level radioactive waste and mixed waste. Low level radioactive waste is as defined in 10 CFR 62.2 by the United States Nuclear Regulatory Commission.

21. **Property Damage** means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **Pollution Condition** that caused it.

    c. **Natural Resources Damage**.

    **Property Damage** does not include **Clean-up Cost** or physical injury to or the loss of use of the insured's own property or property over which the insured is now or has ever exercised physical possession or control.

22. **Restoration Costs** means reasonable and necessary costs incurred by the Insured with our written consent, which consent shall not be unreasonably withheld or delayed, to repair, replace or restore real or personal property to substantially the same condition it was in prior to being damaged during work performed in the course of incurring **Clean-Up Costs** arising from **Pollution Conditions**. **Restoration Costs** do not include costs associated with improvements or betterments.

23. **Underground Storage Tank(s) or System(s)**: Means any one or combination of tanks (including underground pipes connected thereto) that is used to contain an accumulation of regulated substances, and the volume of which (including the volume of underground pipes, fill, vent and above ground distribution components connected thereto) is 10 percent or more beneath the surface of the ground.

24. **Your Product** means:

    a. Specific goods or products other than real property, designated by endorsement, scheduled to the policy or on the Declarations Page, that is manufactured, sold, handles, distributed or disposed of by you, others trading under your name or a person or organization whose business or assets you have acquired.

    b. Containers, (other than automobiles, rolling stock, vessels or aircraft), materials or equipment furnished in connection with such goods or property

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

25. **Your Work** includes the specific:

   a. Warranties or representations made at any time prior, during or subsequent to the Policy Period with respect to the fitness, quality, durability, performance or use and

   b. Providing of or failure to provide warnings or instructions.

Copyright, Aspen Specialty, 2008, 2010
Includes copyrighted material of ISO, Inc. with its permission.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SCHEDULE OF COVERED LOCATION(S) ENDORSEMENT

THIS ENDORSMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:
ENVIRONMENTAL IMPAIRMENT POLLUTION LEGAL LIABILITY

### SCHEDULE

| Address | Retroactive Date |
|---|---|
| 28430 WITHERSPOON PKWY VALENCIA, CA 91355 | 06/07/2010 |

Coverage is provided for the __Covered Location__ or __Covered Locations__ above, but solely as respects to Section I - Pollution Legal Liability Coverage(s) 1., 2., and 3.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

ASPER064 0310

Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## RETAINED LIMIT ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART          Form Number: CG 00 01 10 01

CONTRACTORS POLLUTION LIABILITY COVERAGE PART          Form Number: ASPER003

The terms "Deductible" or "Self-Insured Retention" as they appear throughout the Declarations and Policy are deleted and replaced with the term **"Retained Limit"** on each occasion.

**Retained Limit** shall mean any deductible, self-insured retention or other form of retained limit for which the insured is legally responsible under this policy.

The **Retained Limit** shall apply on a "per claim," "per loss" or "per occurrence" basis as indicated.  The **Retained Limit** may also be subject to a policy aggregate, if so selected.

All other terms, conditions and exclusions shall remain the same.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## GENERAL SERVICE OF SUIT ENDORSEMENT

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

ALL COVERAGE PARTS IN THIS POLICY

Pursuant to any statute of any state or district of the United States of America which makes provision therefore, the insurer hereby designates the Commissioner, Superintendent or Director of Insurance or other officer specified for that purpose in the statute, and his or her successors in office, and duly authorized deputies in the state where this policy is issued, as the insurer's true and lawful attorney for service of legal process in action, suit or proceeding brought in the state where this policy is issued by or on behalf of an insured or beneficiary  against the insurer arising out of the insurance issued under this policy.

The Company's registered forwarding  address for purposes of receiving service from the Commissioner, Superintendent or Director of Insurance or other officer in each state shall be: Aspen Specialty Insurance Management, Inc., c/o General Counsel,  175  Capital  Blvd.,  Rocky  Hill,  CT  06067;  (860)  760-7758;  Questions  can  be  directed  to: Compliance@aspenspecialty.com.  In addition, please note state-specific instructions as follows:

In Arizona, service must be made on the Commissioner of Insurance, but a copy of any service of legal process should also be delivered or forwarded (for informational purposes only) to: Mr. John Rohwer, John Rohwer & Company, P.O. Box 2229, Phoenix, AZ 85002 or Gail Flock c/o CT Corporation System, 2394 East Camelback Road, Phoenix, AZ 85016.

In California, any service of legal process may also be delivered or forwarded to: Jere Keprios c/o CT Corporation, 818 West Seventh Street, Los Angeles, CA  90017.

In Colorado, any service of legal process may also be delivered or forwarded to: Christen Vinnola c/o The Corporation Company, 1675 Broadway, Suite 1200, Denver, CO  80202.

In Georgia, service must be made on the Commissioner of Insurance, but a copy of such service should also  be delivered or forwarded (for informational purposes only) to: Dale W. Morris c/c CT Corporation System, 1201 Peachtree Street, NE, Atlanta, GA  30361.

In Hawaii, any service of legal process may also be delivered or forwarded to: Ronald V. Grant c/o CT Corporation Company, Inc. 900 Fort Street Mall, Suite 1800 Honolulu, HI 96813.

In Louisiana, any service of legal process may also be delivered or forwarded to: Lisa Uttech c/o CT Corporation Regional System, 5615 Corporate Blvd Suite 400B, Baton Rouge, LA 70808.

In Maine, service must be made on the Commissioner of Insurance, but a copy of such filing  should also  be delivered or forwarded (for informational purposes only) to: Peter B. Webster c/o CT Corporation System, 81 West Main Street, Yarmouth, ME 04096.

In Michigan, service of legal process may only be made on the Insurance Commissioner,  but a copy of such filing should also be sent (for reference only) to: General Counsel, Aspen Insurance U.K. Limited c/o Aspen Specialty Insurance Management, Inc., 175 Capital Blvd., Rocky Hill, CT 06067.

In North Carolina, service of legal process may only be made on the Insurance Commissioner, but a copy of any service of legal process should also be delivered or forwarded (for reference only)  to: Ron M. Strickland c/o CT Corporation System 150 Fayetteville Street Box 1011, Raleigh, NC 27601.

ASPCO002 0110

Page 1 of 2

In Tennessee, any service of legal process may only be made on the Insurance Commissioner, but a copy of such filing should also be delivered or forwarded (for reference only)  to: Mark Williams c/o CT Corporation System 800 S. Gay Street, Suite 2021, Knoxville, TN 37929.

In Texas, any service of legal process may only be made on the Insurance Commissioner, but a copy of such filing should also be delivered or forwarded (for reference only)  to: Shirley Dillon c/o CT Corporation System, 350 North St. Paul Street, Dallas, TX  75201.

In Wyoming, any service of legal process should be made on the Insurance Commissioner, but a copy of such filing should also be delivered or forwarded (for reference only)  to: Tammy Bellefuille c/o CT Corporation System 1720 Carey Avenue, Cheyenne, WY 82001.

The foregoing designation of attorney for service of legal process upon the Company shall not constitute a waiver of the Company's rights to remove, remand, dismiss or transfer any suit or proceeding from any court, or to commence any suit or other proceeding in any court of competent jurisdiction.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TOTAL LEAD EXCLUSION**

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. The following Exclusion is added to 2., Exclusions of the GENERAL LIABILITY COVERAGE FORM:

   This Policy Does Not Apply To:

   1. "Bodily Injury", "Property Damage", "Personal Injury", or "Advertising Injury" arising out of, resulting from, caused by or contributed to by the presence, ingestion, inhalation, or absorption of or exposure to lead, lead compounds, or lead contained in any materials;

   2. Any cost or expense to abate, mitigate, remove, or dispose of lead, lead compounds or materials containing lead;

   3. Any supervision, instruction, recommendations, warnings or advice given or which should have been given in connection with parts 1. or 2. above; or

   4. Any obligation to share damages with or repay anyone else who must pay damages in connection with parts 1., 2., or 3. above.

ASPGL003 01 04          Includes copyrighted material of ISO, Inc., with its permission.



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**

**SILICA EXCLUSION ENDORSEMENT**

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1. The following Exclusion is added to SECTION I - COVERAGES, COVERAGE A. - BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. - EXCLUSIONS and SECTION I - COVERAGES, COVERAGE B. - PERSONAL AND ADVERTISING INJURY LIABILITY, 2. - EXCLUSIONS:

   1. Any liability for "bodily injury", "property damage", "personal injury", "advertising injury", occupational disease, disability, shock, mental anguish or mental injury, at any time arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to silica, silicate, any silica material or any by-product, residue or compound containing silica or silicate; or

   2. Any obligation of the "insured" to indemnify any party because of damages arising out of "bodily injury", "property damage", "personal injury", "advertising injury", occupational disease, disability, shock, mental anguish or mental injury, at any time as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to silica or silicate, any silica material or any by-product, residue or compound containing silica or silicate; or

   3. Any obligation to defend any "suit" or claim against the "insured" alleging bodily injury, "property damage", "personal injury", "advertising injury", occupational disease, disability, shock, mental anguish or mental injury, resulting from or contributed to, by the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to silica, silicate, any silica material or any by-product, residue or compound containing silica or silicate.

ASPEN

ASPEN SPECIALTY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**EXTERIOR INSULATION AND FINISH SYSTEM EXCLUSION**
("Synthetic stucco" and similar systems)

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of:

1. The design, manufacture, construction, fabrication, preparation, installation, application, maintenance, use, sale, service, repair, including remolding, correction, replacement or service by you or by others on your behalf of an Exterior Insulation and Finish System (EIFS) of the type commonly referred to as "synthetic stucco" or any part or portion thereof, or any substantially similar system or any part or portion thereof, including the application or use of conditions, primers, accessories, flashings, coatings, caulking, or sealants in connection with such a system.

2. The design, manufacture, construction, fabrication, preparation, installation, application, maintenance, use, sale, service, repair, including remolding, correction, replacement or service by you or by others on your behalf of any exterior component, fixture or feature of any structure if an Exterior Insulation and Finish System or substantially similar system is used on any part of that structure.

This exclusion applies to all causes of action including, but not limited to, allegations of negligent hiring, placement, training or supervision, or to any act, error or omission.

ASPGL032 05 04        Includes copyrighted material of ISO, Inc., with its permission.



**A S P E N**

ASPEN SPECIALTY

## THIS AMENDMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

### AMENDMENT – COMMON POLICY CONDITIONS

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The Common Policy Conditions (IL 00 17 11/98) are amended by the addition of the following:

G.    **Other Insurance with This Company**

If this policy contains two or more Coverage Parts providing coverage for the same "occurrence," "accident," "cause of loss," "loss" or offense, the maximum limit of insurance under all Coverage Parts shall not exceed the highest limit of insurance under any one Coverage Part.

If this policy and any other policy issued to you by us apply to the same "occurrence," "accident," "cause of loss," "injury," "loss" or offence, the maximum limit of insurance under all of the policies shall not exceed the highest limit of insurance under any one policy. This condition does not apply to any policy issued by us which specifically provides that the policy is to apply as excess insurance over this policy.

ASPGL044 05 04          Includes copyrighted material of ISO, Inc., with its permission.



**THIS ENDORSEMENT CHANGES THE POLICY-PLEASE READ IT CAREFULLY**

**PRIMARY AND NON-CONTRIBUTING INSURANCE**
**(THIRD-PARTY)**

**THIS ENDORSEMENT MODIFIES INSURANCE UNDER THE FOLLOWING:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Section IV: Commercial General Liability Conditions, Paragraph 4, and all subparts thereof, as contained in the policy is deleted in its entirety and replaced with the following condition as respects the Third Party shown below:

**Section IV: Commercial General Liability Conditions**

4. Other Insurance:

    (a)  With respect to the Third Party shown below, the insurance provided by this policy shall be primary and non-contributing insurance. Any and all other valid and collectable insurance available to such Third Party in respect of work performed by you under written contractual agreements with said Third Party for loss covered by this policy, shall in no instance be considered as primary, co-insurance, or contributing insurance. Rather, any such other insurance shall be considered excess over and above the insurance provided by this policy.

**The Third Party to whom this endorsement applies is:**

Absence of a specifically named Third Party above means that the provisions of this endorsement apply "as required by written contractual agreement with any Third Party for whom you are performing work."

All other terms and conditions of this policy remain unchanged.

This endorsement is effective on the inception date of the policy unless otherwise stated herein. (The information below is required only when this endorsement is issued subsequent to preparation of this policy.)

**Policy Number:** ERA5KCM10

**Named Insured:** AMERICRAFT CONSTRUCTORS, INC.
                    DBA: AMERICAN CRAFTSMAN RESTORATION

**Endorsement Effective Date:** 06/07/2010

ASPGL051 11 04        Includes copyrighted material of ISO, Inc. with its permission



ASPEN

ASPEN SPECIALTY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY LIABILITY
DEDUCTIBLE ENDORSEMENT**

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDE UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Amount and Basis of Deductible |
|---|---|
| Bodily Injury Liability | $10,000      per occurrence<br>INCLUDING LOSS ADJUSTMENT EXPENSE |
| Property Damage Liability | $10,000      per occurrence<br>INCLUDING LOSS ADJUSTMENT EXPENSE |
| Personal Advertising Injury Liability<br>(Personal Injury and Advertising Injury) | $10,000      per occurrence<br>INCLUDING LOSS ADJUSTMENT EXPENSE |

APPLICATION OF ENDORSEMENT

Enter below any limitations on the application of this endorsement.  If no limitation is entered, the deductibles apply to damages for all "bodily injury," property damage,"  "personal advertising injury," ("personal injury" and "advertising injury") however caused:

1.  Our obligation under the Bodily Injury Liability, Property Damage Liability, Personal and Advertising Injury Liability (Personal Injury and Advertising Injury) Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages, and the Limits of Insurance applicable to Each Occurrence or offense for such coverages will be reduced by the amount of such deductible.  Aggregate Limits for such coverages shall not be reduced by the application of such deductible amount.

2.  The deductible amounts apply to damages and all legal and loss adjustment expenses.

3.  The deductible amounts stated in the Schedule above apply, respectively:

    a.  Under the Bodily Injury Liability Coverage to all damages because of the "bodily injury"  sustained by one person;

    b.  Under Property Damage Liability Coverage to all damages because of the "property damage" sustained by one person, any organization or association; or

    c.  Under Personal and Advertising Injury Liability (Personal Injury and Advertising Injury) Coverages to all damages sustained by one person as a result of one "occurrence" or offense.

4.  The terms of this insurance, including those with respect to our right and duty to defend any "suits" seeking those damages and your duties in the event of an "occurrence," offense, claim or "suit", apply irrespective of the application of the deductible amount.

5.  We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

ASPGL071 03/05          Includes copyrighted material of ISO, Inc. with its permission

A S P E N

ASPEN SPECIALTY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**NON-DUPLICATION OF LIMITS OF INSURANCE ENDORSEMENT**

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS COVERAGE PART**

In consideration of the premium charged, **SECTION III – LIMITS OF INSURANCE** is amended to add the following:

B.    Regardless of the number of insureds, claims made or "suits" brought, or persons or organizations making claims or bringing "suits":

    a.    With respect to all "bodily injury" and "property damage" that arises out of one "occurrence" and is covered, in whole or in part, by this policy and any other policy issued by us or any affiliate to you, the maximum that we will pay under all such policies combined is the highest Each Occurrence Limit of Insurance stated in the Limits of Insurance section of the Declarations page in any one of these policies.

       "Occurrence" means an accident including continuous or repeated exposure to substantially the same general harmful conditions.

       In the event of continuous, progressive or repeated "bodily injury" or "property damage" over any length of time, such "bodily injury" or "property damage" shall be deemed to be one "occurrence".

    b.    With respect to all "personal and advertising injury" that arises out of the commission of an offense covered by this policy and any other policy issued by us or any affiliate to you, the maximum that we will pay under all such policies combined is the highest Personal and Advertising Injury Limit of Insurance stated in the Limits of Insurance section of the Declarations page in any one of these policies.

       In the event of continuous, progressive, or repeated "personal and advertising injury" over any length of time, such "personal and advertising injury" shall be deemed to be one offense.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

ASPGL114 12/06          Includes copyrighted material of ISO, Inc. with its permission

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CONTINUOUS OR PROGRESSIVE INJURY OR DAMAGE EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to any "bodily injury" or "property damage":

1.  which first existed, or is alleged to have first existed, prior to the inception of this policy.  "Property damage" from "your work", or the work of any additional insured,  performed prior to policy inception will be deemed to have first existed  prior to the policy inception, unless such "property damage"  is sudden and accidental and takes place within the policy period); or

2.  which was, or is alleged to have been, in the process of taking place prior to the inception date of this policy, even if the such "bodily injury" or "property damage" continued during this policy period; or

3.  which is, or is alleged to be, of the same general nature or type as a condition, circumstance or construction defect which resulted in "bodily injury" or "property damage" prior to the inception date of this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

ASPGL164 0110

Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 00 62 12 02

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# WAR LIABILITY EXCLUSION

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Exclusion i. under Paragraph **2.**, **Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

  **2. Exclusions**

    This insurance does not apply to:

    **i. War**

      "Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

      (1) War, including undeclared or civil war; or

      (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

      (3) Insurrection, rebellion, revolution, usurped power, or action taken by gov- ernmental authority in hindering or de- fending against any of these.

B. The following exclusion is added to Paragraph **2.**, **Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

  **2. Exclusions**

    This insurance does not apply to:

    **WAR**

    "Personal and advertising injury", however caused, arising, directly or indirectly, out of:

    a. War, including undeclared or civil war; or

    b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

    c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

C. Exclusion h. under Paragraph **2.**, **Exclusions of Section I – Coverage C – Medical Payments** does not apply.  Medical payments due to war are now subject to Exclusion g . of Paragraph **2.**, **Exclusions of Section I – Coverage C – Medical Payments** since "bodily injury" arising out of war is now excluded under Coverage **A.**

© ISO Properties, Inc., 2002

POLICY NUMBER: ERA5KCM10

COMMERCIAL GENERAL LIABILITY
CG 20 10 10 01

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – SCHEDULED PERSON OR ORGANIZATION

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Name of Person or Organization:**

ALL PERSONS OR ORGANIZATIONS WHERE REQUIRED BY WRITTEN CONTRACT WITH THE NAMED INSURED.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A. Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

**B.** With respect to the insurance afforded to these additional insureds, the following exclusion is added:

**2. Exclusions**

This insurance does not apply to "bodily injury" or "property damage" occurring after:

(1) All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or

(2) That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

POLICY NUMBER:  ERA5KCM10

**COMMERCIAL GENERAL LIABILITY**
**CG 20 37 10 01**

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – OWNERS, LESSEES OR CONTRACTORS – COMPLETED OPERATIONS

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| |
|---|
| **Name of Person or Organization:** <br> ALL PERSONS OR ORGANIZATIONS WHERE REQUIRED BY WRITTEN CONTRACT WITH THE NAMED INSURED |
| **Location And Description of Completed Operations:** |
| **Additional Premium:** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location designated and described in the schedule of this endorsement performed for that insured and included in the "products-completed operations hazard".

CG 20 37 10 01

© ISO Properties, Inc., 2000

Page 1 of 1

POLICY NUMBER: ERA5KCM10

COMMERCIAL GENERAL LIABILITY
CG 21 16 07 98

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – DESIGNATED PROFESSIONAL SERVICES

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Description Of Professional Services: |
| --- |
| 1. ALL PROFESSIONAL SERVICES |
| 2. |
| 3. |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations
as applicable to this endorsement.)

With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph
**2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2.,
Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the
rendering of or failure to render any professional service.

Copyright, Insurance Services Office, Inc., 1997       Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., **Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

  (1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  (2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

  (1) Whether the insured may be liable as an employer or in any other capacity; and

  (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph 2., **Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

  (1) A person arising out of any:

    (a) Refusal to employ that person;

    (b) Termination of that person's employment; or

    (c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  (2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

  (1) Whether the insured may be liable as an employer or in any other capacity; and

  (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COMMERCIAL GENERAL LIABILITY
CG 21 49 09 99

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# TOTAL POLLUTION EXCLUSION ENDORSEMENT

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

COMMERCIAL GENERAL LIABILITY
CG 21 75 12 02

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism" or an "other act of terrorism". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

1. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property.  For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

2. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   **a.** Physical injury that involves a substantial risk of death; or

   **b.** Protracted and obvious physical disfigurement; or

   **c.** Protracted loss of or impairment of the function of a bodily member or organ; or

3. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

4. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

5. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs **1.** and **2.** describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002.  The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

   **a.** The act resulted in aggregate losses in excess of $5 million; and

©ISO Properties, Inc., 2002

b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002. Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. In the event of any incident of a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

© ISO Properties, Inc., 2002

CG 21 75 12 02

POLICY NUMBER: ERA5KCM10

COMMERCIAL GENERAL LIABILITY
CG 24 04 10 93

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

Name of Person or Organization:
ALL PERSONS OR ORGANIZATIONS WHERE REQUIRED BY WRITTEN CONTRACT WITH THE NAMED INSURED

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US Condition (Section **IV** – COMMERCIAL GENERAL LIABILITY CONDITIONS) is amended by the addition of the following:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

IL 00 21 07 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

(Broad Form)

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

© ISO Properties, Inc., 2001

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

# POLICYHOLDER'S GUIDE TO REPORTING AN ENVIRONMENTAL
# OR PROFESSIONAL LIABILITY CLAIM

## Aspen Specialty Insurance Management Company Claims Department

A. As soon as you, the POLICY HOLDER, are aware of an event that will give rise to a claim being made against you (3rd Party Liability Claims) please be sure to report the matter in a timely manner to both your agent/broker and Aspen Specialty Insurance Management, Inc. Be sure to include your policy number and the name of the insured as it is stated on the policy.

B. New Claims can be reported to Aspen Specialty Insurance Company as follows;

   1. **By Mail:**   Claims Department
                     Aspen Specialty Insurance Company
                     c/o Aspen Specialty Insurance Management Co.
                     600 Atlantic Avenue 21st Floor
                     Boston, MA 02210
                     Main Tel. No.: 617-532-7300

   2. **By FAX:**    617-532-7342

   3. **By Dedicated Email:**
      • 3rd Party Environmental Claims  - environmental.claims@aspenspecialty.com;
      • Claim Status Requests - status.environmental.claims@aspenspecialty.com

C. Direct Dial & Direct Email to the ASIM Casualty Claim Staff:

| Sr. Environmental Liability Claim Examiner | Casualty Claim Assistant |
|---|---|
| Jack Marlin      617-532-7337 | Ashley Thompson    617-532-7839 |
| jack.marlin@aspenspecialty.com | ashley.thompson@aspenspecialty.com |
| | **Senior Claim Assistant** |
| | Millie Morales      617-532-7362 |
| | milagros.morales@aspenspecialty.com |

D. Special Issue Resolution:

| Head of Claims - ASIM |
|---|
| Bob Clare      617-532-7304 |
| bob.clare@aspenspecialty.com |

E. Emergency Response Assistance:

In the event you require assistance during a Crisis Management event, or need to speak to an environmental expert for consultation on a potential urgent pollution event, please call the following third party vendors. Insure to have your company name, address, contact name, and your Aspen Specialty Insurance Company policy number, ERA5KCM10, available.

**Northeast:**
Ambrose Environmental Management, Inc.
Toll Free 24/7   1-888-556-4734
States: Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont

**All other regions:**
TRC Environmental
Josh Lewis
24/7   1-303-323-5644
Country wide

02/04/2015

**EXHIBIT B**



# KAYE, ROSE & PARTNERS, LLP
### ATTORNEYS AT LAW

1801 Century Park East, Suite 1500
Los Angeles, CA 90067-2302
TEL (310) 551-6555 • FAX (310) 277-1220
E-MAIL la@kayerose.com

May 5, 2011

**VIA U.S. CERTIFIED MAIL & FACSIMILE (661) 775-7634**

Thomas C. Geoffroy
Americraft Constructors, Inc. d/b/a American Craftsman
28430 Witherspoon Parkway
Valencia, California 91355

> Re:  *William Overholt v. American Constructors, Inc. d/b/a American Craftsman*
> Restoration and mold prevention/remediation work performed on August 12-14,
> 2008 at 16619 Calle Haleigh, Pacific Palisades, CA 90272

Dear Mr. Geoffroy:

Please be advised that our law firm has been retained to represent William Overholt in connection with his claim for damages arising out of the restoration and mold prevention/ remediation work that was negligently performed by American Craftsman on August 12-14, 2008 at Mr. Overholt's residence located at 16619 Calle Haleigh, Pacific Palisades, CA 90272. As you may recall, Mr. Overholt had put his house up for sale in 2008. He hired American Craftsman to perform the restoration and mold prevention/remediation work after an air conditioner leak was discovered in the basement in August 2008. Brian Mellinger was the lead technician on the project. American Craftsman removed carpeting and sections of wall in the basement and cleaned the area around the air conditioner and installed large dryer fans. In October 2008, Mr. Overholt reached an agreement to sell the house for a December closing. All contingencies were removed except for the mold inspection, which revealed toxic mold in the air originating from a single source—the pedestal under the air conditioner which had been cleaned but not removed. In performing the restoration and mold prevention/remediation work, American Craftsman had determined that it was not necessary to remove the pedestal.

As you may also recall, on November 4, 2008 you and co-owner Mike Cosley responded by coming out and inspecting the house. The following day, you and Mr. Overholt had a telephone conversation in which you acknowledged that the restoration and mold prevention/remediation by American Craftsman had been performed improperly and "not done to our own standards". You advised Mr. Overholt that American Craftsman did a quick source removal when it should have been more comprehensive. You further indicated that your technician was "not competent" or authorized to make the determination that it was unnecessary to remove the pedestal under the air conditioner. At the end of the discussion you promised Mr. Overholt that he would be financially compensated for this unfortunate situation.

---

<div align="center">

| SAN DIEGO | SAN FRANCISCO |
|---|---|
| 402 West Broadway, Suite 1300 | 425 California Street, Suite 2025 |
| San Diego, CA 92101-3542 | San Francisco, CA 94104-2213 |
| TEL (619) 232-6555 • FAX (619) 232-6577 | TEL (415) 433-6555 • FAX (415) 433-6577 |

</div>



Thomas C. Geoffroy
Page 2

As a result of American Craftsman's failure to properly perform the restoration and mold prevention/remediation work, it was necessary for Mr. Overholt to hire another contractor, Building Cleaning Services, to properly re-do the work. Because of American Craftsman's negligence mold spread throughout the entire house and all of the HVAC ducts needed to be cleaned. Mr. Overholt also incurred further and additional cleanup costs. Importantly, as a result American Craftsman's failure to properly perform the restoration and mold prevention/remediation work, the mold inspection contingency was not removed and the buyers withdrew their offer to purchase the house. It took Mr. Overholt several more months until March 29, 2009 to sell the house, and ultimately the eventual sale price was $150,000 less than the amount originally agreed to in October 2008. As a result of the delayed sale, Mr. Overholt also incurred additional expenses including mortgage, association dues, utilities, and other costs. Thus, as a result of American Craftsman's negligence Mr. Overholt sustained damages in the total amount of at least $211,887.18.

At this time we request that American Craftsman make good on its promise to provide compensation to Mr. Overholt to cover his financial losses due to the negligently performed restoration and mold prevention/remediation work. We would be happy to set up a meeting to further discuss this matter and to provide you with the documentation supporting all of Mr. Overholt's damages. We would like to resolve this matter as soon as possible, and we believe the parties may be able to amicably resolve this matter for a reasonable amount without resorting to litigation. However, if necessary we are prepared to pursue all available legal remedies on behalf of Mr. Overholt, including but not limited to filing suit. If the parties are unable to amicably resolve this matter and it becomes necessary for us to pursue litigation, we would seek the full amount of $211,887.18 as well as an award of our attorneys' fees and costs incurred in connection with the prosecution of this matter. Ultimately, if American Craftsman makes good on its promise, we believe the parties can and should be able to reach an agreeable resolution of this matter.

Finally, if you have insurance coverage for this claim, we ask that you promptly put your insurance carrier on notice of this claim and provide us with your insurance carrier's contact information and policy number as soon as possible.

We hope that the parties can reach an amicable resolution of this matter. We look forward to your prompt response to this letter and ask that you contact us by no later than May 16, 2011.

Yours very truly,

KAYE, ROSE & PARTNERS, LLP

Daniel F. Berberich

cc: William Overholt (via e-mail)

02/04/2015

**EXHIBIT C**

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles-Superior Court

MAY 0 9 2011

John A. Clarke, Executive Officer/Clerk
By __A. Williams__, Deputy

| | |
|---|---|
| 1 | KAYE, ROSE & PARTNERS, LLP |
| | Bradley M. Rose (SBN 126281) |
| 2 | Daniel F. Berberich (SBN 215946) |
| | 1801 Century Park East, Suite 1500 |
| 3 | Los Angeles, California 90067-2302 |
| | Telephone: (310) 551-6555 |
| 4 | Facsimile: (310) 277-1220 |
| | E-mails: brose@kayerose.com |
| 5 | dberberich@kayerose.com |
| 6 | Attorneys for Plaintiff |
| | WILLIAM OVERHOLT |

CASE MANAGEMENT CONFERENCE

AUG 2 4 2011
_____
Date

John H. Reid    D(40 F  83 am

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                FOR THE COUNTY OF LOS ANGELES – WEST DISTRICT

10

| | | |
|---|---|---|
| 11 | WILLIAM OVERHOLT, | Case No.: **SC112542** |
| 12 | Plaintiff, | COMPLAINT FOR: |
| 13 | vs. | 1. BREACH OF WRITTEN CONTRACT; |
| 14 | AMERICRAFT CONSTRUCTORS, INC. d/b/a | 2. NEGLIGENT REPAIR/ IMPROVEMENT TO REAL PROPERTY; |
| 15 | AMERICAN CRAFTSMAN, a California corporation; AND DOES 1 TO 10 INCLUSIVE, | 3. PROMISSORY ESTOPPEL; 4. NEGLIGENT MISREPRESENTATION; |
| 16 | Defendants. | 5. FRAUDULENT INDUCEMENT OF CONTRACT; |
| 17 | | 6. FALSE ADVERTISING; 7. BREACH OF FIDUCIARY DUTY; |
| 18 | | 8. UNFAIR BUSINESS ACTS; |
| 19 | | 9. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; |
| 20 | | 10. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE; |
| 21 | | 11. NEGLIGENT HIRING, TRAINING, SUPERVISION AND/OR RETENTION |
| 22 | | |
| 23 | | |

24

25   Plaintiff WILLIAM OVERHOLT, by and through his undersigned attorneys, complains and

26   alleges as follows:

27                **JURISDICTION AND VENUE**

28   1.   This court is the proper venue for this action pursuant to California *Code of Civil*

-1-
COMPLAINT



1   *Procedure* § 395(a). As set forth herein, the obligations sued upon herein were entered into and to be

2   performed in this judicial district and the wrongful conduct of defendants occurred in this judicial

3   district.

### PARTIES

4

5   2.     Plaintiff WILLIAM OVERHOLT ("Plaintiff") is an individual who at all relevant times

6   mentioned herein resided in and had significant contacts with the County of Los Angeles, State of

7   California.

8   3.     Defendant AMERICRAFT CONSTRUCTORS, INC. d/b/a AMERICAN CRAFTSMAN

9   (individually referred to as "American Craftsman" and collectively referred to as one of the

10  "Defendants") is a California corporation with a principal place of business located at 28430

11  Witherspoon Parkway, Valencia, California 91355. At all relevant times mentioned herein, American

12  Craftsman conducted activities in and had significant contacts with the County of Los Angeles, State of

13  California, and with this judicial district.

14  4.     The true names and capacities, whether individual, corporate, associate or otherwise of

15  Defendants DOES 1 through 10 (individually referred to as DOES 1 through 10 and collectively

16  referred to as one of the "Defendants"), inclusive, are unknown to Plaintiff who therefore sues said

17  Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of

18  the Defendants designated herein as fictitiously named Defendants is, in some manner, responsible for

19  the events and occurrences herein referred to, either contractually or tortiously, and caused the damage

20  to Plaintiff as herein alleged. When Plaintiff ascertains the true names and capacities of DOES 1

21  through 10, it will ask leave of Court to amend its Complaint setting forth the same.

22  5.     Plaintiff is informed and believes and thereon alleges that at all times relevant hereto,

23  each of the Defendants, including DOES 1 through 10, was the agent or employee of each of the

24  remaining Defendants, and was acting within the scope and course of said employment and/or agency

25  at the time of the acts complained of herein.

### GENERAL ALLEGATIONS

26

27  6.     In or around the latter part of 2008, Defendants held themselves out as competent to

28  perform restoration and mold prevention/remediation work, and indeed represented themselves as

1    specialists in that area.

2         7.    On or around August 12, 2008, Defendants agreed to perform restoration and mold

3    prevention/remediation work with respect to Plaintiff's residence located at 16619 Calle Haleigh,

4    Pacific Palisades, California 90272 after an air conditioner leak was discovered in the basement.

5         8.    Plaintiff and Defendants entered into a written contract memorializing the agreement for

6    Defendants to perform the restoration and mold prevention/remediation work.

7         9.    Defendants undertook to perform the restoration and mold prevention/remediation work

8    at Plaintiff's residence on or around August 12-14, 2008.  Defendants negligently performed the work

9    by failing to act in accordance with the prevailing industry standards and with Defendants' own

10   standards.  Defendants also engaged in other acts or omissions which were negligent, improper, illegal,

11   and otherwise contrary to the terms and conditions of the parties' contract.

12        10.    As a result of Defendants' acts or omissions, mold spread throughout Plaintiff's entire

13   residence.  Accordingly, it was necessary for Plaintiff to hire another contractor, Building Cleaning

14   Services, to properly re-do the work and remove the mold that spread throughout the entire house as a

15   result of Defendants' negligence.  Moreover, Plaintiff was unable to sell the residence for the price

16   agreed to with the May family because it did not pass the mold inspection as a result of Plaintiff's acts

17   or omissions.  It took Plaintiff several more months until March 29, 2009 to sell the residence, and

18   ultimately the eventual sale price was $150,000 less than the amount originally agreed to.  As a result of

19   the delayed sale, Plaintiff incurred additional expenses and costs.

20        11.    As a proximate cause of Defendants' breach of contract and other improper acts or

21   omissions, Plaintiff has suffered damages in the amount of at least $211,887.18, the actual amount to be

22   shown at the time of trial, as well as attorney's fees and costs.

23        <u>FIRST CLAIM FOR RELIEF FOR BREACH OF WRITTEN CONTRACT</u>

24                              (Against All Defendants)

25        12.    Plaintiff realleges and incorporates herein each and every allegation contained in

26   Paragraphs 1 through 11, as though fully set forth herein.

27        13.    In or around August 12, 2008, Plaintiff and Defendants entered into a written contract

28   (the "contract"), the terms of which consisted of an agreement by Defendants to competently provide

KAYE, ROSE & PARTNERS, LLP

- 3 -
COMPLAINT

1  restoration and mold prevention/remediation services with respect to Plaintiff's residence in accordance

2  with the prevailing industry standards and with Defendants' own standards, in exchange for Plaintiff's

3  agreement to provide payment for said services in accordance with Defendants' Pricing Guide.

4      14.   Plaintiff has performed all conditions, covenants, and promises required on its part to be

5  performed in accordance with the terms and conditions of the contract.

6      15.   Defendants failed to competently perform the work in accordance with the terms and

7  conditions of the parties' contract.

8      16.   As a result of Defendants' breach of the contract, Plaintiff has been damaged in an

9  amount of at least $211,887.18; the actual amount to be shown at the time of trial.

10                 SECOND CLAIM FOR RELIEF FOR NEGLIGENT REPAIR/

11                     IMPROVEMENT OF REAL PROPERTY

12                            (Against All Defendants)

13      17.   Plaintiff realleges and incorporates herein each and every allegation contained in

14  Paragraphs 1 through 16, as though fully set forth herein.

15      18.   In or around August 12-14, 2008, Defendants undertook to perform restoration and mold

16  prevention/remediation work on Plaintiff's residence.

17      19.   Defendants negligently performed the work by failing to provide services in accordance

18  with the prevailing industry standards and with Defendants' own standards. Defendants also engaged

19  in other acts or omissions which were negligent or otherwise unlawful.

20      20.   As a proximate result of these acts or omissions by Defendants, Plaintiff has been

21  damaged in the amount of at least $211,887.18, the actual amount to be shown at the time of trial, as

22  well as attorney's fees and costs.

23      21.   The wrongful acts of Defendants alleged herein were willful and intentional in that they

24  acted with a conscious disregard of Plaintiff's rights for the purpose of oppressing, defrauding and

25  injuring Plaintiff. As a result of such willful and intentional conduct, Plaintiff is entitled to punitive

26  damages in an amount according to proof.

27  ///

28  ///

KAYE, ROSE & PARTNERS, LLP

- 4 -
COMPLAINT

## THIRD CLAIM FOR RELIEF FOR PROMISSORY ESTOPPEL

### (Against All Defendants)

22.    Plaintiff realleges and incorporates herein each and every allegation contained in Paragraphs 1 through 21, as though fully set forth herein.

23.    On or August 12-14, 2011, Defendants promised to Plaintiff that it would perform on the contract and make sure that the work was done competently.

24.    In so promising Plaintiff, Defendants should have known that Plaintiff would be reasonably induced to rely on Defendants' promises by agreeing to hire Defendants to provide restoration and mold prevention/remediation services and pay for said services.

25.    Plaintiff reasonably relied on Defendants' promises and was thereby induced to contract with Defendants for restoration and mold prevention/remediation services.

26.    Defendants have not performed any part of their promises.  As a result of Defendants' failure to perform according to their promises made to Plaintiff, Plaintiff has suffered damages in the amount of at least $211,887.18, the actual amount to be shown at the time of trial, as well as attorney's fees and costs.

27.    Injustice can be avoided by enforcing Defendants to completely pay Plaintiff the amount that Plaintiff has been damaged, as well as attorney's fees and costs.

## FOURTH CLAIM FOR RELIEF FOR NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

28.    Plaintiff realleges and incorporates herein each and every allegation contained in Paragraphs 1 through 27, as though fully set forth herein.

29.    On or about August 12-14, 2008, Defendants continuously made false representations to Plaintiff that they would send a competent technician to perform the restoration and mold prevention/remediation work with respect to Plaintiff's residence in accordance with the prevailing industry standards and with Defendants' own standards, in exchange for Plaintiffs' agreement to hire Defendants and pay for their services.

30.    Defendants' representations were in fact false, the true facts were that Defendants sent a technician who was not competent to perform the restoration and mold prevention/remediation work

KAYE, ROSE & PARTNERS, LLP

- 5 -
COMPLAINT

1   with respect to Plaintiff's residence in accordance with the prevailing industry standards and with

2   Defendants' own standards.

3       31.   Defendants made these representations, with no reasonable ground for believing them to

4   be true in that they sent a technician who was not competent to perform the restoration and mold

5   prevention/remediation work with respect to Plaintiff's residence in accordance with the prevailing

6   industry standards and with Defendants' own standards; at the time of the making of these

7   representations, and at all times thereafter Defendants concealed from Plaintiff that they had no

8   reasonable grounds for believing the representations to be true.

9       32.   These representations were made by Defendants with the intent to induce Plaintiff to act

10  in the manner herein alleged.

11      33.   Plaintiff at the time these representations were made by Defendants, and at the time

12  Plaintiff took the actions herein alleged, was ignorant of the falsity of Defendants' representations and

13  believed them to be true.  In reliance on these representations, Plaintiff was induced to and did hire

14  Defendants to provide restoration and mold prevention/remediation services and to pay Defendants for

15  said services.  Plaintiff's reliance on Defendants' statements was justified because Defendants

16  constantly reassured Plaintiff that they would send a competent technician to perform the restoration

17  and mold prevention/remediation work with respect to Plaintiff's residence in accordance with the

18  prevailing industry standards and with Defendants' own standards, in exchange for Plaintiffs'

19  agreement to hire Defendants and pay for their services.

20      34.   Defendants made these representations with the intention of inducing Plaintiff to act in

21  reliance on these representations in the manner herein alleged, or with the expectation that Plaintiff

22  would so act.

23      35.   The wrongful acts of Defendants alleged herein were willful and intentional in that they

24  acted with a conscious disregard of Plaintiff's rights for the purpose of oppressing, defrauding and

25  injuring Plaintiff.  As a result of such willful and intentional conduct, Plaintiff is entitled to punitive

26  damages in an amount according to proof.

27  ///

28  ///

KAYE, ROSE & PARTNERS, LLP

- 6 -
**COMPLAINT**

## FIFTH CLAIM FOR RELIEF FOR FRAUDULENT INDUCEMENT OF CONTRACT

### (Against All Defendants)

36.    Plaintiff realleges and incorporates herein each and every allegation contained in Paragraphs 1 through 35, as though fully set forth herein.

37.    Defendants    promised    to    competently    provide    restoration    and    mold prevention/remediation services with respect to Plaintiff's residence in accordance with the prevailing industry standards and with Defendants' own standards.  Pursuant to these promises, Defendants agreed to competently provide such services.

38.    When Defendants made these promises to Plaintiff, Defendants did not have any intention of performing on these promises.

39.    At the time the promises were made, Plaintiff did not know that the promises were false.

40.    Plaintiff justifiably relied on Defendants' promises and hired Defendants to provide restoration and mold prevention/remediation services and to pay Defendants for such services.

41.    Defendants' promises without any intention of performance were made with the intent to defraud and induce Plaintiff to rely upon them and to act as described.

42.    In justifiable reliance on Defendants' conduct, Plaintiff has been damaged in the amount of at least $211,887.18, the actual amount to be shown at the time of trial, as well as attorney's fees and costs.

43.    The wrongful acts of Defendants alleged herein were willful and intentional in that they acted with a conscious disregard of Plaintiff's rights for the purpose of oppressing, defrauding and injuring Plaintiff.  As a result of such willful and intentional conduct, Plaintiff is entitled to punitive damages in an amount according to proof.

## SIXTH CLAIM FOR RELIEF FOR FALSE ADVERTISING (B&P Code § 17500)

### (Against All Defendants)

44.    Plaintiff realleges and incorporates herein each and every allegation contained in Paragraphs 1 through 43, as though fully set forth herein.

45.    In or around August 2008, Defendants maintained a website and otherwise disseminated various other written advertising materials in which they held themselves out to be competent in

KAYE, ROSE & PARTNERS, LLP

1  performing restoration and mold prevention/remediation services and that all of its technicians were

2  competent to do so.

3      46.  Defendants knew, or by the exercise of reasonable care should have known, that the

4  statements were untrue or misleading.

5      47.  As a proximate result of these acts or omissions by Defendants, Plaintiff has been

6  damaged in the amount of at least $211,887.18, the actual amount to be shown at the time of trial, as

7  well as attorney's fees and costs.

8  ## SEVENTH CLAIM FOR RELIEF FOR BREACH OF FIDUCIARY DUTY

9  (Against All Defendants)

10      48.  Plaintiff realleges and incorporates herein each and every allegation contained in

11  Paragraphs 1 through 47, as though fully set forth herein.

12      49.  As the hired contractor to perform restoration and mold prevention/remediation services

13  with respect to Plaintiff's residence which was sale, Defendants were in a position of trust and

14  responsibility, and owed fiduciary obligations to Plaintiff to perform the restoration and mold

15  prevention/remediation work in a competent manner.

16      50.  Despite these fiduciary obligations, Defendants performed the restoration and mold

17  prevention/remediation work negligently.  This conduct constitutes a breach of the fiduciary duty which

18  was willful, intentional, malicious and fraudulent.

19      51.  As a proximate result of these acts, Plaintiff has been damaged in the amount of at least

20  $211,887.18, the actual amount to be shown at the time of trial, as well as attorney's fees and costs.

21      52.  The wrongful acts of Defendants alleged herein were willful and intentional in that they

22  acted with a conscious disregard of Plaintiff's rights for the purpose of oppressing, defrauding and

23  injuring Plaintiff.  As a result of such willful and intentional conduct, Plaintiff is entitled to punitive

24  damages in an amount according to proof.

25  ## EIGHTH CLAIM FOR RELIEF FOR UNFAIR BUSINESS ACTS (*B&P Code* § 17200)

26  (Against All Defendants)

27      53.  Plaintiff realleges and incorporates herein each and every allegation contained

28  in Paragraphs 1 through 52, as though fully set forth herein.

KAYE, ROSE & PARTNERS, LLP

54.   In or around August 2008, November 2008, and thereafter, Defendants held themselves out as competent to provide restoration and mold prevention/remediation services and that all of their technicians were competent to do so.  Defendants also performed other acts and omissions that were unlawful, unfair, deceptive, misleading, or fraudulent business acts or practices.

55.   As a proximate result of these acts or omissions by Defendants, Plaintiff has been damaged in the amount of at least $211,887.18, the actual amount to be shown at the time of trial, as well as attorney's fees and costs.

## NINTH CLAIM FOR RELIEF FOR TORTIOUS INTERFERENCE WITH
## CONTRACTUAL RELATIONS
### (Against All Defendants)

56.   Plaintiff realleges and incorporates herein each and every allegation contained in Paragraphs 1 through 55, as though fully set forth herein.

57.   In or around the latter part of 2008, Plaintiff had a contract with the May family to sell his Pacific Palisades residence.

58.   Defendants had knowledge of said contract between Plaintiff and the May family.

59.   On or around August 12-14, 2008, Defendants negligently performed the restoration and mold prevention/remediation services with respect to Plaintiff's residence by failing to provide services in accordance with the prevailing industry standards and with Defendants' own standards.  Defendants also engaged in other acts or omissions which were negligent, intentional or otherwise unlawful which resulted in the breach or disruption of that contractual relationship.

60.   As a result of Defendants' acts or omissions, there was an actual breach or disruption of the contractual relationship between Plaintiff and the May family.

61.   As a proximate result of these acts or omissions by Defendants, Plaintiff has been damaged in the amount of at least $211,887.18, the actual amount to be shown at the time of trial, as well as attorney's fees and costs.

62.   The wrongful acts of Defendants alleged herein were willful and intentional in that they acted with a conscious disregard of Plaintiff's rights for the purpose of oppressing, defrauding and injuring Plaintiff.  As a result of such willful and intentional conduct, Plaintiff is entitled to punitive

KAYE, ROSE & PARTNERS, LLP

1  damages in an amount according to proof.

2  ## TENTH CLAIM FOR RELIEF FOR TORTIOUS INTERFERENCE WITH

3  ## PROSPECTIVE BUSINESS ADVANTAGE

4  (Against All Defendants)

5  63.  Plaintiff realleges and incorporates herein each and every allegation contained

6  in Paragraphs 1 through 62, as though fully set forth herein.

7  64.  In or around the latter part of 2008, Plaintiff had an economic relationship with the May

8  family in which it was anticipated that Plaintiff would sell his Pacific Palisades residence, which in all

9  probability would result in future economic benefit to Plaintiff.

10  65.  Defendants had knowledge of Plaintiff's economic relationship with the May family.

11  66.  On or around August 12-14, 2008, Defendants negligently performed the restoration and

12  mold prevention/remediation services with respect to Plaintiff's residence by failing to provide services

13  in accordance with the prevailing industry standards and with Defendants' own standards.  Defendants

14  also engaged in other acts or omissions which were negligent, intentional or otherwise unlawful which

15  resulted in the breach or disruption of that economic relationship.

16  67.  As a result of Defendants' acts or omissions, there was an actual disruption of the

17  economic relationship between Plaintiff and the May family.

18  68.  As a proximate result of these acts or omissions by Defendants, Plaintiff has been

19  damaged in the amount of at least $211,887.18, the actual amount to be shown at the time of trial, as

20  well as attorney's fees and costs.

21  69.  The wrongful acts of Defendants alleged herein were willful and intentional in that they

22  acted with a conscious disregard of Plaintiff's rights for the purpose of oppressing, defrauding and

23  injuring Plaintiff.  As a result of such willful and intentional conduct, Plaintiff is entitled to punitive

24  damages in an amount according to proof.

25  ## ELEVENTH CLAIM FOR RELIEF FOR NEGLIGENT HIRING, TRAINING,

26  ## SUPERVISION AND/OR RETENTION

27  (Against All Defendants)

28  70.  Plaintiff realleges and incorporates herein each and every allegation contained

KAYE, ROSE & PARTNERS, LLP

- 10 -
COMPLAINT

in Paragraphs 1 through 69, as though fully set forth herein.

71. In or around August 2008, Defendants directed one of their employed technicians to perform restoration and mold prevention/remediation with respect to Plaintiff's residence.

72. Defendants were negligent in hiring, training, supervising and/or retaining said employee in connection with restoration and mold prevention/remediation work.

73. Defendants' employee was unfit or incompetent to perform the restoration and mold prevention/remediation work for which Defendants directed said technician to perform.

74. Defendants knew or should have known that said employee was unfit or incompetent to perform the restoration and mold prevention/remediation work for which Defendants directed said employee to perform, and that thus unfitness or incompetence created a particular risk to Plaintiff.

75. Defendants' employee's unfitness or incompetence damaged Plaintiff the amount of at least $211,887.18, the actual amount to be shown at the time of trial, as well as attorney's fees and costs.

76. Defendants' negligence in hiring, training, supervising and/or retaining said employee was a substantial factor in causing Plaintiff's damages.

77. The wrongful acts of Defendants alleged herein were willful and intentional in that they acted with a conscious disregard of Plaintiff's rights for the purpose of oppressing, defrauding and injuring Plaintiff. As a result of such willful and intentional conduct, Plaintiff is entitled to punitive damages in an amount according to proof.

///
///
///
///
///
///
///
///
///

- 11 -
COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For the principal sum, of at least $211,887.18 in addition to other fees and/or interest thereon at a legal rate, the amount of which will be determined at the time of trial.

2. For punitive damages on Plaintiff's Second, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth and Eleventh Claims for Relief;

3. For costs of suit and attorneys' fees incurred herein;

4. For such other and further relief as the Court deems just and proper.


DATED: May 6, 2011                        KAYE, ROSE & PARTNERS, LLP



                                          By_____
                                               Bradley M. Rose
                                               Daniel F. Berberich
                                               Attorneys for Plaintiff
                                               WILLIAM OVERHOLT

KAYE, ROSE & PARTNERS, LLP

## REQUEST FOR JURY TRIAL

Plaintiff, William Overholt, requests trial in the above-mentioned case by jury.

DATED: May 6, 2011

KAYE, ROSE & PARTNERS, LLP

By _____

Bradley M. Rose
Daniel F. Berberich
Attorneys for Plaintiff
WILLIAM OVERHOLT

KAYE, ROSE & PARTNERS, LLP

- 13 -
COMPLAINT

EXHIBIT D



May 27, 2011

American Constructors, Inc.
24932 Avenue Kearny, Unit 6
Valencia, CA  91355

Re:     Named Insured:      American Constructors, Inc.
        Policy No.:          ERA5KCM09
        Policy Period:       06/07/09-06/07/10
        Date of Claim:       05/26/11
        Claimant:            William Overholt
        Our File No.:        ER0900029387

Dear Sir or Madam:

On behalf of Aspen Specialty Insurance Company ("Aspen"), this will acknowledge receipt of the above-noted matter.  We will be reviewing the information that has been provided to us in an effort to determine what rights or coverage may be provided for this matter under the terms of the above-noted policy (the "Policy").

In the interim, we consider all rights under the Policy and at law (common, statutory and otherwise), to be mutually reserved.  We specifically reserve the right to assert any and all defenses to coverage, including those that may be developed or discovered in the course of our further coverage investigation.

We remind you of your continuing obligation to fully and completely cooperate with Aspen in connection with this matter, and to keep us apprised of developments as this matter proceeds.  Accordingly, in the event that you receive or obtain additional information relating to this matter, please advise us and forward all pertinent documents and information.  If you have any other insurance policies, which may respond to the claim asserted, you should notify that carrier immediately.

**Please be advised that the handling of this matter has been assigned to Michael Uzenski who can be reached at (646) 502-1073 or via e-mail at Michael.Uzenski@aspenspecialty.com.**  When corresponding with us on this matter, kindly refer to the Policy and claim numbers referenced above.

Very truly yours,

Stephen G. Perrella
SVP, Casualty Claims
Aspen Specialty
590 Madison Avenue
New York, NY 10022
T: (646) 502-1038  F: (646) 502-1020
E-mail: Stephen.Perrella@AspenSpecialty.com

Cc:    Debbie Swenson debbies@nationaleands.com
       National E & S Insurance Brokers, Inc.

EXHIBIT E



**Clausen**
**Miller** PC

CLAUSEN MILLER P.C.  CLAUSEN MILLER L.L.P.  CLAUSEN MILLER EUROPE
CHICAGO, IL        LONDON, ENGLAND    Clausen Miller P.C.
IRVINE, CA                            Clausen Miller L.L.P., LONDON
NEW YORK, NY                          Teraud-Lambard-Jumi & Associés, PARIS
PARSIPPANY, NJ                        Studio Legale Corapi, ROME
WHEATON, IL                           van Cutsem-Wittamer-Marnef & Partners, BRUSSELS
SHANGHAI, CHINA

*Attorneys at Law*          2040 Main Street, Suite 500 • Irvine, CA 92614 • www.clausen.com
                            Tel: 949.260.3100 • Fax: 949.260.3190
                            **KATHLEEN E. BAILEY**
                            **DIRECT LINE (949) 260-3120**

June 16, 2011

<u>**SENT BY EMAIL AND CERTIFIED MAIL - RRR**</u>

Thomas C. Geoffroy
Americraft Constructors, Inc.
28430 Witherspoon Parkway
Valencia, CA 91355

Re:   <u>Overholt v. Americraft Constructors, Inc. d/b/a/ American Craftsman,</u>
      Los Angeles County Superior Court Case No. SC112542

Insureds:        American Constructors, Inc. dba: American
                 Craftsman (2009-2010 Policy); and
                 Americraft Constructors, Inc. dba: American
                 Craftsman Restoration (2010-2011 Policy)

Claimant:        William Overholt
Policy Numbers:  ERA5KCM09, June 7, 2009 to June 7, 2010
                 ERA5KCM10, June 7, 2010 to June 7, 2011

Claim No.:       ER0900029387

Dear Mr. Geoffroy:

     This law firm serves as coverage counsel to Aspen Specialty Insurance Company ("Aspen"). This letter is written in response to the notice of the above-referenced claim sent to Aspen on May 26, 2011 by Debbie Swenson of National E & S Insurance Brokers, Inc., on behalf of Americraft Constructors, Inc. d/b/a American Craftsman ("American Craftsman"). Aspen's receipt of Ms. Swenson's May 26, 2011 correspondence was its first notice of this claim.

     Aspen has evaluated this claim in light of the coverage afforded by the following policies: (1) Commercial General Liability Policy No. ERA5KCM09, issued by Aspen to American Constructors, Inc. dba: American Craftsman, as Named Insured, effective from June 7, 2009 to June 7, 2010 ("2009-2010 Policy"); and (2) Commercial General Liability Policy No. ERA5KCM10, issued by Aspen to Americraft Constructors, Inc. dba: American Craftsman Restoration, as Named Insured, effective June 7, 2010 to

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 2

June 7, 2011 ("2010-2011 Policy").  Collectively, the 2009-2010 Policy and the 2010-2011 Policy are referred to as "the subject policies."

## COVERAGE DETERMINATION

As discussed more fully below, based on the information provided to Aspen to date, Aspen has determined that there is no potential for coverage for the claims asserted in the subject action under the subject policies, and therefore, Aspen has no duty to defend or indemnify American Craftsman.  Aspen has performed its coverage evaluation under Coverage A – Bodily Injury and Property Damage Liability and Coverage D – Pollution Legal Liability.

With respect to Coverage A – Bodily Injury and Property Damage Liability of the subject policies, Aspen has determined that there is no coverage available because:

1.    the claims asserted against American Craftsman in the subject action do not seek damages because of "property damage" that occurred during the effective dates of either of the subject policies; and/or

2.    American Craftsman knew of Plaintiff's "property damage" claim prior to the effective dates of the subject policies; and/or

3.    the "property damage" first occurred in whole or in part, prior to the effective dates of the subject policies; and/or

4.    the "property damage" would not have occurred but for exposure to, or the presence of, "fungi or bacteria," as defined in the subject policies.  See Fungi or Bacteria Exclusion.

With respect to Coverage D – Pollution Legal Liability, Aspen has determined that there is no coverage available because:

1.    coverage for "property damage," "claim expenses," and "mold clean-up costs" arising from "mold" is provided solely on a claims-made and reported basis under part d. of Coverage D (see Exclusion r., Mold) and, thus, the "claim" must be first made against American Craftsman and first reported to Aspen during the policy period of either the 2009-2010 Policy or the 2010-2011 Policy, which it was not.

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 3

2.      this claim is based on a "loss" arising out of "mold" which existed prior to the effective date of the subject policies and, thus, it is an excluded "known condition." See Exclusion a, Expected or Intended and Known Conditions.

Coverage B - Personal and Advertising Injury and Coverage C - Medical Payments are not applicable to this claim.

## STATEMENT OF FACTS

By letter dated May 5, 2011, Daniel Berberich of Kay, Rose & Partners, LLP wrote to you advising you of his firm's representation of William Overholt in connection with a claim for damages arising out of the restoration and mold prevention/remediation work allegedly negligently performed by American Craftsman on August 12-14, 2008. According to Mr. Berberich's letter, toxic mold was discovered to have originated from a pedestal under the air conditioner which an American Craftsman technician cleaned but failed to remove. You were advised of, inspected, and allegedly admitted responsibility for the negligent mold remediation on or about November 4-5, 2008. Thereafter, Mr. Overholt allegedly retained another contractor to remediate the mold throughout his home. Nevertheless, a potential buyer for Mr. Overholt's home backed out of its contract, and Mr. Overholt allegedly sustained financial damages as a result.

On May 9, 2011, Plaintiff William Overholt filed an original Complaint against Defendant Americraft Constructors, Inc. d/b/a American Craftsman, in Los Angeles Superior Court, as Case No. SC112542, alleging eleven causes of action ("the subject action"). The complaint alleges the following causes of action: (1) breach of written contract; (2) negligent repair; (3) promissory estoppel; (4) negligent misrepresentation; (5) fraudulent inducement of contract; (6) false advertising; (7) breach of fiduciary duty; (8) unfair business acts; (9) tortious interference with contractual relations; (10) tortious interference with prospective business advantage; and (11) negligent hiring, training, supervision and retention.

Despite the varied causes of action, the gist of the subject action is the same as that presented in Mr. Berberich's letter of May 5, 2011, to wit: American Craftsman contractually agreed to perform restoration and mold prevention/remediation work on or around August 12-14, 2008. Cp., ¶ 9. American Craftsman "negligently performed the work by failing to act in accordance with the prevailing industry standards and with Defendants' own standards." Id. As a result of American Craftsman's alleged

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 4

negligence, "mold spread throughout Plaintiff's entire residence," and he sustained financial damages resulting from such negligence.

## COVERAGE ANALYSIS

### The Subject Policies

Aspen has considered this claim under Commercial General Liability Policy No. ERA5KCM09, issued by Aspen to American Constructors, Inc. dba: American Craftsman, as Named Insured, effective from June 7, 2009 to June 7, 2010 ("2009-2010 Policy") and Commercial General Liability Policy No. ERA5KCM10, issued by Aspen to Americraft Constructors, Inc. dba: American Craftsman Restoration, as Named Insured, effective June 7, 2010 to June 7, 2011 ("2010-2011 Policy"). Collectively, the 2009-2010 Policy and the 2010-2011 Policy are referred to as "the subject policies." Where the policy language is different, each policy is discussed separately.

### Insuring Agreements

The subject policies contain two coverage parts relevant to Aspen's coverage analysis: Coverage A – Bodily Injury and Property Damage Liability ("Coverage A"), and Coverage D – Pollution Legal Liability ("Coverage D"). Each is discussed below.

### Coverage A – Bodily Injury And Property Damage Liability

The insuring agreement in Coverage A states as follows:

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of ... "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for ... "property damage" to which this insurance does not apply.

\* \* \*

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 5

    **b.**    This insurance applies to . . . "property damage" only if:

        (1)    The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2)    The . . . "property damage" occurs during the "policy period"; and

        (3)    Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the . . . "property damage" had occurred, in whole or in part.  If such a listed insured or authorized "employee" knew, prior to the policy period, that the . . . "property damage" occurred, then any continuation, change or resumption of such . . . "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

"Property damage" is defined, in relevant part, to mean either "physical injury to tangible property," or "loss of use of tangible property that is not physically injured."

"Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

### "Property Damage" During The Policy Period

For coverage to exist under Coverage A of the 2009-2010 Policy, "property damage" must have been sustained between June 7, 2009 and June 7, 2010.  For coverage to exist under Coverage A of the 2010-2011 Policy, "property damage" must have been sustained between June 7, 2010 and June 7, 2011.

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 6

According to Mr. Berberich's May 5, 2011 letter and the allegations in the subject action, Plaintiff's "property damage" was allegedly sustained between August 12-14, 2008 (when American Craftsman completed its work) and some date prior to March 29, 2009 (when Plaintiff sold his house). Accordingly, the "property damage" alleged in the subject action occurred prior to the effective dates of the subject policies. For this reason, the claims asserted in the subject action do not potentially fall within the insuring agreement of Coverage A of the subject policies.

Aspen also reserves its right to disclaim coverage for those causes of action and/or damages which do not seek recovery for "property damage," as that term is defined in the subject policies.

## Caused By An Occurrence

"Occurrence" is defined in the subject policies as an "accident." It is well settled that intentional and fraudulent conduct is not an accident. Although Aspen is not declining to defend American Craftsman on this ground, Aspen reserves its right to disclaim coverage for any damages, including punitive damages, awarded in the subject action because of American Craftsman's intentional or fraudulent acts. See, e.g., Cp., ¶¶ 21, 32, 35, 41, 43, 52, 62, 69, and 77.

## Known "Property Damage" Prior To The Policy Period

As set forth in the insuring agreement quoted above, Coverage A of the subject policies applies to "property damage" only if "prior to the policy period, no insured . . . knew that the . . . 'property damage' had occurred, in whole or in part." According to Coverage A of the subject policies, "property damage" is deemed to have been known when an insured or authorized employee receives a written or verbal demand or claim for damages because of "property damage," or, otherwise, becomes aware by any means that "property damage" occurred or has begun to occur. The subject policies further state that "any continuation, change or resumption of such 'property damage' will be deemed to have been known prior to the policy period."

According to Mr. Berberich's May 5, 2011 letter, American Craftsman was notified about Plaintiff's mold claim by no later than November 4, 2008, when you inspected Plaintiff's house and allegedly confirmed that American Craftsman's work was improperly performed. American Craftsman was made aware by no later than November 5, 2008 that Plaintiff was seeking financial compensation as a result of

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 7

American Craftsman's improper mold remediation work.  For this reason, Aspen has determined that there is no potential for coverage under Coverage A of the subject policies.

### Continuous And Progressive Exclusion

In addition to the foregoing, the 2009-2010 Policy contains a "Continuous & Progressive Exclusion" Endorsement, which states, in relevant part, as follows:

This insurance does not apply to:

1. "Bodily injury" or "property damage," including continuous, progressive or repeated "bodily injury" or "property damage," that first occurs, in whole or in part, prior to the effective date of this policy;

2. "Bodily injury" or "property damage," including continuous, progressive or repeated "bodily injury" or "property damage," that first occurs, in whole or in part, prior to the effective date of this policy and also occurs during the policy period;

3. "Bodily injury" or "property damage," including continuous, progressive or repeated "bodily injury" or "property damage," that first occurs, in whole or in part, prior to the effective date of this policy, also occurs during the policy period, and ceases to occur after the expiration or cancellation date of this policy;

\* \* \*

This exclusion applies regardless of whether American Craftsman knew of such "property damage."

Similarly, the 2010-2011 Policy contains a "Continuous Or Progressive Injury Or Damage Exclusion" Endorsement which states, in pertinent part, as follows:

This insurance does not apply to any . . . "property damage":

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 8

1.  which first existed, or is alleged to have first existed, prior to the inception of this policy. "Property damage" from "your work," or the work of any additional insured, performed prior to policy inception will be deemed to have first existed prior to the policy inception, unless such "property damage" is sudden and accidental and takes place within the policy period); or

2.  which was, or is alleged to have been, in the process of taking place prior to the inception date of this policy, even if . . . such . . . "property damage" continued during this policy period; or

3.  which is, or is alleged to be, of the same general nature or type as a condition, circumstance or construction defect which resulted in . . . "property damage" prior to the inception date of this policy.

All "property damage" alleged in the subject action first existed, or is alleged to have first existed, and was in the process of taking place, or is alleged to have been in the process of taking place, prior to the June 7, 2009 inception date of the 2009-2010 Policy and prior to the June 7, 2010 inception date of the 2010-2011 Policy. For this reason, Aspen disclaims coverage under Coverage A of the subject policies.

## Fungi Or Bacteria Exclusion

The subject policies contain a "Fungi or Bacteria Exclusion" Endorsement applicable to Coverage A. The 2009-2010 Policy's "Fungi or Bacteria Exclusion" Endorsement states, in relevant part:

This insurance does not apply to:

**Fungi Or Bacteria**

a.  . . . "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi"

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 9

> or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

> b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

The 2010-2011 Policy has a virtually identical "Fungi or Bacteria Exclusion" Endorsement with slight wording variations that have no substantive impact on Aspen's analysis.

The term "fungi" is defined in the subject policies as "any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi."

Plaintiff's "property damage" claims in the subject action all arise out of alleged mold contamination and consequential damages. Accordingly, such claims fall squarely within the scope of the foregoing exclusions.

## Coverage D – Pollution Legal Liability

The "Contractors Pollution Legal Liability Endorsement" to the subject policies adds Coverage D – Pollution Legal Liability ("Coverage D") to the subject policies. There are four insuring agreements under Coverage D: (a) Contractors Pollution Legal Liability (Occurrence Coverage); (b) Crisis Management Expense (Occurrence Coverage); (c) Non-Owned Disposal Site (Claims-Made Coverage); and (d) Mold (Claims-Made Coverage). The insuring agreement in part (d) entitled Mold (Claims-Made Coverage) states, in relevant part:

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 10

**d.    Insuring   Agreement  –  Mold   (Claims-Made Coverage)**

We will pay on your behalf all sums an insured shall become legally obligated to pay for . . . **Property Damage**, **Claim Expenses**, or **Mold Clean-up Cost** as a result of **Claims** first made and reported against you during the policy period **Arising from Mold** caused by **Contracting Activities**, subsequent to the retroactive date.

"Property Damage" is defined in Coverage D of the subject policies as "physical injury to tangible property" or "loss of use of tangible property that is not physically injured." The 2009-2010 Policy's definition of "Property Damage" also includes "[d]iminution of third parties property."

"Claim" is defined in Coverage D of the subject policies as "any written or oral demand, notice, request for indemnity or other legal or equitable proceedings" asserted against the **Insured**, . . . "for **Loss** . . . arising out of . . . **Mold** from **Contracting Activities** to which this insurance applies."

"Loss" is defined as "Property Damage," "Claim Expenses" and "Mold Clean-up Cost."

"Contracting Activities" is defined as "those activities or operations conducted by you or on your behalf, as otherwise disclosed to us as of the inception of this Policy."

**"Claim" First Made During The Policy Period**

Coverage under part (d) entitled Mold (Claims-Made Coverage) of Coverage D of the subject policies is afforded on a claims-made and reported basis. Thus, to qualify for coverage under the 2009-2010 Policy, a "claim" must be first made against American Craftsman and reported to Aspen between June 7, 2009 and June 7, 2010. Similarly, to qualify for coverage under the 2010-2011 Policy, a "claim" must be first made against American Craftsman and reported to Aspen between June 7, 2010 and June 7, 2011. Neither policy affords coverage for any "claim" first made prior to its issuance.

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 11

Plaintiff's "claim" against American Craftsman was first made on or about November 4-5, 2008, when Mr. Overholt advised you that his house had failed a mold inspection due to American Craftsman's failure to remove the pedestal underneath the air conditioner and sought financial compensation from American Craftsman for all financial damages caused thereby.

Because this claim was first made against American Craftsman prior to the inception date of the subject policies, there is no potential for coverage for the claims asserted in the subject action under part (d) of Coverage D of the subject policies. Further, there is no potential for coverage for the claims asserted in the subject action under the part (d) of Coverage D of the 2009-2010 Policy because this claim was not reported to Aspen until May 26, 2011, after expiration of the 2009-2010 Policy.

<u>"Known Condition" Exclusions</u>

Plaintiff's claims in the subject action are also excluded from all coverage parts of Coverage D in the subject policies, pursuant to exclusion a., Expected or Intended and Known Conditions, in the 2009-2010 Policy, and exclusion j., Known Conditions, in the 2010-2011 Policy.

This exclusion in the 2009-2010 Policy states:

This insurance does not apply to:

a.      **Expected or Intended and Known Conditions:
        <u>Arising from</u> <u>Loss</u> expected or intended from the
        standpoint of the insured, and any Known Condition.
        Known Condition as used here means <u>Loss</u> arising
        out of <u>Pollution Conditions</u> or <u>Mold</u> existing prior to
        the <u>Policy Period</u> and reported to an insured, and any
        continuation or resumption of, or change in such
        <u>Pollution Conditions</u> or <u>Mold</u>.**

This exclusion in the 2010-2011 Policy states:

This insurance does not apply to:

j.      **Known Conditions:     <u>Arising From</u> any <u>Known
        Condition</u>.**

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 12

"Known Condition" is defined in Coverage D of the 2010-2011 Policy as " **Loss** arising out of **Pollution Conditions** or **Mold** existing prior to the **Policy Period** or were known by an insured prior to the **Policy Period**, and any subsequent continuation or resumption of or changes in such **Pollution Conditions** or **Mold**."

According to Mr. Berberich's May 5, 2011 letter, American Craftsman was notified of Plaintiff's mold problem by November 4, 2008, when you inspected Plaintiff's house and allegedly confirmed that American Craftsman's work had been improperly performed. American Craftsman was also aware as of November 5, 2008 that Plaintiff was seeking financial compensation as a result of American Craftsman's improper mold remediation work. Thus, the subject claim falls within the exclusions a. and j. of Coverage D of the subject policies. For this reason, Aspen has determined that there is no potential for coverage for the claims asserted in the subject action under Coverage D of the subject policies.

<u>Mold Exclusion</u>

Plaintiff's claims in the subject action are also excluded from coverage parts a, b, and c of Coverage D in the subject policies, pursuant to exclusion r., Mold, in the 2009-2010 Policy and exclusion k., Mold, in the 2010-2011 Policy.

This exclusion in the 2009-2010 Policy states:

This insurance does not apply to:

r.    **Mold:** This Policy does not provide coverage for, and will not apply to **Loss** or **Claims** **Arising from** **Mold**, except as otherwise expressly provided by **Section I - Pollution Legal Liability**, Insuring Agreement part (D), **Mold (Claims-Made Coverage)**.

This exclusion in the 2010-2011 Policy states:

k.    **Mold:** This Policy does not provide coverage for, and will not apply to **Loss** or **Claims** **Arising from** **Mold**, except as otherwise expressly provided by **Section I - Pollution Legal Liability**, Insuring Agreement part (D), **Mold (Claims-Made Coverage)**.

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 13

In light of the foregoing, there is no potential for coverage for the claims asserted in the subject action under parts a, b, and c of Coverage D of the subject policies.

## ADDITIONAL RESERVATION OF RIGHTS

In addition to the foregoing, Aspen reserves its right to rely on the following provisions of the subject policies as additional grounds on which to disclaim or limit coverage.

### Insured Status

American Constructors, Inc. dba: American Craftsman is the Named Insured on the 2009-2010 Policy. Americraft Constructors, Inc. dba: American Craftsman Restoration is not identified as an insured under the 2009-2010 Policy. Americraft Constructors, Inc. dba: American Craftsman Restoration is the Named Insured on the 2010-2011 Policy. American Constructors, Inc. dba: American Craftsman is not identified as an insured under the 2010-2011 Policy. Accordingly, Aspen reserves the right to disclaim coverage under the subject policies to any person, entity or organization that does not qualify as an insured.

### Coverage A Exclusions

Based upon the information that has been provided to Aspen to date, it appears that the following exclusions in Coverage A of the subject policies are potentially applicable to the claims asserted against American Craftsman in the subject action:

**b.** **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

\* \* \*

**l.** **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 14

**m.    Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)    A defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or

(2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of the sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.    Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1)    "Your product";

(2)    "Your work"; or

(3)    "Impaired Property"

if such product, work, or property is withdrawn or recalled from the market, or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy, or dangerous condition in it.

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 15

### Coverage D Exclusions

 Based upon the information that has been provided to Aspen to date, it appears that the following Coverage D exclusions are potentially applicable to the claims asserted against American Craftsman in the subject action:

 e. **Affiliates: Arising from** errors, acts or omissions claimed against, any of the following entities:

  1) Any related business enterprise which is operated, managed or owned, in whole or in part, by an insured; or

  2) Your parent company; or

  3) Any other affiliated or subsidiary companies;

  unless the entity is named as an insured or as an additional insured in this Policy, or in an endorsement attached to this Policy. In no event shall this policy cover suits by one insured or additional insured under this policy against another insured or additional insured under this policy.[1]

 f. **Expected or Intended Loss: Arising From Loss** expected or intended from the standpoint of the insured.[2]

---

 [1] Although identical "Affiliates" exclusions appear in both of the subject policies, it is listed as Exclusion e. in the 2009-2010 Policy and Exclusion a. in the 2010-2011 Policy.

 [2] This exclusion appears as a stand-alone exclusion in the 2010-2011 Policy, and is part of the 2009-2010 Policy's "Expected or Intended and Known Conditions" Exclusion, discussed above.

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 16

g.    **Fines, Penalties and Multiple Damages:**  Any fines or penalties or awards for multiple damages assessed against an insured relating to **Claims** or **Loss** covered by this policy.

*  *  *

k.    **Warranty or Guarantee:**  **Arising from**, any kind of express warranty or guarantee given on or [on] behalf of the insured.

### Punitive Damages

In addition to the subject policies' exclusion for fines, penalties and multiple damages, California public policy prohibits the indemnification of punitive damages, such as those sought in the second, fourth, fifth, sixth, seventh, ninth, tenth and eleventh causes of action in the subject action.  For this reason, Aspen reserves its right to disclaim coverage for any award of punitive damages.

### Voluntary Payments

Both Coverage A and Coverage D in the subject policies contain provisions stating that American Craftsman shall not, except at its own cost, "voluntarily make any payment, assume any obligation or incur any expense other than for first aid" without Aspen's consent.  Aspen reserves its right to disclaim coverage under the subject policies if any liability should be imposed on American Craftsman as a result of its alleged November 5, 2008 agreement to financially compensate Plaintiff.

### Non-Stacking Endorsement

Aspen reserves its right to rely on the following endorsement that amends the Common Policy Conditions of the subject policies, precluding the "stacking" of limits under multiple coverage parts or multiple policies:

If this policy contains two or more Coverage Parts providing coverage for the same "occurrence," "accident," "cause of loss," "loss" or offense, the maximum limit of insurance under all coverage Parts shall not exceed the highest limit of insurance under any one Coverage Part.

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 17

If this policy and any other policy issued to you by us apply to the same "occurrence," "accident," "cause of loss," "injury," "loss" or offence, the maximum limit of insurance under all of the policies shall not exceed the highest limit of insurance under any one policy. This condition does not apply to any policy issued by us which specifically provides that the policy is to apply as excess insurance over this policy.

### Non-Duplication Of Limits Endorsement

Aspen reserves its right to rely on the following endorsement that amends Section III – Limits of Insurance as to Coverage A. This Endorsement states, in relevant part, as follows:

8.   Regardless of the number of insureds, claims made or "suits" brought, or persons or organizations making claims or bringing "suits":

a.   With respect to all "bodily injury" and "property damage" that arises out of one "occurrence" and is covered, in whole or in part, by this policy and any other policy issued by us or any affiliate to you, the maximum that we will pay under all such policies combined is the highest Each Occurrence Limit of Insurance stated in the Limits of Insurance section of the Declarations page in any one of these policies.

"Occurrence" means an accident including continuous or repeated exposure to substantially the same general harmful conditions.

In the event of continuous, progressive or repeated "bodily injury" or "property damage" over any length of time, such "bodily injury" or "property damage" shall be deemed to be one "occurrence."

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 18

### Deductibles

The coverage afforded by Coverage A of the subject policies is subject to a $10,000 each "occurrence" deductible applicable to Aspen's obligation to indemnify American Craftsman with respect to covered "property damage" claims. The coverage afforded by Coverage D of the Aspen Policies is subject to a $10,000 each "Loss" deductible applicable to claims within its insuring agreements, including the Mold insuring agreement. The Coverage D deductible applies to all "Loss" resulting from each "Claim," including "Claims Expenses" (e.g., attorneys' fees and costs).

### Other Insurance

The Coverage A and Coverage D coverage parts contain "other insurance" provisions specifying when the subject policies will apply as excess insurance, when they will apply as primary insurance, and the method of sharing with other insurance that also is primary insurance. Aspen reserves the right to rely on these provisions to further limit or preclude coverage for the claims asserted against American Craftsman in the subject action.

### CONCLUSION

Based upon the foregoing coverage analysis, Aspen has determined that there is no potential for coverage for the claims asserted in the subject action under the subject policies. Accordingly, Aspen must decline to participate in the defense and indemnity of American Craftsman in the subject action.

Pursuant to California's Fair Claims Practices Regulations, an insurer is afforded at least forty (40) calendar days after receipt of a claim to communicate its coverage position. Accordingly, Aspen was not required to complete its coverage investigation and provide you with its determination until July 5, 2011. Nevertheless, at your request and as a courtesy to you, Aspen has provided this coverage determination to you on an expedited basis. We note this only to say that Aspen's coverage determination has been based solely on the information and documentation provided to date. If you believe there are any additional facts or documents that may have a bearing on Aspen's coverage determination, please provide them to us immediately.

Aspen reserves its right to deny coverage based on any additional grounds that become known by or available to Aspen subsequent to the date of this letter. Accordingly, nothing contained herein and nothing omitted from this letter should be

Thomas C. Geoffroy
Americraft Constructors, Inc.
June 16, 2011
Page 19

construed by you as a waiver of any of Aspen's rights under the subject policies or applicable law.

If you believe that Aspen has reached this coverage determination in error, Aspen would be pleased to consider whatever additional information and/or documents that you provide to us. Additionally, or alternatively, if you disagree with this coverage determination, you may contact the California Department of Insurance, Customer Services Division, Claims Service Bureau, 300 South Spring Street, Los Angeles, California 90013; (213) 897-8921 (outside California); (800) 927-HELP (inside California); (800) 482-4833 (TDD Only).

Very truly yours,

CLAUSEN MILLER P.C.

*Kathleen E. Bailey*

Kathleen E. Bailey

/keb

cc:   Michael Uzenski, Aspen Specialty Insurance Company (By Email)
      Debbie Swenson, National E & S Insurance Brokers, Inc. (By Email)

80154

EXHIBIT F

LAW OFFICES

# SHAPERO, SHAPERO & HURST
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS

MARTIN M. SHAPERO*
STEVEN J. SHAPERO*¹
E. RICH HURST

*A PROFESSIONAL
CORPORATION

¹ALSO MEMBER OF
NEW YORK BAR

5950 CANOGA AVENUE
SUITE 404
WOODLAND HILLS, CALIFORNIA 91367-5060

TELEPHONE
(818) 710-1200
(323) 873-6469

FACSIMILE
(818) 710-1447

July 1, 2011

Kathleen E. Bailey, Esq.
Clausen Miller
2040 Main Street, Suite 500
Irvine, CA 92614

> Re:  Overholt v. Americraft Constructors, Inc. dba American Craftsman
> Los Angeles County Superior Court Case No. SC 112542
> Your insured:  American Constructors, Inc. dba American Craftsman
> Restoration
> Policy Numbers: ERA5KCM09, ERA5KCM10
> Your claim No.:  ER0900029387

Dear Ms. Bailey:

Please be advised this office represents Americraft Constructors, Inc. dba American Craftsman Restoration (hereinafter "American") in connection with the above matter.  Please direct all communications regarding this matter to this office. This letter responds to yours, dated June 16, 2011, constituting the denial by Aspen Specialty Insurance Company (hereinafter "Aspen") of American's tender of defense in the above matter.

Please be advised that our office is currently reviewing the matter, but, suffice it to say, we believe your letter is not well taken.

As I am sure you are aware, the insurance company's duty to defend a claim is much broader than its duty to indemnify the insured if, and when, liability and damages to the claimant are determined.  An insurance company's duty to defend a claim arises, and continues, when there is a potential that a covered claim is being asserted.  "The duty to defend arises whenever the lawsuit against the insured seeks damages on any theory that, if proved, would be covered by the policy.  Thus, a defense is excused only when "the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." [Montrose Chem. Corp. v. Sup.Ct. (Canadian Universal Ins. Co., Inc. (1993) 6 C4th 287, 295, 24 CR2d 467, 471.]  Cal. Prac. Guide Ins. Lit. Ch. 7B-C.

Kathleen E. Bailey, Esq.
July 1, 2011
Page 2

An insurance company may refuse to defend a claim only when the indisputable facts demonstrate that there is no potential that a covered claim is being asserted. Id.

Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. [Horace Mann Ins. Co. v. Barbara B. (1993) 4 C4th 1076, 1081, 17 CR2d 210, 214; Wausau Underwriters Ins. Co. v. Unigard Security Ins. Co. (1998) 68 CA4th 1030, 1035, 80 CR2d 688, 690.] Cal. Prac. Guide Ins. Lit. Ch. 7B-C

An insurance company is obligated to conduct a thorough and complete investigation of the facts, giving all inferences in favor of coverage, before withholding policy benefits. *Egan v. Mutual of Omaha* (1979) 24 Cal. 3d 809, 821; *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 89 Cal.Rptr. 78.

Some cases state that failure to investigate adequately "bars the insurer from denying the tendered defense, and subjects it to liability for the insureds' full attorney's fees and costs incurred thereafter with other counsel." [Stalberg v. Western Title Ins. Co. (1991) 230 CA3d 1223, 1233, 282 CR 43, 50] Cal. Prac. Guide Ins. Lit. Ch. 7B-C.

An insurer cannot avoid its duty to defend based on a coverage defense that depends on facts in dispute in the underlying lawsuit (e.g., when the complaint alleges that the insured engaged in particular conduct and the issue is whether that conduct was intentional (excluded) or negligent (covered)): "If coverage depends on an unresolved dispute over a factual question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend." [Mirpad, LLC v. California Ins. Guar. Ass'n (2005) 132 CA4th 1058, 1068, 34 CR3d 136, 142–143 (emphasis in original); see Horace Mann Ins. Co. v. Barbara B. (1993) 4 C4th 1076, 1085, 17 CR2d 210, 216] Cal. Prac. Guide Ins. Lit. Ch. 7B-C

We believe that Aspen Insurance Company has failed to comply with its obligations as set forth above. It has done literally no investigation of the facts; on the contrary, your letter indicates that Aspen Insurance Company has accepted the contentions of the claimant as irrefutable and conclusive. They are neither, and Aspen Insurance is not permitted to consider them as such. "Even if the face of the complaint does not indicate a potential for coverage under the policy, extrinsic facts known to the insurer may generate a duty to defend because (a) current pleading rules liberally allow amendment, and (b) the third party plaintiff who drafted the complaint cannot be the arbiter of the policy's coverage. [Gray v. Zurich Ins. Co., supra, 65 C2d at 275–277, 54 CR at 112–113; Montrose Chem. Corp. v. Sup.Ct. (Canadian Universal Ins. Co., Inc.), supra, 6 C4th at 295, 24 CR2d at 471]" Cal. Prac. Guide Ins. Lit. Ch. 7B-C.

Your "analysis" with respect to Coverage D – Pollution Legal Liability is misguided. Although you set forth the policy definition of "claim" as "any written or oral demand, notice, request for indemnity or other legal or equitable proceedings" nowhere

Kathleen E. Bailey, Esq.
July 1, 2011
Page 3

do you cite to any "facts" that support your contention that such a claim was "first made on or about November 4-5, 2008, when Mr. Overholt advised you that his house had failed a mold inspection due to American Craftsman's failure to remove the pedestal underneath the air conditioner and sought financial compensation from American Craftsman for all financial damages caused thereby." You acknowledge in your "Statement of Facts" that you rely entirely on only two sources for the "facts" which you contend support the denial of a defense: the May 5, 2011 letter from Daniel Berberich, counsel for the Plaintiff, and the complaint filed by Mr. Overholt. However, nowhere in the letter or the complaint does it state that "Mr. Overholt sought financial compensation" during the November 2008 timeframe. You apparently simply made that up. The closest the letter or complaint comes to such a conclusion is the unsubstantiated statement (unverified by you) by Mr. Berberich at the end of page one of his letter that "At the end of the discussion [Mr. Geoffroy] promised Mr. Overholt that he would be financially compensated for this unfortunate situation." Even if this statement were true, it would not constitute a "written or oral demand, notice, request for indemnity or other legal or equitable proceedings" arising to a "claim."

Moreover, I would direct you to Mr. Berberich's letter at page two where he states: "At this time we request that American Craftsman make good on its promise to provide compensation to Mr. Overholt to cover his financial losses due to the negligently performed restoration and mold prevention/remediation work." This request confirms that a claim had not been made during the November 2008 timeframe, as you contend.

You state that you are relying on the complaint for "facts" supporting Aspen's denial of a defense but you fail to acknowledge that the purported damages that form the basis of Mr. Overholt's claim were not even known during the November 2008 timeframe. The complaint at paragraph 10 indicates that Mr. Overholt purportedly sold his residence in March of 2009 for $150,000 less, plus other costs fees and expenses, than the amount allegedly agreed to in connection with the earlier sale. How could Mr. Overholt have made a claim in November of 2008 when he hadn't realized any damages?

A "claim" requires something more than the expression of dissatisfaction or disappointment or lodging of a grievance: "A claim requires more than a mere threatened action or notice of intention to hold an insured responsible for a wrongful act." *Abifadel v. Cigna Ins. Co.* (1992) 8 CA4th 145, 160, 9 CR2d 910, 921.

The Court in *Abifadel* explained:

"In defining "claims," the law focuses on the claimant's formal demands for service or payment and does not recognize a request for an explanation, the expression of dissatisfaction or disappointment, mere complaining, or the lodging of a grievance as a claim. In both its ordinary meaning and in the interpretation given to it by other courts in similar

Kathleen E. Bailey, Esq.
July 1, 2011
Page 4

circumstances, a claim is a demand for something as a right or as due. A formal lawsuit is not required before a claim is found to have been made. (Hill v. Physicians & Surgeons Exchange, supra, 225 Cal.App.3d at pp. 5-6; Phoenix Ins. Co. v. Sukut Construction Co., supra, 136 Cal.App.3d at p. 677.) A claim is the assertion of a liability of the party, demanding that the party perform some service or pay some money. (Hill v. Physicians & Surgeons Exchange, supra, at pp. 5-7.) A claim is a demand or challenge of something as a right and asserts the liability of the party from whom a service or sum of money is requested. (Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co. (1976) 64 Cal.App.3d 261, 269 [134 Cal.Rptr. 427].)

In Hill, supra, 225 Cal.App.3d 1, the patient who had been assigned her physician's rights under his "claims made" insurance policy, asserted that she had made a claim within the policy period. During the policy period, surgery was performed on her. Also during the policy period, she complained of the results of the surgery. Her physician acknowledged that she should not have the complained-of problems as a result of the surgery and did not bill for his services. After the policy period expired, the patient sent a notice of intent to sue to the physician. The Court of Appeal found the patient had neither made a demand of nor asserted a right against the physician within the policy period. It held that a claim had not been made within the policy period." Id at 160-163.

We believe Aspen Insurance's knee-jerk denial of a defense of the claim, without conducting any investigation, constitutes a breach of the insurance policies, a breach of the obligation of good faith and fair dealing implied by California law in every insurance policy and constitutes bad faith on the part of Aspen Insurance Company. "An insurer is required to investigate all claims promptly (see Ins.C. § 790.03(h)(3)): "The risk that an insurer takes when it denies coverage without investigation is that the insured may later be able to prove that a reasonable investigation would have uncovered evidence to establish coverage or a potential for coverage. In that case, the insurer will be liable for the costs of defense already incurred by the insured ... and could also be exposed to tort liability. [American Int'l Bank v. Fidelity & Dep. Co. of Maryland (1996) 49 CA4th 1558, 1571, 57 CR2d 567, 574"; Eigner v. Worthington (1997) 57 CA4th 188, 195, 66 CR2d 808, 813" Cal. Prac. Guide Ins. Lit. Ch. 7B-C

Please be advised that Aspen's bad faith conduct has put American in peril and forced American to incur costs and expenses, including attorney's fees, to protect itself. Accordingly, at the appropriate time, American will seek to hold Aspen liable for the costs and expenses incurred by American as a result of Aspen's bad faith conduct.

Kathleen E. Bailey, Esq.
July 1, 2011
Page 5

Based on the foregoing, we request on behalf of American that Aspen reconsider its denial of a defense in this matter and confirm the same by July 8, 2011.

Nothing in this letter shall be construed as a waiver of any of American's rights or remedies, afforded under California or Federal law; all such rights and remedies are expressly reserved.

Sincerely,

SHAPERO, SHAPERO & HURST

By: _____
E. Rich Hurst

ERH:rh
cc: client



*Clausen Miller* P.C.

*Attorneys at Law*

| CLAUSEN MILLER P.C. | CLAUSEN MILLER L.L.P. | CLAUSEN MILLER EUROPE |
|---|---|---|
| CHICAGO, IL | LONDON, ENGLAND | Clausen Miller P.C. |
| IRVINE, CA | | Clausen Miller L.L.P., LONDON |
| NEW YORK, NY | | Tomel-Lombard-Jund & Assocés, PARIS |
| PARSIPPANY, NJ | | Studio Legale Corapi, ROME |
| SAN FRANCISCO, CA | | van Cleuson/Whitmer-Martel & Partners, BRUSSELS |
| WHEATON, IL | | |
| SHANGHAI, CHINA | | |

2040 Main Street, Suite 500  •  Irvine, CA 92614  •  www.clausen.com
Tel: 949.260.3100  •  Fax: 949.260.3190

ALEC M. BARINHOLTZ
DIRECT LINE (949) 260-3116

July 27, 2011

**SENT BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

E. Rich Hurst, Esq.
Shapero, Shapero & Hurst
5950 Canoga Avenue, Suite 404
Woodland Hills, CA  91367-5060

Re:  Overholt v. Americraft Constructors, Inc. d/b/a/ American Craftsman,
Los Angeles County Superior Court Case No. SC112542

Insureds:  American Constructors, Inc. dba:  American
Craftsman (2009-2010 Policy); and
Americraft Constructors, Inc. dba:  American
Craftsman Restoration (2010-2011 Policy)

Claimant:  William Overholt

Policy Numbers:  ERA5KCM09, June 7, 2009 to June 7, 2010
ERA5KCM10, June 7, 2010 to June 7, 2011

Claim No.:  ER0900029387

Dear Mr. Hurst:

This letter is written in response to your letter dated July 1, 2011.

Aspen Specialty Insurance Company ("Aspen") has fully considered the points raised in your letter.  Aspen has also considered your request on behalf of Americraft Constructors, Inc. dba American Craftsman Restoration ("American Craftsman") that Aspen reconsider its denial of coverage for the above-referenced claim under the Coverage D – Pollution Legal Liability coverage part of Commercial General Liability Policy No. ERA5KCM09, issued by Aspen to Americraft Constructors, Inc. dba:  American Craftsman, as Named Insured, effective from June 7, 2009 to June 7, 2010  ("2009-2010   Policy");   and   Commercial   General   Liability   Policy No. ERA5KCM10, issued by Aspen to Americraft Constructors, Inc. dba:  American

E. Rich Hurst, Esq.
Shapero, Shapero & Hurst
July 27, 2011
Page 2

Craftsman Restoration, as Named Insured, effective June 7, 2010 to June 7, 2011 ("2010-2011 Policy").[1]   The 2009-2010 Policy and the 2010-2011 Policy are referred to collectively as "the subject policies."

Despite its further review and consideration of this matter, it remains Aspen's determination that there is no potential for coverage under the subject policies and, therefore, Aspen has no duty to defend or to indemnify American Craftsman in connection with the claims asserted in the original complaint filed in the above-referenced lawsuit brought by William Overholt ("subject action").

<u>**Aspen's Investigation**</u>

Your letter first takes issue with the adequacy of Aspen's investigation. As we emphasized in our June 16, 2011 letter, California's Fair Claims Practices Regulations afforded Aspen at least forty (40) calendar days from its receipt of this claim to communicate its coverage position. Aspen first received notice of this claim on May 26, 2011 and, therefore, was not required to complete its coverage investigation and provide American Craftsman with its coverage determination until July 5, 2011.

Nevertheless, at American Craftsman's request, and as a courtesy, Aspen provided its coverage determination on an expedited basis. We explained in our June 16, 2011 letter that Aspen's expedited review was limited to the information that had been provided to date, and expressly invited American Craftsman to provide any additional information that it believed might have a bearing on Aspen's coverage determination. Aspen has not "accepted the contentions of the claimant as irrefutable and conclusive" and, under the circumstances, your letter's criticism about the adequacy of Aspen's investigation is misplaced. Again, if there are any additional facts or documentation that your client would like to provide for Aspen's review, please provide them to us and Aspen will consider them. So far, however, Aspen has not been provided with any new or additional facts or documents.

<u>**"Claim" First Made Prior To The Effective Dates Of The Subject Policies**</u>

The balance of your letter disputes Aspen's determination that there is no coverage available for the claims asserted against American Craftsman under the Aspen

---

[1]   We do not understand your letter to be taking issue with or requesting reconsideration of Aspen's denial of coverage under the Coverage A -- Bodily Injury and Property Damage Liability provisions of the subject policies. If we are mistaken, please advise.

E. Rich Hurst, Esq.
Shapero, Shapero & Hurst
July 27, 2011
Page 3

Policies' Coverage D – Pollution Legal Liability coverage part ("Coverage D"). In particular, your letter disputes Aspen's determination that there is no coverage because the underlying "Claim" was first made prior to the effective dates of either of the subject policies.

As explained in our June 16, 2011 correspondence, the Coverage D insuring agreement that is relevant to Plaintiff's claims in the subject action is part (d), entitled Mold (Claims-Made Coverage), which states, in relevant part:

> d.    **Insuring Agreement – Mold (Claims-Made Coverage)**
>
> We will pay on your behalf all sums an insured shall become legally obligated to pay for . . . **Property Damage, Claim Expenses,** or **Mold Clean-up Cost** as a result of **Claims** first made and reported against you during the policy period **Arising from Mold** caused by **Contracting Activities,** subsequent to the retroactive date.

As relevant to Aspen's analysis, the term "Claim" is defined in Coverage D of the subject policies as "any written or oral demand, notice, request for indemnity or other legal or equitable proceedings" asserted against the "**Insured,** . . . for **Loss** . . . arising out of . . . **Mold** from **Contracting Activities** to which this insurance applies."

Aspen denied coverage under Coverage D, in part, because the "Claim" against American Craftsman was first made on or about November 4-5, 2008, when Mr. Overholt advised your client that his house had failed a mold inspection due to American Craftsman's failure to remove the pedestal underneath the air conditioner and allegedly secured American Craftsman's agreement to financially compensate him.

According to your July 1, 2011 letter, Mr. Overholt's complaints about American Craftsman's work and American Craftsman's alleged agreement to compensate him do not amount to a "Claim" as that term is defined in the subject policies. Your letter relies on cases such as Abfidel v. Cigna Ins. Co. (1992) 8 Cal.App.4th 145, 160, for the proposition that a "claim" requires something more than the expression of dissatisfaction, disappointment, lodging of a grievance or a threat to hold an insured responsible for a wrongful act." Rather, a "claim" requires a demand for something as a

E. Rich Hurst, Esq.
Shapero, Shapero & Hurst
July 27, 2011
Page 4

right or as due and asserts the liability of the party from whom a service or money is requested. Based on this definition of "claim," your letter states that Mr. Overholt did not make any "claim" against American Craftsman until May 5, 2011, which is when Mr. Overholt's attorney, Daniel Berberich, demanded that American Craftsman make good on its earlier promise to compensate Mr. Overholt for his losses.

Aspen respectfully disagrees with your analysis. Unlike the subject policies, the claims-made policy at issue in Abfidel did not define the term "claim." Thus, the Abfidel court's comments about the meaning of the undefined term "claim" have no application where, as here, that term is expressly defined.[2] See, e.g., Evanston Ins. Co. v. OEA, Inc. (9th Cir. 2009) 566 F.3d 915, (applying California law; interpreting and applying policy definition of "claim" that defined term as "notice received by the insured of an intention to hold the insured responsible for an Occurrence involving this policy").

The subject policies' definition of "Claim" is broader than a "demand for something as a right or as due" or the "assertion of a liability of the party, demanding that the party perform some service or pay some money." The term "Claim" is defined to include, among other things, "any written or oral . . . notice" asserted against the "**Insured**, . . . "for **Loss** . . . arising out of . . . **Mold** from **Contracting Activities** to which this insurance applies."

Based on the content of Mr. Berberich's May 5, 2011 letter, and in the absence of any contrary information from American Craftsman, it reasonably appeared that in November 2008, American Craftsman was placed on notice that toxic mold was emanating from the pedestal underneath an air conditioning unit that American Craftsman cleaned, but did not remove. At that time, American Craftsman allegedly acknowledged the inadequacy of its work, and offered to financially compensate Mr. Overholt. The foregoing fits comfortably within the subject policies' definition of "Claim."

If American Craftsman disputes that the events of November 2008 happened, or that they happened as described in Mr. Berberich's letter, Aspen would be

---

[2] The decisions on which Abfidel relied – Hill v. Physicians & Surgeons Exchange (1990) 225 Cal.App.3d 1, Phoenix Ins. Co. v. Sukut Construction Co. (1982) 136 Cal.App.3d 673, Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co. (1976) 64 Cal.App.3d 261 – likewise are inapposite, because they also construed the meaning of the undefined term, "claim."

E. Rich Hurst, Esq.
Shapero, Shapero & Hurst
July 27, 2011
Page 5

pleased to consider whatever additional information that American Craftsman would like to provide.

### "Known Loss" Exclusions

Aspen did not base its denial under Coverage D solely on the ground that Mr. Overholt's "Claim" against American Craftsman was first made prior to the effective dates of the subject policies. Aspen also denied coverage on the separate and independent ground that the subject policies' respective "known condition" exclusions preclude coverage. Your July 1, 2011 letter does not address these exclusions.

This exclusion in the 2009-2010 Policy states:

This insurance does not apply to:

a. **Expected or Intended and Known Conditions:** **Arising from** **Loss** expected or intended from the standpoint of the insured, and any **Known Condition**. **Known Condition** as used here means **Loss** arising out of **Pollution Conditions** or **Mold** existing prior to the **Policy Period** and reported to an insured, and any continuation or resumption of, or change in such **Pollution Conditions** or **Mold**.

This exclusion in the 2010-2011 Policy states:

This insurance does not apply to:

j. **Known Conditions:** **Arising From** any **Known Condition.**

"Known Condition" is defined in Coverage D of the 2010-2011 Policy as " **Loss** arising out of **Pollution Conditions** or **Mold** existing prior to the **Policy Period** or were known by an insured prior to the **Policy Period**, and any subsequent continuation or resumption of or changes in such **Pollution Conditions** or **Mold**."

According to Mr. Berberich's May 5, 2011 letter, American Craftsman was notified about Mr. Overholt's toxic mold contamination claims no later than November 4, 2008, when American Craftsman inspected Mr. Overholt's house and allegedly

E. Rich Hurst, Esq.
Shapero, Shapero & Hurst
July 27, 2011
Page 6

confirmed the inadequacy of its earlier work. Mr. Overholt's report to American Craftsman of his continuing mold complaints constitutes a "known condition" that predates the effective dates of either of the subject policies.

Further, for purposes of these exclusions, it does not matter whether the extent of Mr. Overholt's alleged "Loss" was known or fully realized at the time that the mold conditions were reported to American Craftsman. The definition of "known condition" includes loss arising out of the continuation, resumption or change in mold conditions that were reported to American Craftsman prior to the effective dates of the subject policies.

## Conclusion

Aspen's coverage determination is based on the facts and analysis set forth in our letter dated June 16, 2011, as well as the facts and analysis set forth in this letter. If you or American Craftsman believe that there are any additional facts or information that bear on Aspen's coverage determination, we again invite you and/or American Craftsman to provide such information immediately. Please also immediately provide us with a copy of any amended pleadings filed in the subject action. In the meantime, Aspen reserves all of its rights under the subject policies and applicable law. Accordingly, nothing contained herein and nothing omitted from this letter should be construed by you or American Craftsman as a waiver of any of Aspen's rights.

Please do not hesitate to call me if you would like to discuss any of these matters further.

Very truly yours,

CLAUSEN MILLER P.C.

Alec M. Barinholtz

/amb

cc:   Michael Uzenski, Aspen Specialty Insurance Company (By Email)

EXHIBIT H

STEVEN W. MURRAY
a law corporation

SUITE 205
14930 VENTURA BOULEVARD
SHERMAN OAKS, CALIFORNIA 91403

(818) 501-2277
fax (818) 501-6441
info@pslaw.com

December 2, 2011

<u>Via Email and U.S. Mail</u>

Alec. M. Barinholtz, Esq.
CLAUSEN MILLER
2040 Main St., Ste. 500
Irvine, CA 92614

      Re: *Overholt vs. Americraft*
        *Claim No. ER0900029387*

Dear Mr. Barinholtz:

      Enclosed is a demand letter from Plaintiff's attorney which is self explanatory. Your insureds request Aspen immediately take all steps to protect them by either accepting this demand or otherwise negotiating a settlement on or before the December 15, 2011 time limit stated therein.

      Your insureds face a great financial risk in this litigation and Aspen was paid a premium to protect them from exactly this type of risk. Settlement is the most reasonable manner of disposing of this claim.

      Please contact me if there is anything I can do to assist you in effecting this protection for my clients.

      Very truly yours,

      STEVEN W. MURRAY

SWM:hd
cc: Mike Cosley
    E. Rich Hurst, Esq.



## KAYE, ROSE & PARTNERS, LLP
### ATTORNEYS AT LAW

1801 Century Park East, Suite 1500
Los Angeles, CA 90067-2302
TEL (310) 551-6555 • FAX (310) 277-1220
E-MAIL la@kayerose.com

December 1, 2011

**VIA MAIL & FACSIMILE (818) 710-1200**

Rich Hurst, Esq.
Shapero, Shapero & Hurst
5950 Canoga Avenue, Suite 404
Woodland Hills, CA 91367

     Re:   *William Overholt v. Americraft Constructors, Inc.*
            Case No: SC112542; Better Business Bureau Arbitration
            <u>Our Ref. No.: OVE1.002</u>

Dear Mr. Hurst:

     As you know, our firm represents William Overholt in the above-referenced matter against Americraft Constructors, Inc. Mr. Overholt has sustained significant damages as a result of Americraft Constructors' negligence and breach of contract. Although we are prepared to proceed with litigation, we believe it would be in the best interests of all parties to make one last attempt to settle this matter before proceeding forward. Both parties have incurred costs and attorney's fees so far, and these fees will no doubt increase going forward.

     Accordingly, demand is hereby made that Americraft Constructors immediately settle this matter. At this time we are authorized to settle this matter for $189,000. This offer will remain open for fifteen (15) days until the close of business on December 15, 2011 at 5:00 p.m., at which point it will expire. If this offer is accepted our client would of course provide a full release of all claims. We consider this offer to be very reasonable and note it is far less than the amount demanded in the Complaint. However, should your client not accept this offer, our client will incur additional attorney's fees going forward and the amount demanded will increase accordingly. Should this matter not settle we will seek the full amount of damages in this action including costs and attorney's fees, the sum of which will surely exceed this amount substantially. We ask that you communicate acceptance in writing and look forward to your prompt response.

                    Very truly yours,

                    KAYE, ROSE & PARTNERS, LLP

                    Daniel F. Berberich

SAN DIEGO
402 West Broadway, Suite 1300
San Diego, CA 92101-3542
TEL (619) 232-6555 • FAX (619) 232-6577

SAN FRANCISCO
425 California Street, Suite 2025
San Francisco, CA 94104-2213
TEL (415) 433-6555 • FAX (415) 433-6577

EXHIBIT I



CLAUSEN MILLER P.C.   CLAUSEN MILLER L.L.P.   CLAUSEN MILLER EUROPE
CHICAGO, IL          LONDON, ENGLAND          Clausen Miller P.C.
IRVINE, CA                                    Clausen Miller L.L.P., LONDON
NEW YORK, NY                                  Teaud-Lambard-Juni & Associés, PARIS
PARSIPPANY, NJ                                Studio Legale Carpi, ROME
SAN FRANCISCO, CA                             van Cutsem-Wittamer-Marnef & Partners, BRUSSELS
WHEATON, IL
SHANGHAI, CHINA

*Attorneys at Law*          2040 Main Street, Suite 500 • Irvine, CA 92614 • www.clausen.com
                                          Tel: 949.260.3100 • Fax: 949.260.3190
                                                            Alec M. Barinholtz
                                                     Direct Line: (949) 260-3116
                                                 E-Mail: abarinholtz@clausen.com

December 14, 2011

**BY EMAIL AND U.S. MAIL**

Steven W. Murray, Esq.
14930 Ventura Boulevard, Suite 250
Sherman Oaks, CA 91403

      Re:    <u>Overholt v. Americraft Constructors, Inc. d/b/a/ American Craftsman</u>,
           Los Angeles County Superior Court Case No. SC112542
           Insureds:       American Constructors, Inc. dba:  American
                                Craftsman (2009-2010 Policy); and
                                Americraft Constructors, Inc. dba:  American
                                Craftsman Restoration (2010-2011 Policy)
           Claimant:      William Overholt
           Policy Numbers:  ERA5KCM09, June 7, 2009 to June 7, 2010
                                ERA5KCM10, June 7, 2010 to June 7, 2011
           Claim No.:     ER0900029387

Dear Mr. Murray:

        This letter is written in response to your letter dated December 2, 2011.
Your letter forwarded a copy of a December 1, 2011 settlement demand from plaintiff's
counsel in the above-referenced matter ("subject action") to Rich Hurst, defense counsel
to your client, Americraft Constructors, Inc. dba American Craftsman Restoration
("American Craftsman").  Your letter requested that Aspen Specialty Insurance Company
("Aspen") either accept the demand or negotiate a settlement on behalf of American
Craftsman.

        Aspen respectfully must decline your request.

        As you know, Aspen declined coverage for this claim by a letter dated June
16, 2011, a copy of which is enclosed for your reference.  Aspen advised that if there

Steven W. Murray, Esq.
December 14, 2011
Page 2

were any additional facts or documents that may have a bearing on its coverage determination, American Craftsman should provide them immediately.

By a letter dated July 1, 2011, Mr. Hurst requested that Aspen reconsider its coverage position. Although Mr. Hurst's letter disputed Aspen's coverage determination, it did not provide any additional facts or documents for Aspen's further consideration.

By a letter dated July 27, 2011, we provided Aspen's response to Mr. Hurst's letter, a copy of which is enclosed for your reference. Our letter analyzed and responded to each point raised in Mr. Hurst's July 1, 2011 letter. Our letter also noted that despite our express invitation to American Craftsman to provide any additional information or documentation that it believed might bear on Aspen's coverage determination, none was provided. Based on the information that was provided to Aspen to date, and following Aspen's further review and consideration of this matter, we advised that it remained Aspen's determination that there was no potential for coverage under the subject policies and, therefore, Aspen had no duty to defend or to indemnify American Craftsman in connection with the claims asserted in plaintiff's original complaint in the subject action. We again invited Mr. Hurst and/or American Craftsman to bring to our attention any additional facts or documentation bearing on Aspen's coverage determination.

To date, Aspen has not been provided with any additional facts or documentation. Accordingly, no change in Aspen's earlier coverage determination is warranted at this time. Because Aspen has no duty to defend or indemnify American Craftsman with respect to the claims asserted in the original complaint in the subject action, Aspen respectfully declines your request that it negotiate and/or fund a settlement on behalf of American Craftsman.

We wish to remind you that Aspen's coverage determination is based on the facts and analysis set forth in our letters dated June 16, 2011 and July 27, 2011. We also again invite you and/or American Craftsman to immediately provide us with any additional facts or information that you believe bears on Aspen's coverage determination. If there have been any amended pleadings filed in the subject action, please also immediately provide them. In the meantime, Aspen continues to reserve all of its rights under the subject policies and applicable law. Accordingly, nothing contained herein and nothing omitted from this letter should be construed by you or American Craftsman as a waiver of any of Aspen's rights.

Steven W. Murray, Esq.
December 14, 2011
Page 3

        Please do not hesitate to contact me if you would like to discuss any of these matters further.

                    Very truly yours,

                    CLAUSEN MILLER P.C.

                    Alec M. Barinholtz

/amb

Enclosures

cc:    Michael Uzenski, Aspen Specialty Insurance Company (By Email; w/encl.)



No. BCA Case # 836

## IN MATTER OF THE ARBITRATION
### Of

William Overholt

*Claimant*

v.

Americraft Constructors, Inc.

*Respondent*

Paul D. Loreto, Arbitrator

## REASONS FOR DECISON

**Appearances:**

TIMOTHY R. LEE- Bar No. 110846
LAW OFFICES OF TIMOTHY R. LEE
11900 West Olympic Boulevard, Suite 680
Los Angeles, California 90064
Attorneys for Claimant WILLIAM OVERHOLT

E. RICH HURST - Bar No. 176614
SHAPERO, SHAPERO & HURST
A Partnership of Professional Corporations
5950 Canoga Ave., Suite 404
Woodland Hills, California 91367-5060
Attorneys for Respondent Americraft Constructors, Inc.



# Background

## Hearing Held

The hearing in this matter was held in the Reseda office of the Business Consumer Alliance over the period December 17 through 20, 2013.

## Jurisdiction

The Emergency Work Authorization between American Craftsman Restoration and William Overholt dated August 8, 2008 contains a Section entitled DISPUTE RESOLUTION which states in part:

Any controversy or claim arising out of or related to this Agreement which is over the dollar limit of the Small Claims Court must be settled by binding arbitration in Los Angeles County, California in accordance with the uniform rules for Better Business Bureau Arbitration. Judgment upon award may be entered in any Court having jurisdiction thereof.

The Business Consumer Alliance is the successor to the Better Business Bureau for purposes of this agreement. Thus, there is jurisdiction to resolve this dispute according to the terms stated in the Business Consumer Alliance Agreement to Arbitrate signed on behalf of the parties dated May 17, 2013.

## Positions of the Parties

The Business Consumer Alliance Agreement states in the Nature of the Dispute section the basic position of the parties which was further developed in detail during the arbitration hearing and two post-arbitration briefs.

### Initiator/Claimant

Dr. Overholt hired AMERICRAFT CONSTRUCTORS, INC. d/b/a AMERICAN CRAFTSMAN (ACR) in August 2008 to perform restoration and mold prevention/ remediation work on his residence resulting from water damage and possible mold growth from an air conditioner leak. Dr. Overholt contends that ACR was negligent, breached its contract or was legally culpable in some fashion for work performed arising out of the air conditioner leak. As a result of ACR to properly perform the work the residence failed a mold inspection which resulted in a loss of $ 150,000 due to the cancelled sale of the residence and other carrying costs. Dr. Overholt contended in the Agreement to Arbitrate that he is entitled to $

2

211,887.18 from Americraft which was later reduced to $ 198,785.28 in the post-arbitration brief.

**Respondent**

AMERICRAFT CONSTRUCTORS, INC. d/b/a AMERICAN CRAFTSMAN (ACR) contends that the claimant's claims are without merit and ACR written scope of work expressly excluded mold remediation or investigation beyond a limited area. Further, ACR contends that the claimant has released ACR for all "pre-existing microbial contamination." ACR also contends that it did not cause the loss of the sale of the residence, the loss of the sale is speculative and the sale could have been made with minimal remediation by the claimant.

## Testimony

The following witnesses testified in detail during the hearing and each party had the opportunity to cross-examine and re-direct each of the witnesses:

Susan Montgomery, Real Estate Agent/Broker

Dr. William Overholt, homeowner

Roger Garrison, Building Cleaning Services (BCS)

Mile Cosley, ACR

## Documentary Evidence

The claimant presented 42+ exhibits prior to the testimony and respondent submitted 25+ exhibits.

## Briefs

The clamant and respondent each submitted a brief prior to the arbitration hearing, a post-hearing brief and a post-hearing reply brief.

Opinion

## Measure of Damages for Negligent Defective Performance

Since the measure of damages resulting from negligent defective performance by ACR is a key issue and its resolution resolves several other issues I will discuss it first. The claimant's largest element of damages is the difference between the sale price of the October 2008 sale which was cancelled and the February 2009 sale which was completed and the carrying costs of the property in the interim.

Respondent ACR contends that the case of SAFECO INSURANCE COMPANY OF AMERICA et al., Plaintiffs and Appellants, v. J & D PAINTING et al., Defendants and Respondents. (1993) 17 Cal.App.4th 1199 21 Cal. Rptr.2d 903 is the controlling authority. Claimant Dr. Overholt contends that the *Safeco* case is distinguishable from the present matter because unlike in this matter there was no specific sale contract in the *Safeco* case. Dr. Overholt contends that ACR's negligence was the proximate cause of the cancellation of the sale to the Mays and he is entitled to the diminution in value between the ultimate sale in February 2009 and the cancellation of the Mays sale in October 2008 and related carrying costs between these dates.

In *Safeco* the defendant painter negligently caused a fire at a home insured by Safeco. The appellant alleged that during the time it took to repair the home the property value declined $ 300,000 and additional mortgage and interest payments were incurred. Safeco claimed that the defendant was responsible for the damages based on a negligence theory. The court stated at p. 1203 the general rules as follows:

> As a general rule, a plaintiff in a suit for negligent damage to real property is allowed to recover either the cost of repair or the diminution in value, but not both. (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal. App.3d 565, 576 [136 Cal. Rptr. 751].) It clearly makes sense to allow only one measure of recovery. "A plaintiff in a tort action is not, in being awarded damages, to be placed in a better position than he would have been had the wrong not been done." (*Valdez* v. *Taylor Automobile Co.* (1954) 129 Cal. App.2d 810, 821-822 [278 P.2d 91]; *Christiansen* v. *Roddy* (1986) 186 Cal. App.3d 780, 789-790 [231 Cal. Rptr. 72]). Allowing both measures of recovery would generally violate this principle.

4

The appellant in Safeco sought a recovery where the diminution in value exceeded the cost of repair based on a theory that if the cost of repair is allowed when it exceeds the diminution in value, diminution in value should be allowed when it exceeds the cost of repair. The court noted that the appellant conceded that no cases authorize this exception. The Appellant based it's contention on Civil Code section 3333, which states: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." The Court noted that although the decline in value was not speculative and could be measured, the rule that appellant asked the court to adopt did not fit into the underlying tort doctrines.

The Court at pp. 1204-1205 concluded:

> The rule for recovery in tort has never rested solely on "but for" causation (cause in fact), but has also been based on proximate cause. Thus, Civil Code section 3333 mandates recovery not simply for all detriment caused by defendant's negligence, but for all detriment *proximately caused* thereby. The wording of the statute is manifestly designed to make the trier of fact focus closely on the issue of proximate cause.

> A superseding cause utterly unrelated to the defendant's negligence breaks the chain of proximate causation and is a bar to recovery. "'Liability cannot be predicated on a prior and remote cause which merely furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, even though the injury would not have resulted but for such condition or occasion; ....'" (*Schrimscher* v. *Bryson* (1976) 58 Cal. App.3d 660, 664 [130 Cal. Rptr. 125], quoting 65 C.J.S. (1966) Negligence, § 111(4), p. 1213.) Although appellant might have sold his house at a high price but for respondent's negligence, the decline in the market bore no relation whatsoever to the acts of respondent. Respondent's negligence, if such there was, was merely the condition or occasion for the market decline to affect appellant's house.

> In assessing proximate cause, courts also look to the foreseeability of the superseding cause of injury. (*Johnson* v. *Union Furniture Co.* (1939) 31 Cal. App.2d 234 [87 P.2d 917].) It can hardly be said that

5

respondent should have foreseen the steep decline that has occurred in California real estate values.

The fact that in this matter the claimant had a real estate contract[1] and incurred holding costs while another buyer was located does not in my opinion avoid the rationale of the Safeco case. The fact remains that although the claimant could have sold the house at a higher price but for the ACR negligence, the decline in the market bore no relationship to the negligence of ACR but such negligence as in the *Safeco* case was merely the condition for the market decline to affect the claimant's house. As the court in *Safeco* discussed above, a superseding cause unrelated to the defendant's negligence breaks the chain of proximate causation and any liability cannot be predicated on a prior and remote cause which merely furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, even though the injury would not have resulted but for such condition or occasion. As a result the decline in the market bore no relation whatsoever to the acts of ACR. ACR's negligence was merely the condition or occasion for the market decline to affect claimant's house. This reasoning is not affected by the fact that there was a contract for sale.

In addition, in Safeco the ruling was predicated on a proximate cause analysis since, as noted, the court concluded that the decline in market value could be calculated and was not speculative. A careful reading of the *Safeco* case reveals that the result would not be any different even if a specific contract for sale had existed. The Court made it very clear that

[1] Whether or not the contract to sell the claimant's home is a binding contract for purposes of this issue is problematic since the buyer could [and did] cancel the contract without specifying a reason. (See exhibit 104 and 108). The Mays did not state in the documentation a reason for cancellation of the sale. There was hearsay testimony that the sale was cancelled due to discovery of mold. However, there was evidence in the MIS report to the Mays (exhibit 107, p.4 of 12) that there were water stains upstairs in the ceiling area where ACR did not do any work and concerns related to the exterior of the structure. Since the Mays did not testify it is unclear as to whether the sale was cancelled due to the attic issue, the structure issues, the bonus room issues or all of them. Since the Safeco case holds that ACR was not the proximate cause of the market decline and the measure of damages in this type of a case is the cost of repair, these interesting issues do not need to be addressed.

despite a "but for" cause in fact analysis the painter was not proximate cause of the decline in the market and therefore not liable for the lost profit. In other words, the fact that there was a contract for sale to the Mays is a distinction without a difference.

Therefore, I conclude that the measure of damages in this matter is the cost of repair. As a result, the issues related to the sale to the Mays such as misrepresentation and failure to disclose are moot.

## Negligence

Since I have concluded that the measure of damages is the cost of repair, the next issue I need to decide is whether or not ACR's work resulted in liability for these costs of repair. The claimant contends that ACR negligently performed its work in August 2008 which resulted in mold being discovered in October 2008 when the home was conditionally sold to the Mays.

The key issue is whether or not ACR's work fell below the standard of care of a reasonable contractor in the same position as ACR. First, ACR as testified to by Mr. Cosley holds itself out as an expert in water damage cleanup and mold remediation. Dr. Overholt on the other hand is not an expert in water damage and hired ACR because they were the experts. Dr. Overholt placed no restrictions on the work performed by ACR. The evidence showed that Dr. Overholt did whatever was recommended to maintain the property and paid all invoices promptly.

After a review of all the documents and detailed testimony some of which is conflicting I conclude that the claimant has established by a preponderance of the evidence that ACR did not meet the applicable standard of care in relation to the dry out and mold remediation of the bonus room/HVAC closet. Mr. Garrison of BCS testified that ACR in several instances did not follow the mold to its source and properly eradicate it. He confirmed mold was present in the HVAC closet, carpet tack strips along the north wall and in the nook area. He testified that the carpet pad had been replaced but not the moldy wooden tack strips and water stained carpet. Mr. Garrison testified that ACR effectively dried out the HVAC closet but did not effectively identify or eradicate the mold that was likely already present.

ACR attacks these findings and opinions by stating that Mr. Garrison is not a qualified expert in mold investigation and remediation. While Mr.

7

Garrison does not have the resume credentials of Mr. Cosley, I find his testimony to be credible on the issue of mold in the bonus room/HVAC closet due to the work of ACR. Mr. Garrison inspected the residence after mold was confirmed in the bonus room /HVAC closet areas. He then supervised the remediation. On the other hand, Mr. Cosley was not involved in the dry out and remediation at the Dr. Overholt residence. The ACR technicians who performed the work did not testify. One of these technicians continues to work for ACR.  BAJI Jury Instruction 203 states:

> You may consider the ability of each party to provide evidence. If a party provided weaker evidence when it could have provided stronger evidence, you may distrust the weaker evidence.

Since Mr. Garrison was present and supervised the actual work and ACR did not provide any testimony of the technicians who worked on the Dr. Overholt home I conclude that the claimant has met its burden of proof on the negligence issue related to the bonus room/HVAC closet. I find that the testimony of Mr. Garrison was credible and established that the work performed by ACR did not met the standard of care of a contractor in a similar position to ACR.

Whether or not the mold readings in the upstairs hallway were directly related to the ACR work is not clear. As noted by Mr. Cosley, the final tests indicating this area was clean did not comply with the testing protocols since the air scrubbers were not turned off the required amount of time before the test. Since no remediation was performed in the attic area, this issue does not affect the amount of damages except for the damage element related to the cost of the test itself.

## Breach of Contract

The claimant also asserts that ACR breached its contract with Dr. Overholt. The fact that Dr. Overholt asserts a breach its contract against ACR does not relieve ACR from tort liability for negligently performing the services for which it contracted.

Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequently damages beyond the expectations of the parties are not recoverable. (Civ. Code, § 3300; Mitchell v. Clarke (1886) 71 Cal. 163 [11 P. 882]; Brandon & Tibbs v. George Kevorkian Accountancy Corp. (1990) 226 Cal. App.3d 442, 455-456 [277 Cal. Rptr. 40]; Menodoyoma, Inc. v. County

8

of Mendocino (1970) 8 Cal. App.3d 873, 879 [87 Cal. Rptr. 740] [applying the rule of Hadley v. Baxendale (1884 Ex.) 156 Eng.Rep. 145 to contract damages recoverable under Civ. Code, § 3300].

Here the contract entitled "Emergency Work Authorization" was for ACR to "furnish cleaning and restoration materials and to perform all labor necessary to preserve and protect said property from further damage." Even if ACR breached its contract to preserve and protect the property by its failure to discover and remediate mold in the bonus room/HVAC closet any consequential damages related to a decline in the market value caused by a housing bubble bursting was not within the contemplation of the parties and as explained above are not recoverable for breach of contract. Although tort damages can be recovered for negligent work performed, diminution in value due to a decline in the real estate market as discussed above is not a recoverable damage. Therefore the recoverable damages in this matter are the costs of repair under either a breach of contract theory or a tort theory.

## Exculpatory Clause/Limitation of Liability

The contract between Dr. Overholt and ACR contains the following exculpatory clause which states:

"PRE-EXISTING MICROBIAL CONTAMINATION: Owner/agent acknowledges and agrees that ACR will not be held liable nor will owners seek to hold ACR liable for visible and/or unseen mold that may exist at the premises. Owner/agent acknowledges that ACR is not retained to perform mold remediation or investigation. Owner/agent acknowledges that any mold issues must be addressed directly with the insurance company or a certified environmental testing company."

The claimant contends that this clause does not bar a recovery for damages [as permitted by law] incurred by Dr. Overholt. ACR asserts that this clause is clear and is enforceable. The claimant states that the clause is clear but that an ambiguity is created by additional provisions of the contract in which ACR agreed to perform limited mold remediation[less than ten square feet]. The claimant cites several Civil Code sections related to interpretation of contacts in support of its position.

First, as noted by the claimant, ACR did identify and complete less than ten square feet of mold remediation.  Thus this boilerplate contract language was inconsistent with the actual work performed. In addition, since ACR were the experts in water damage and mold remediation they were in the best position to advise Dr. Overholt as what mold remediation was

9

necessary to prevent further damage to the home as specified in the contract.

Second, California in the case of Tunkl v. Regents of the Univ. of California, (1963) 60 Cal.2d 92 (1963), 383 P.2d 441, 32 Cal. Rptr. 33 has held that for certain types of contracts exculpatory clauses are not enforceable for negligent harm causing behavior. The Court in *Tunkl* discussed this issue in detail as follows at pp.98-101:

> If, then, the exculpatory clause which affects the public interest cannot stand, we must ascertain those factors or characteristics which constitute the public interest....
>
> In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. [Citation omitted]The party seeking exculpation is engaged in performing a service of great importance to the public, [Citation omitted] which is often a matter of practical necessity for some members of the public. [Citation omitted]The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards [Citation omitted] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [Citation omitted] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, [Citation omitted] and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [Citation omitted] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, [Citation omitted] subject to the risk of carelessness by the seller or his agents.
>
> While obviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, the above circumstances pose a different situation. In this situation the releasing party does not really acquiesce voluntarily in the contractual shifting of the risk, nor can we be reasonably certain that he receives an adequate consideration for the transfer. Since the service is one which each member of the public, presently or potentially, may find essential to him, he faces, despite his economic inability to do so, the prospect of a compulsory

assumption of the risk of another's negligence. The public policy of this state has been, in substance, to posit the risk of negligence upon the actor; in instances in which this policy has been abandoned, it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer.

ACR is a licensed entity which affects the public interest. In this water damage dry out emergency situation ACR is in the stronger bargaining situation, and has control of the premises for purposes of preserving and protecting the property from further damage. Thus ACR falls within the criteria sated in *Tunkl*. Therefore to absolve ACR of negligence and to shift the risk of failure to properly investigate and remediate a mold situation to the homeowner is not consistent with California law as noted in the *Tunkl* case. As a result I decline to use the Exculpatory clause as a bar to the claimant's recovery of the cost of repair.

## Damages

As noted above I have concluded that the measure of damages in this matter is the cost of repair.

Dr. Overholt seeks repair costs totaling **$ 12,587** consisting of the following:

Palisades Heating's original work was damaged. It was repaired by Palisades Heating at a cost of **$2,850.00.**

BCS remediated the mold at a cost of **$5,250.00**
11-03-08- $470.00
11-06-08- $ 3,250.00
11-11-08-$ 980.00
11-18-08-$ 550.00

As a result of ACR'S negligently performed work, the Air Ducts had to be cleaned. The cost of the air duct cleaning was **$1,475.00.**

MIS performed testing to identify the source of the mold and performed testing to determine that the mold was removed at a cost of **$1,188.00**
October 31, 2008 $483.00
November 10, 2008 $705.00

Painting and carpet **$1,824.00**

I will allow the following damages;

11

BCS remediation of the mold at a cost of **$5,250.00**
Palisades Heating's damaged work repair; **$2,850.00**
The MIS test of October 31, 2008; **$483.00**

The total awarded damages for the cost of repair is **$ 8,583.00**

I have agreed to award as the cost of repair the repair costs of Palisades Heating in the amount of **$2,850.00**. Although this amount was the work of Palisades Heating the work was required because further remediation was necessary due to work of ACR. Palisades Heating was not a water damage repair or mold remediation entity. The BCS remediation work in the amount of **$5,250.00** would not have been necessary if the repairs of ACR in August 2008 had been performed properly. The first MIS report of October 31, 2008 is a necessary cost of repair expense.

I decline to award the amount of **$1,824.00** for the painting and carpeting since the cost of the carpet is a replacement cost which would have been the responsibility of the homeowner even if the work of ACR had been performed correctly. The air duct cleaning is also not part of the cost of repair since there is no evidence that the work performed in the bonus room/HVAC closet could have entered the air ducts. Finally, the final MIS test as noted earlier was not performed according to the proper testing protocol and is not a reasonable recoverable cost of repair.

## Conclusion

After a careful review of parties' excellent and detailed presentation of the evidence and briefs, I conclude for the reasons stated that the accompanying Arbitration Award is a fair and equitable resolution of this matter based on the facts and the law presented.


Dated: 2/12/14                    s/Paul D. Loreto
                                  Paul D. Loreto, Arbitrator

12

CM-010

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):* | **FOR COURT USE ONLY** |

Steven J. Shapero
Steven J. Shapero
Shapero, Shapero & Hurst
5950 Canoga Avenue, Suite 404
Woodland Hills, CA 91367
TELEPHONE NO.: (818) 710-1200   FAX NO.: (818) 710-1447
ATTORNEY FOR *(Name):* American Craftsman Restoration

**FILED**
Superior Court Of California
County of Los Angeles

FEB 03 2015

Sherri R. _____ Executive Officer/Clerk
By _____, Deputy
Judi Lara

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central District

CASE NAME:  ACR vs. Aspen Specialty Insurance Company

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: BC 571410 |
|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[X] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify):*
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: February 2, 2015
Steven J. Shapero
(TYPE OR PRINT NAME)                          ► _____ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET**  Legal Solutions ® Plus  Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach—Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case—Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief from Late Claim
Other Civil Petition

| SHORT TITLE: ACR vs. Aspen Specialty Insurance Company | CASE NUMBER | BC 5 7 1 4 1 0 |
|---|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES  CLASS ACTION? [ ] YES  LIMITED CASE? [ ] YES  TIME ESTIMATED FOR TRIAL 10 [ ] HOURS/ [X] DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

### Applicable Reasons for Choosing Courthouse Location (see Column C below)

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | [ ] A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | [ ] A6070 Asbestos Property Damage | 2. |
| | | [ ] A7221 Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210 Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | [ ] A7240 Other Professional Health Care Malpractice | 1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | [ ] A7250 Premises Liability (e.g., slip and fall) | 1., 4. |
| | | [ ] A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | [ ] A7270 Intentional Infliction of Emotional Distress | 1., 3. |
| | | [ ] A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

| SHORT TITLE: ACR vs. Aspen Specialty Insurance Company | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☒ A6015  Insurance Coverage (not complex) | 1.,②. 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation     Number of parcels _____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F  Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 2 of 4

| SHORT TITLE: ACR vs. Aspen Specialty Insurance Company | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2., 9. |
| | | ☐ A6160 Abstract of Judgment | 2., 6. |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment | 2., 3., 9. |
| | | ☐ A6123 Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190 Election Contest | 2. |
| | | ☐ A6110 Petition for Change of Name | 2., 7. |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100 Other Civil Petition | 2., 9. |

 

| SHORT TITLE: ACR vs. Aspen Specialty Insurance Company | CASE NUMBER |
| --- | --- |

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case. | ADDRESS: 26074 Avenue Hall, Suite 10 |
| --- | --- |
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | |

| CITY: Valencia | STATE: CA | ZIP CODE: 91355 | |
| --- | --- | --- | --- |

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk</u> courthouse in the <u>Central</u> District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: <u>February 2, 2015</u>

(SIGNATURE OF ATTORNEY/FILING PARTY)

Steven J. Shaper

## PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* COMPANY, a business entity of unknown origin; ASPEN SPECIALTY INSURANCE MANAGEMENT CO., a business entity of unknown nature; ASPEN SPECIALTY INSURANCE SOLUTIONS LLC, a California Limited Liability Company; and DOES 1 through 100, inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:** AMERICRAFT
*(LO ESTA DEMANDANDO EL DEMANDANTE):* CONSTRUCTORS, INC., dba AMERICAN CRAFTSMAN RESTORATION, a California corporation; MICHAEL J. COSLEY, an individual.

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

FEB 03 2015

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 o más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | CASE NUMBER: (Número del Caso): BC 571410 |
|---|---|

The name and address of the court is:
(El nombre y dirección de la corte es):
Stanley Mosk Courthouse
111 N. Hill Street
Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
E. Rich Hurst                    (818) 710-1200  (818) 710-1447
Steven J. Shapero
Shapero, Shapero & Hurst
Woodland Hills, CA 91367

DATE                          SHERRI R. CARTER by      Judi Lara          , Deputy
(Fecha)                                  (Secretario)                    (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons. (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of (specify):
3. [X] on behalf of (specify): Aspen Specialty Insurance Company, a business entity of unknown origin

   under: [ ] CCP 416.10 (corporation)      [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
          [X] other (specify): Business entity, form unknown

4. [ ] by personal delivery on (date)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

SUMMONS

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

**STIPULATION – EARLY ORGANIZATIONAL MEETING**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lasuperiorcourt.org** under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
   (INSERT DATE)                                        (INSERT DATE)
   complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lasuperiorcourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE (NON-CLASS ACTION)
Case Number _____

**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**

BC 5 7 1 4 1 0

Your case is assigned for all purposes to the judicial officer indicated below . There is additional information on the reverse side of this form.

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM | |
|---|---|---|---|---|---|---|
| Hon. Kevin C. Brazile | 1 | 534 | Hon. Mitchell L. Beckloff | 51 | 511 | |
| Hon. Barbara A. Meiers | 12 | 636 | Hon. Susan Bryant-Deason | 52 | 510 | |
| Hon. Terry A. Green | 14 | 300 | Hon. Steven J. Kleifield | 53 | 513 | |
| Hon. Richard Fruin | 15 | 307 | Hon. Ernest M. Hiroshige | 54 | 512 | |
| Hon. Rita Miller | 16 | 306 | Hon. Malcolm H. Mackey | 55 | 515 | |
| Hon. Richard E. Rico | 17 | 309 | Hon. Michael Johnson | 56 | 514 | |
| Hon. Stephanie Bowick | 19 | 311 | Hon Rolf M. Treu | 58 | 516 | |
| Hon Dalila Corral Lyons | 20 | 310 | Hon. Michael L. Stern | 62 | 600 | |
| Hon. Robert L. Hess | 24 | 314 | Hon. Mark Mooney | 68 | 617 | |
| Hon. Yvette M. Palazuelos | 28 | 318 | Hon. William F. Fahey | 69 | 621 | |
| Hon. Barbara Scheper | 30 | 400 | Hon. Suzanne G. Bruguera | 71 | 729 | |
| Hon. Samantha Jessner | 31 | 407 | Hon. Ruth Ann Kwan | 72 | 731 | |
| Hon. Mary H. Strobel | 32 | 406 | Hon. Rafael Ongkeko | 73 | 733 | |
| Hon. Michael P. Linfield | 34 | 408 | Hon. Teresa Sanchez-Gordon | 74 | 735 | |
| Hon. Gregory Alarcon | 36 | 410 | | | | |
| Hon. Marc Marmaro | 37 | 413 | | | | |
| Hon. Maureen Duffy-Lewis | 38 | 412 | | | | |
| Hon. Elizabeth Feffer | 39 | 415 | | | | |
| Hon. Michelle R. Rosenblatt | 40 | 414 | | | | |
| Hon. Holly E. Kendig | 42 | 416 | | | | |
| Hon. Mel Red Recana | 45 | 529 | | | | |
| Hon. Frederick C. Shaller | 46 | 500 | **Hon. Emilie H. Elias** | **324** | **CCW** | |
| Hon. Debre Katz Weintraub | 47 | 507 | **\*Provisionally Complex Non-Class Action Cases** | | | |
| Hon. Elizabeth Allen White | 48 | 506 | Assignment is Pending Complex Determination | 324 | CCW | |
| Hon. Deirdre Hill | 49 | 509 | | | | |
| Hon. John L. Segal | 50 | 508 | | | | |

**\*Complex**

All non-class action cases designated as provisionally complex are forwarded to the Supervising Judge of the Complex Litigation Program located in the Central Civil West Courthouse (600 S. Commonwealth Ave., Los Angeles 90005), for complex/non-complex determination pursuant to Local Rule 3.3(k). This procedure is for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the outcome of that assessment, the case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record PFB 03 2015   SHERRI R. CARTER, Executive Officer/Clerk

By _____, Deputy Clerk

LACIV CCH 190 (Rev05/14)
LASC Approved 05-06
For Optional Use

NOTICE OF CASE ASSIGNMENT –

UNLIMITED CIVIL CASE

Page 1 of 2

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Three Rules, as applicable in the Central District, are summarized for your assistance.

## APPLICATION

The Chapter Three Rules were effective January 1, 1994.  They apply to all general civil cases.

## PRIORITY OVER OTHER RULES

The Chapter Three Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts.  These matters may be heard and resolved at this conference.  At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

## SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party or if appropriate on counsel for the party.

**This is not a complete delineation of the Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is absolutely imperative.**

LACIV CCH 190 (Rev05/14)
LASC Approved 05-06
For Optional Use

**NOTICE OF CASE ASSIGNMENT –**

**UNLIMITED CIVIL CASE**

Page 2 of 2

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties.  The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:  FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

    It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____   ➤   _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR PLAINTIFF)

Date:

_____   ➤   _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR DEFENDANT)

Date:

_____   ➤   _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR DEFENDANT)

Date:

_____   ➤   _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR DEFENDANT)

Date:

_____   ➤   _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR _____ )

Date:

_____   ➤   _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR _____ )

Date:

_____   ➤   _____
(TYPE OR PRINT NAME)                                    (ATTORNEY FOR _____ )

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:

   ☐   Request for Informal Discovery Conference
   ☐   Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. **For a Request for Informal Discovery Conference, briefly describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, briefly describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

LACIV 094 (new)
LASC Approved 04/11
For Optional Use

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least ____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

## The following parties stipulate:

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date: _____

_____
(TYPE OR PRINT NAME)

➤ (ATTORNEY FOR _____ )

Date: _____

_____
(TYPE OR PRINT NAME)

➤ (ATTORNEY FOR _____ )

Date: _____

_____
(TYPE OR PRINT NAME)

➤ (ATTORNEY FOR _____ )

## THE COURT SO ORDERS.

Date: _____

_____
JUDICIAL OFFICER

Exhibit B

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
    Randolph P. Sinnott, #107301
    rsinnott@spcclaw.com
550 S. Hope St., Suite 2350
Los Angeles, California 90071-2618
Tel.: (213) 996-4200; Fax: (213) 892-8322

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
    Stephen R. Wong, #186187
    swong@spcclaw.com
Two Embarcadero Center, Suite 1410
San Francisco, California 94111
Tel.: (415) 352-6200; Fax: (415) 352-6224

Attorneys for Defendants Aspen Specialty Insurance Company
and Aspen Specialty Insurance Solutions, LLC

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| AMERICRAFT CONSTRUCTORS, INC., dba AMERICAN CRAFTSMAN RESTORATION, a California corporation; and MICHAEL J. COSLEY, an individual,<br><br>      Plaintiffs,<br><br>    vs.<br><br>ASPEN SPECIALTY INSURANCE COMPANY, a business entity of unknown origin; ASPEN SPECIALTY INSURANCE MANAGEMENT CO., a business entity of unknown nature; ASPEN SPECIALTY INSURANCE SOLUTIONS LLC, a California Limited Liability Company; and DOES 1 through 100, inclusive,<br><br>      Defendants. | Case No. BC571410<br><br>**ASPEN SPECIALTY INSURANCE COMPANY'S ANSWER TO COMPLAINT** |

Defendant Aspen Specialty Insurance Company ("ASIC") answers the Complaint of plaintiffs Americraft Constructors, Inc. and Michael J. Cosley ("plaintiffs") as follows:

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL. (213) 996-4200 • FAX (213) 892-8322

## GENERAL DENIAL

1.     Pursuant to California Code of Civil Procedure § 431.30(d), ASIC denies generally and specifically each and every allegation contained in each and every paragraph of the Complaint, and denies that plaintiffs have been damaged in the sum or sums alleged, or in any sum or matter whatsoever by reason of the alleged actions, conduct and/or omissions of ASIC.  ASIC further denies generally that plaintiffs are entitled to the relief they seek.

## AFFIRMATIVE DEFENSES

2.     ASIC asserts the following Affirmative Defenses, without conceding that it bears the burden of proof on any such matter asserted therein.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State A Claim)

3.     Each cause of action in the Complaint fails to state facts sufficient to constitute a cause of action against ASIC.

## SECOND AFFIRMATIVE DEFENSE

### (Claims Precluded by Terms, Conditions, Definitions and Exclusions)

4.     Each cause of action is barred by the terms, definitions, exclusions, conditions and limitations contained in ASIC's policy.

## THIRD AFFIRMATIVE DEFENSE

### (Laches, Waiver, Estoppel and/or Unclean Hands)

5.     Each cause of action is barred, in whole or part, by the equitable doctrines of laches, waiver, estoppel and/or unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

6.     Each cause of action is barred by the applicable statute of limitation.

## FIFTH AFFIRMATIVE DEFENSE

### (Comparative Fault)

7.     At all times mentioned in the Complaint, plaintiffs and others unnamed in

the present action carelessly, recklessly and negligently caused and contributed in some degree to the alleged incident and to the damages and injuries, if any, alleged to have been sustained by plaintiffs, which, therefore, bars any recovery, or in the alternative, reduces the right of recovery by the amount their negligence contributed to this incident under the doctrine of comparative negligence.

## SIXTH AFFIRMATIVE DEFENSE

### (Superseding Cause)

8.     Plaintiffs are barred from any recovery from ASIC, in that any damage proven to have been sustained by plaintiffs was caused by the intervening action or actions of plaintiffs and/or other persons or parties that were a superseding cause of plaintiffs' damages and not due to any act or omission on the part of ASIC.

## SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

9.     Each cause of action is barred to the extent that plaintiffs failed to mitigate, minimize, or avoid whatever damage was allegedly sustained, and any recovery must therefore be reduced by the amount which resulted from that failure.

## EIGHTH AFFIRMATIVE DEFENSE

### (Mold Exclusion)

10.     Plaintiffs' claims are barred in whole or in part to the extent that the insured's purported liability arose from Mold.

## NINTH AFFIRMATIVE DEFENSE

### (Known Condition Exclusion)

11.     Plaintiffs' claims are barred to the extent that they arise from any Loss arising out of a Pollution Condition or Mold that existed prior to the policy period or were known to an insured prior to the policy period.

## TENTH AFFIRMATIVE DEFENSE

### (Expected or Intended Loss Exclusion)

12.     Plaintiffs' claims are barred in whole or in part to the extent that the insured's

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL (213) 996-4200 • FAX (213) 892-8322

BC571410

1 purported liability arose from Loss expected or intended from the standpoint of the

2 insured.

### ELEVENTH AFFIRMATIVE DEFENSE

#### (Fines, Penalties and Multiple Damages Exclusion)

5   13.   Plaintiffs' claims are barred in whole or in part to the extent that the insured's

6 purported liability arose out of fines, penalties or awards for multiple damages assessed

7 against the insured.

### TWELFTH AFFIRMATIVE DEFENSE

#### (Warranty or Guarantee Exclusion)

10   14.   Plaintiffs' claims are barred to the extent they arose from any kind of express

11 warranty or guarantee given on or behalf of an insured.

### THIRTEENTH AFFIRMATIVE DEFENSE

#### (Professional Liability Exclusion)

14   15.   Plaintiffs' claims are barred in whole or in part to the extent that the insured's

15 purported liability arose out professional services rendered or failed to be rendered by the

16 insured or others for whom the insured is legally liable.

### FOURTEENTH AFFIRMATIVE DEFENSE

#### (Contractual Liability Exclusion)

19   16.   Plaintiffs' claims are barred in whole or in part to the extent that the insured's

20 purported liability arose from liability of others assumed by the insured under any contract

21 or agreement.

### FIFTEENTH AFFIRMATIVE DEFENSE

#### (Breach of No Voluntary Assumption of Obligation Condition)

24   17.   Plaintiffs' claims are barred in whole or in part to the extent that an insured

25 breached the no voluntary assumption of obligation condition of ASIC's policy.

### SIXTEENTH AFFIRMATIVE DEFENSE

#### (Other Insurance)

28   18.   Each cause of action alleged against ASIC is barred to the extent that an

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL (213) 996-4200 • FAX (213) 892-8322

4

insured has other valid insurance for the alleged loss.

### SEVENTEENTH AFFIRMATIVE DEFENSE

### (Breach of Notice Condition)

19.     Each cause of action alleged against ASIC is barred to the extent that the insured breached the notice conditions of the ASIC policy.

### EIGHTEENTH AFFIRMATIVE DEFENSE

### (Right to Raise Additional Defenses Based on Ongoing Discovery)

20.     The Complaint does not describe the underlying matter with sufficient particularity to enable ASIC to determine all of its defenses.  ASIC therefore reserves its right to assert all defenses that may be pertinent to the Complaint once the precise nature of such claims is determined.

WHEREFORE, ASIC prays for judgment as follows:

1.     That plaintiffs' Complaint against ASIC be dismissed with prejudice, and plaintiffs take nothing by it;

2.     For ASIC's attorneys' fees and costs; and

3.     For such other and further relief as the Court may deem just and proper.

DATED:  March 13, 2015                    SINNOTT, PUEBLA,
                                          CAMPAGNE & CURET, APLC


                                          By: _____
                                              STEPHEN R. WONG
                                              Attorneys for Aspen Specialty Insurance
                                              Company and Aspen Specialty Insurance
                                              Solutions. LLC

I:\WPDOCS\Aspen\Americraft\Pleadings\Answer.State.ASIC.docx

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL (213) 996-4200 • FAX (213) 892-8322

1

## **PROOF OF SERVICE**

2

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

3

 At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Francisco, State of California. My business address is Two Embarcadero Center, Suite 1410, San Francisco, CA 94111.

4

5

 On March 13, 2015, I served true copies of the following document(s) described as **ASPEN SPECIALTY INSURANCE COMPANY'S ANSWER TO COMPLAINT** on the interested parties in this action as follows:

6

7

| | |
|---|---|
| Steven J. Shapero, Esq. | Attorney for Plaintiff |
| Shapero, Shapero & Hurst | AMERICRAFT CONSTRUCTORS, |
| 5950 Canoga Avenue, Suite 404 | INC., dba AMERICAN |
| Woodland Hills, CA 91367 | CRAFTSMAN RESTORATION |
| Telephone: (818) 710-1200 | |
| Facsimile: (818) 710-1447 | |
| E-Mail: sshapero@shaperohurst.com | |

8

9

10

11

 **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Sinnott, Puebla, Campagne & Curet, APLC's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

12

13

14

15

 I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

16

17

 Executed on March 13, 2015, at San Francisco, California.

18

19

Lena Mason

20

21

22

23

24

25

26

27

28

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
TWO EMBARCADERO CENTER, SUITE 1410
SAN FRANCISCO, CALIFORNIA 94111
TEL (415) 352-6200 • FAX (415) 352-6224

1 | SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
       Randolph P. Sinnott, #107301
2 |        rsinnott@spcclaw.com
550 S. Hope St., Suite 2350
3 | Los Angeles, California 90071-2618
Tel.: (213) 996-4200; Fax: (213) 892-8322
4 |
SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
5 |        Stephen R. Wong, #186187
       swong@spcclaw.com
6 | Two Embarcadero Center, Suite 1410
San Francisco, California 94111
7 | Tel.: (415) 352-6200; Fax: (415) 352-6224

8 | Attorneys for Defendants Aspen Specialty Insurance Company
and Aspen Specialty Insurance Solutions, LLC
9 |

10 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11 | **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

12 |

13 | AMERICRAFT CONSTRUCTORS, INC.,      Case No. BC571410
dba AMERICAN CRAFTSMAN
14 | RESTORATION, a California corporation;  **ASPEN SPECIALTY INSURANCE**
and MICHAEL J. COSLEY, an individual,  **SOLUTIONS, LLC's ANSWER TO**
15 |                        **COMPLAINT**
      Plaintiffs,
16 |
      vs.
17 |
ASPEN SPECIALTY INSURANCE
18 | COMPANY, a business entity of unknown
origin; ASPEN SPECIALTY
19 | INSURANCE MANAGEMENT CO., a
business entity of unknown nature; ASPEN
20 | SPECIALTY INSURANCE SOLUTIONS
LLC, a California Limited Liability
21 | Company; and DOES 1 through 100,
inclusive,
22 |
      Defendants.
23 |

24 |

25 |     Defendant Aspen Specialty Insurance Solutions, LLC ("ASIS") answers the

26 | Complaint of plaintiffs Americraft Constructors, Inc. and Michael J. Cosley ("plaintiffs")

27 | as follows:

28 |

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL (213) 996-4200 • FAX (213) 892-8322

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL (213) 996-4200 • FAX (213) 892-8322

**GENERAL DENIAL**

1.     Pursuant to California Code of Civil Procedure § 431.30(d), ASIS denies generally and specifically each and every allegation contained in each and every paragraph of the Complaint, and denies that plaintiffs have been damaged in the sum or sums alleged, or in any sum or matter whatsoever by reason of the alleged actions, conduct and/or omissions of ASIS.  ASIS further denies generally that plaintiffs are entitled to the relief they seek.

**AFFIRMATIVE DEFENSES**

2.     ASIS asserts the following Affirmative Defenses, without conceding that it bears the burden of proof on any such matter asserted therein.

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State A Claim)**

3.     Each cause of action in the Complaint fails to state facts sufficient to constitute a cause of action against ASIS.

**SECOND AFFIRMATIVE DEFENSE**

**(Claims Precluded by Terms, Conditions, Definitions and Exclusions)**

4.     Each cause of action is barred by the terms, definitions, exclusions, conditions and limitations contained in the policy issued by defendant Aspen Specialty Insurance Company.

**THIRD AFFIRMATIVE DEFENSE**

**(Laches, Waiver, Estoppel and/or Unclean Hands)**

5.     Each cause of action is barred, in whole or part, by the equitable doctrines of laches, waiver, estoppel and/or unclean hands.

**FOURTH AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

6.     Each cause of action is barred by the applicable statute of limitation.

BC571410

## FIFTH AFFIRMATIVE DEFENSE

### (Comparative Fault)

7.     At all times mentioned in the Complaint, plaintiffs and others unnamed in the present action carelessly, recklessly and negligently caused and contributed in some degree to the alleged incident and to the damages and injuries, if any, alleged to have been sustained by plaintiffs, which, therefore, bars any recovery, or in the alternative, reduces the right of recovery by the amount their negligence contributed to this incident under the doctrine of comparative negligence.

## SIXTH AFFIRMATIVE DEFENSE

### (Superseding Cause)

8.     Plaintiffs are barred from any recovery from ASIS, in that any damage proven to have been sustained by plaintiffs was caused by the intervening action or actions of plaintiffs and/or other persons or parties that were a superseding cause of plaintiffs' damages and not due to any act or omission on the part of ASIS.

## SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

9.     Each cause of action is barred to the extent that plaintiffs failed to mitigate, minimize, or avoid whatever damage was allegedly sustained, and any recovery must therefore be reduced by the amount which resulted from that failure.

## EIGHTH AFFIRMATIVE DEFENSE

### (Mold Exclusion)

10.     Plaintiffs' claims are barred in whole or in part to the extent that the insured's purported liability arose from Mold.

## NINTH AFFIRMATIVE DEFENSE

### (Known Condition Exclusion)

11.     Plaintiffs' claims are barred to the extent that they arise from any Loss arising out of a Pollution Condition or Mold that existed prior to the policy period or were known to an insured prior to the policy period.

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL (213) 996-4200 • FAX (213) 892-8322

### TENTH AFFIRMATIVE DEFENSE

#### (Expected or Intended Loss Exclusion)

12. Plaintiffs' claims are barred in whole or in part to the extent that the insured's purported liability arose from Loss expected or intended from the standpoint of the insured.

### ELEVENTH AFFIRMATIVE DEFENSE

#### (Fines, Penalties and Multiple Damages Exclusion)

13. Plaintiffs' claims are barred in whole or in part to the extent that the insured's purported liability arose out of fines, penalties or awards for multiple damages assessed against the insured.

### TWELFTH AFFIRMATIVE DEFENSE

#### (Warranty or Guarantee Exclusion)

14. Plaintiffs' claims are barred to the extent they arose from any kind of express warranty or guarantee given on or behalf of an insured.

### THIRTEENTH AFFIRMATIVE DEFENSE

#### (Professional Liability Exclusion)

15. Plaintiffs' claims are barred in whole or in part to the extent that the insured's purported liability arose out professional services rendered or failed to be rendered by the insured or others for whom the insured is legally liable.

### FOURTEENTH AFFIRMATIVE DEFENSE

#### (Contractual Liability Exclusion)

16. Plaintiffs' claims are barred in whole or in part to the extent that the insured's purported liability arose from liability of others assumed by the insured under any contract or agreement.

### FIFTEENTH AFFIRMATIVE DEFENSE

#### (Breach of No Voluntary Assumption of Obligation Condition)

17. Plaintiffs' claims are barred in whole or in part to the extent that an insured breached the no voluntary assumption of obligation condition of the the policy issued by

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
550 S. HOPE ST., SUITE 2350
LOS ANGELES, CALIFORNIA 90071-2618
TEL. (213) 996-4200 • FAX (213) 892-8322

1  defendant Aspen Specialty Insurance Company.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Other Insurance)

18.     Each cause of action is barred to the extent that an insured has other valid insurance for the alleged loss.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Breach of Notice Condition)

19.     Each cause of action is barred to the extent that the insured breached the notice conditions of the policy issued by defendant Aspen Specialty Insurance Company.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Right to Raise Additional Defenses Based on Ongoing Discovery)

20.     The Complaint does not describe the underlying matter with sufficient particularity to enable ASIS to determine all of its defenses.  ASIS therefore reserves its right to assert all defenses that may be pertinent to the Complaint once the precise nature of such claims is determined.

WHEREFORE, ASIS prays for judgment as follows:

1.     That plaintiffs' Complaint against ASIS be dismissed with prejudice, and plaintiffs take nothing by it;

2.     For ASIS's attorneys' fees and costs; and

3.     For such other and further relief as the Court may deem just and proper.

DATED:  March 13, 2015                SINNOTT, PUEBLA,
                                      CAMPAGNE & CURET, APLC


By: _____
    STEPHEN R. WONG
    Attorneys for Aspen Specialty Insurance
    Company and Aspen Specialty Insurance
    Solutions, LLC

I:\WPDOCS\Aspen\Americraft\Pleadings\Answer.State.ASIS.docx

5                                                    BC571410

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Francisco, State of California. My business address is Two Embarcadero Center, Suite 1410, San Francisco, CA 94111.

On March 13, 2015, I served true copies of the following document(s) described as **ASPEN SPECIALTY INSURANCE SOLUTIONS, LLC'S ANSWER TO COMPLAINT** on the interested parties in this action as follows:

Steven J. Shapero, Esq.         Attorney for Plaintiff
Shapero, Shapero & Hurst     AMERICRAFT CONSTRUCTORS,
5950 Canoga Avenue, Suite 404  INC., dba AMERICAN
Woodland Hills, CA 91367      CRAFTSMAN RESTORATION
Telephone: (818) 710-1200
Facsimile: (818) 710-1447
E-Mail: sshapero@shaperohurst.com

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Sinnott, Puebla, Campagne & Curet, APLC's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 13, 2015, at San Francisco, California.

Lena Mason